## WACHTELL, LIPTON, ROSEN & KATZ

MARTIN LIPTON
HERBERT M. WACHTELL
LAWRENCE B. PEDOWITZ
PAUL VIZCARRONDO, JR.
PETER C. HEIN
HAROLD S. NOVIKOFF
MEYER G. KOPLOW
THEODORE N. MIRVIS
EDWARD D. HERLIHY
DANIEL A. NEFF
ERIC M. ROTH
ANDREW R. BROWNSTEIN
MICHAEL H. BYOWITZ
PAUL K. ROWE
MARC WOLINSKY
DAVID GRUENSTEIN
STEVEN A. ROSENBLUM
STEPHANIE J. SELIGMAN
JOHN F. SAVARESE
SCOTT K. CHARLES
DAVID S. NEILL

JODI J. SCHWARTZ
ADAM O. EMMERICH
GEORGE T. CONWAY III
RALPH M. LEVENE
RICHARD G. MASON
MICHAEL J. SEGAL
DAVID M. SILK
ROBIN PANOVKA
DAVID A. KATZ
ILENE KNABLE GOTTS
DAVID M. MURPHY
JEFFREY M. WINTNER
TREVOR S. NORWITZ
BEN M. GERMANA
ANDREW J. NUSSBAUM
RACHELLE SILVERBERG
STEVEN A. COHEN
DEBORAH L. PAUL
DAVID C. KARP
RICHARD K. KIM
JOSHUA R. CAMMAKER

51 WEST 52ND STREET
NEW YORK, N.Y. 10019-6150
TELEPHONE: (212) 403-1000
FACSIMILE: (212) 403-2000

GEORGE A. KATZ (1965-1989)
JAMES H. FOGELSON (1967-1991)
LEONARD M. ROSEN (1965-2014)

OF COUNSEL

WILLIAM T. ALLEN           PHILIP MINDLIN
PETER C. CANELLOS          ROBERT M. MORGENTHAU
DAVID M. EINHORN           BERNARD W. NUSSBAUM
KENNETH B. FORREST         ERIC S. ROBINSON
THEODORE GEWERTZ           PATRICIA A. ROBINSON*
MAURA R. GROSSMAN          MICHAEL W. SCHWARTZ
RICHARD D. KATCHER         ELLIOTT V. STEIN
THEODORE A. LEVINE         WARREN R. STERN
DOUGLAS K. MAYER           PATRICIA A. VLAHAKIS
ROBERT B. MAZUR            AMY R. WOLF

* ADMITTED IN THE DISTRICT OF COLUMBIA

COUNSEL

DAVID M. ADLERSTEIN        NANCY B. GREENBAUM
AMANDA K. ALLEXON          MARK A. KOENIG
LOUIS J. BARASH            J. AUSTIN LYONS
DIANNA CHEN                ALICIA C. McCARTHY
ANDREW J.H. CHEUNG         SABASTIAN V. NILES
PAMELA EHRENKRANZ          AMANDA N. PERSAUD
KATHRYN GETTLES-ATWA       JEFFREY A. WATIKER
PAULA N. GORDON

MARK GORDON
JOSEPH D. LARSON
LAWRENCE S. MAKOW
JEANNEMARIE O'BRIEN
WAYNE M. CARLIN
STEPHEN R. DiPRIMA
NICHOLAS G. DEMMO
IGOR KIRMAN
JONATHAN M. MOSES
T. EIKO STANGE
DAVID A. SCHWARTZ
JOHN F. LYNCH
WILLIAM SAVITT
ERIC M. ROSOF
MARTIN J.E. ARMS
GREGORY E. OSTLING
DAVID B. ANDERS
ADAM J. SHAPIRO
NELSON O. FITTS
JEREMY L. GOLDSTEIN
JOSHUA M. HOLMES

DAVID E. SHAPIRO
DAMIAN G. DIDDEN
ANTE VUCIC
IAN BOCZKO
MATTHEW M. GUEST
DAVID E. KAHAN
DAVID K. LAM
BENJAMIN M. ROTH
JOSHUA A. FELTMAN
ELAINE P. GOLIN
EMIL A. KLEINHAUS
KARESSA L. CAIN
RONALD C. CHEN
GORDON S. MOODIE
DONGJU SONG
BRADLEY R. WILSON
GRAHAM W. MELI
GREGORY E. PESSIN
CARRIE M. REILLY
MARK F. VEBLEN

Direct Dial: (212) 403-1208
Direct Fax: (212) 403-2208
E-Mail: pvizcarrondo@wlrk.com

June 17, 2014

**BY E-MAIL AND ECF**

Hon. Richard J. Sullivan
United States District Judge
United States District Court
   for the Southern District of New York
500 Pearl Street, Room 640
New York, New York 10007
sullivannysdchambers@nysd.uscourts.gov

      Re: Lehman Brothers Holdings Inc., et al. v.
          JPMorgan Chase Bank, N.A., No. 11-cv-06760

Dear Judge Sullivan,

      We write as counsel to defendant JPMorgan Chase Bank, N.A. ("JPMorgan") to request a pre-motion conference regarding two proposed motions by JPMorgan in this proceeding: (i) a motion to withdraw the bankruptcy reference, and (ii) a motion for summary judgment dismissing the remaining causes of action in the Amended Complaint.[1]

---

[1] We are aware of the Court's rule that letters requesting pre-motion conferences not exceed three pages. Accordingly, we have limited this letter discussing two separate motions to six pages.

The Honorable Richard J. Sullivan
June 17, 2014
Page 2

### Motion to Withdraw the Reference

This is a massive damages action brought by the Lehman Brothers bankruptcy estate seeking to blame JPMorgan for Lehman's bankruptcy filing on September 15, 2008. Based on theories such as fraud, duress, and breach of the implied covenant of good faith and fair dealing, plaintiffs seek to recover more than $7.9 billion in collateral that was transferred to JPMorgan and applied to repay JPMorgan's enormous claims against various Lehman entities, along with billions of dollars in purported consequential damages. Plaintiffs allege that JPMorgan — despite lending over $100 billion *per day* to Lehman at the height of the financial crisis — engaged in tortious, fraudulent, and other egregious conduct by requesting collateral from the failing firm.

JPMorgan previously moved to withdraw the reference of this adversary proceeding in September 2011, arguing that withdrawal was warranted primarily because, under *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the bankruptcy court is not authorized to issue final judgment in this case. In ruling on that motion, this Court agreed that "the bankruptcy court lacks constitutional authority to finally adjudicate at least the majority of Plaintiffs' claims," and that, as a result, "should this matter proceed to trial, [the Court] will likely need to withdraw the entire reference at that time." *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 480 B.R. 179, 192-93, 197 (S.D.N.Y. 2012).

The Court denied the motion to withdraw without prejudice, but invited JPMorgan to seek leave to file a renewed motion "at the summary judgment stage." *Id.* at 198. Since the Court's ruling, the discovery phase of the case has essentially finished. Fact discovery is complete, expert reports have been exchanged, and expert depositions are scheduled to conclude on July 10.

All that remains before trial is the resolution of motions for summary judgment. Thereafter, to the extent that any claims remain in the case, trial must occur in this Court. This is not only because the bankruptcy court lacks constitutional authority to adjudicate plaintiffs' claims, but also because the bankruptcy court is barred by statute from conducting a jury trial absent consent of both parties. 28 U.S.C. § 157(e); *see, e.g., Dev. Specialists, Inc. v. Akin Gump Straus Hauer & Feld LLP*, 462 B.R. 457, 472 (S.D.N.Y. 2011) (holding that jury demand requires withdrawal of the reference for trial). Here, JPMorgan has demanded a jury, and it has not consented to a jury trial in the bankruptcy court. JPMorgan respectfully submits that the interests of judicial economy and efficiency would best be served by withdrawal of the reference at this time, so that summary judgment motions can be decided by the *same* court that will ultimately preside over a trial in the event that any claims remain.

Further, just as any trial and judgment thereon must be had in this Court, so also any pre-trial grant of summary judgment can ultimately only be effectuated by this Court. As described more fully below, JPMorgan intends to move for summary judgment on all of plaintiffs' remaining claims. The bankruptcy court, however, is not capable of granting that relief. If JPMorgan were to prevail, the bankruptcy court could only issue a report and recommendation that this Court must review *de novo* and enter judgment upon, meaning that summary judgment motions will have to be briefed and argued twice before a final judgment may be entered. Given

The Honorable Richard J. Sullivan
June 17, 2014
Page 3

the number of claims and the size of the discovery record, avoiding such duplication is a sound basis to withdraw the reference. *See, e.g., Solutia Inc. v. FMC Corp.*, 2004 WL 1661115, at *3 (S.D.N.Y. July 27, 2004) (granting withdrawal motion to avoid "having two courts administer two rounds of briefing and argument on the same issues"). And if a trial is needed on any claims, it would make little sense for the bankruptcy court to invest significant time on motions for summary judgment only to have the proceeding removed to this Court for trial. *Geron v. Levine (In re Levine)*, 2012 WL 310944, at *4 (S.D.N.Y. Feb. 1, 2012) ("Because the case would . . . be withdrawn from the Bankruptcy Court for the purposes of trial, efficient use of judicial resources counsels in favor of withdrawal before resolution of the summary judgment motions."); *accord Antioch Co. Litig. Trust v. Morgan*, 2012 WL 5845003, at *2 (S.D. Ohio Nov. 19, 2012) ("The Court finds that it makes good sense to withdraw the reference at the close of fact discovery, so that this Court can define the scope of facts and issues to be tried.").[2]

Finally, this Court's decision not to withdraw the reference at an earlier stage was premised in part on the observation that Bankruptcy Judge James Peck had "extensive" involvement "with not only this proceeding but also with the administration of the entire Lehman bankruptcy." 480 B.R. at 195-97. On January 31 of this year, Judge Peck retired. There have been no hearings or conferences in this adversary proceeding before his successor, Judge Shelley Chapman. Moreover, following Judge Peck's dismissal of most of plaintiffs' claims under the Bankruptcy Code, this case is dominated by common-law claims of the type that district courts, rather than bankruptcy courts, address regularly, that do not raise questions involving the specialized expertise of the bankruptcy court, and that are not likely to arise repeatedly in multiple Lehman-related proceedings.[3]

---

[2] JPMorgan recognizes that a district court may refer pre-trial matters to the bankruptcy court for proposed findings and conclusions. *See Exec. Benefits Ins. Agency v. Arkinson*, 2014 WL 2560461, at *7 (U.S. June 9, 2014). But the Court is not required to rely on this practice. *See In re Standing Order of Reference re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.) (bankruptcy court shall submit proposed findings and conclusions "unless otherwise ordered by the district court"). District courts, including in this jurisdiction, can and do exercise their discretion to bypass the report-and-recommendation procedure where, as here, it is most efficient to withdraw the reference. *E.g., Levine*, 2012 WL 310944, at *4; *accord, e.g., LightSquared Inc. v. Deere & Co.*, 2014 WL 345270, at *5 (S.D.N.Y. Jan. 31, 2014); *Dynegy Danskammer, L.L.C. v. Peabody COALTRADE Int'l Ltd.*, 905 F. Supp. 2d 526, 533 (S.D.N.Y. 2012).

[3] While Judge Koeltl recently denied a motion to withdraw the reference in an unrelated Lehman adversary proceeding (*Lehman Bros. Holdings Inc. v. Intel Corp. (In re Lehman Bros. Holdings Inc.)*, 2014 WL 1877937 (S.D.N.Y. May 10, 2014)), the claims in that case involve the closeout of swap transactions with Lehman that are common to a number of similar proceedings that the bankruptcy court is expected to handle. This case, by contrast, involves facts and issues that are unique to the relationship between JPMorgan and Lehman.

The Honorable Richard J. Sullivan
June 17, 2014
Page 4

Efficiency and judicial economy will therefore not be undermined in any way by having summary judgment motions resolved by this Court. And it makes eminent good sense for this Court to consider motions for summary judgment so that it can determine what issues, if any, arising from plaintiffs' twenty-four remaining claims are appropriate for a trial to be held in this Court.

### Motion for Summary Judgment

Characteristic of what Judge Peck described as plaintiffs' "laundry list approach to litigation" (*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012)), the Amended Complaint pleads nearly 50 claims, many of which are aimed at stripping JPMorgan of the cash and securities collateral that LBHI (the Lehman parent) provided to JPMorgan to secure the enormous extensions of credit that JPMorgan was making to LBI, the Lehman broker-dealer, and other Lehman entities. Some of plaintiffs' claims also seek billions of dollars in consequential damages based on the fantastical theory that if JPMorgan had not requested the collateral, then Lehman would have been able to stave off bankruptcy, the dramatic market turmoil of September 2008 would have suddenly subsided, and Lehman could have accomplished extraordinary, unprecedented transactions for the benefit of creditors.

As noted, nearly half of plaintiffs' claims, namely the bankruptcy claims alleging preferential or constructive fraudulent transfer, were dismissed by Judge Peck under the Bankruptcy Code safe-harbor provisions that protect transfers to financial institutions on account of securities contracts and other financial-industry agreements. The claims that remain invoke a host of ill-fitting legal theories that constitute back-door challenges to the same transfers that were the subject of the now-dismissed avoidance claims. They range from claims for breach of the implied covenant of good faith and fair dealing, to claims of coercion and duress, all the way to claims of fraudulent misrepresentations by JPMorgan's Chairman and CEO.

Plaintiffs' pursuit of, and JPMorgan's defense against, these claims has generated an enormous discovery record over the course of more than four years. At the completion of expert discovery in July, that record will consist of nearly 300 fact depositions, 25 expert reports and depositions, and millions of pages of documents. Any trial in this case will be proportionately lengthy — potentially lasting several months — if plaintiffs' claims are not dismissed on summary judgment. But the parties and Court can and should be spared the expense and burden of such an expansive trial, since JPMorgan is entitled to judgment as a matter of law.

Ultimately, the claims remaining in the Amended Complaint boil down to two central contentions: (i) that JPMorgan was contractually obligated to extend credit to Lehman and was contractually barred from conditioning future extensions of credit upon the receipt of additional collateral, and (ii) that it was malevolent or tortious of JPMorgan to seek to ensure that the claims arising out of multi-billion dollar loans it would make to Lehman had priority over the claims of unsecured creditors. Once these contentions are debunked, plaintiffs' case dissolves.

JPMorgan's requests for collateral were made during the days leading up to the worst financial collapse since the Great Depression. It can hardly be disputed that during the

The Honorable Richard J. Sullivan
June 17, 2014
Page 5

week of September 8, 2008, there were grave concerns about Lehman's ability to survive. It also cannot be disputed that during that week, JPMorgan was providing Lehman with more than $100 billion in credit each day, the majority of which financed the daily repurchase by LBI, the U.S. broker-dealer subsidiary, of securities that LBI sold every night in the triparty repo market, and that JPMorgan was also providing billions of dollars a day in additional unsecured credit that facilitated other Lehman operations. JPMorgan continued making these multibillion-dollar daily loans to LBI even after the Lehman parent filed for bankruptcy and it became widely known that LBI's liquidation was imminent. The premise underlying plaintiffs' claims is that JPMorgan was *obligated* to continue to extend tens of billions of dollars of credit to Lehman, even as the financial markets melted down, and even though the extensions of credit were made at JPMorgan's discretion and on a demand basis. From this, plaintiffs urge that JPMorgan acted unlawfully when it allegedly made "threats" to cease these enormous advances absent further credit support.

Each of plaintiffs' numerous claims based on this theory rises and falls on a contractual question, ripe for review on summary judgment: did the parties' operative contract, the 2000 Clearance Agreement, obligate JPMorgan to extend credit? It is plain from the face of the agreement that it did not. To the contrary, the Clearance Agreement does not contain a single word of obligation or commitment to extend credit. Indeed, the Clearance Agreement is not a loan agreement at all, but rather is what its name implies — an agreement for the provision of clearance services, in connection with which JPMorgan had the right to choose to make credit available to Lehman, or not. The Clearance Agreement thus repeatedly states that the decision whether to make credit available was entirely at JPMorgan's discretion, and that any extension of credit JPMorgan did choose to make would be subject to immediate repayment upon demand.

In the face of this clear and unambiguous language in the Clearance Agreement, plaintiffs hang their case on two words. After repeatedly stating that all credit extensions were entirely discretionary, the Clearance Agreement goes on to state that, regardless of any historical practice of providing credit, JPMorgan "may at any time decline to extend such credit at our discretion, with notice." Solely on the basis of the inclusion of the words "with notice," plaintiffs seek to transform the Clearance Agreement from a services contract into a committed line of credit for amounts well over $100 billion per day, until the expiration of some undefined "commercially reasonable" notice period.

Plaintiffs' radical rewriting of the Clearance Agreement — from an agreement expressly vesting JPMorgan with discretion whether to advance short-term credit, payable upon demand, into a committed line of credit from which JPMorgan had no escape — is both at odds with the contract's express language and thoroughly implausible. As will be demonstrated in JPMorgan's motion, claims premised on allegations that JPMorgan could not cease extending credit and that its requests for collateral were improper present no triable issues of fact and judgment should be granted in favor of JPMorgan. *See, e.g., Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 131 (S.D.N.Y. 2013) (summary judgment appropriate in contract action where agreement is unambiguous).

Plaintiffs' other predominant theme is that JPMorgan acted wrongfully in obtaining guaranties and liens for its daily advances to Lehman because doing so allowed JPMorgan to

The Honorable Richard J. Sullivan
June 17, 2014
Page 6

be preferred over unsecured creditors. *See* Am. Compl. ¶ 1 (alleging that "the purpose of these last-minute maneuvers was to leapfrog JPMorgan over other creditors"). The claims based on this contention are nothing more than bankruptcy preference claims dressed up in inflammatory language. But all claims brought under the Bankruptcy Code's preference provision, as well as related claims brought under the constructive fraudulent transfer provision, were dismissed by Judge Peck as barred by the Bankruptcy Code's safe harbors. 469 B.R. at 451.

Lacking those statutory bases on which to recover from JPMorgan — and left only with claims requiring proof of conscious misbehavior — plaintiffs resort to incendiary assertions that JPMorgan acted improperly in seeking to protect itself as Lehman, a borrower of more than $100 billion each day, experienced a dramatic financial decline. But acting upon the goal of being adequately secured to protect its own stakeholders, thus faring better in bankruptcy than unsecured creditors, is not wrongdoing. Even more so, it was not wrongful in this case, where the liens and guaranties at issue were designed to protect JPMorgan's massive extensions of *new* credit each day, including the week following the bankruptcy filing of the Lehman parent company (LBHI). As JPMorgan intends to demonstrate in its motion, even after an exhaustive investigation by a court-appointed examiner that resulted in a 2000-plus page report, and even after four years of nearly boundless discovery in this case, plaintiffs have utterly failed to adduce evidence of actual wrongdoing that would be required to support the claims that remain in the case.

\* \* \* \* \* \*

JPMorgan respectfully requests permission to bring the motions described above, and to submit briefs addressing these matters fully. We are available for a pre-motion conference at the Court's convenience.

Respectfully submitted,

Paul Vizcarrondo, Jr.

CC: Hon. Shelley C. Chapman
Joseph D. Pizzurro, Esq.
Andrew Rossman, Esq.