**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |  |
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiff/Counterclaim-Defendant and Plaintiff Intervenor,<br><br>-against-<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>Defendant/Counterclaimant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 11 Civ. 6760 (RJS) |

## MEMORANDUM OF LAW IN SUPPORT OF JPMORGAN'S MOTION FOR SUMMARY JUDGMENT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Chase Bank, N.A.*

Dated:  September 15, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

TABLE OF CLAIMS ........................................................................................x

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS ............................................................................... 3

ARGUMENT ...................................................................................................7

POINT I:     JPMORGAN HAD NO OBLIGATION TO LEND TO LEHMAN AND WAS NOT RESTRICTED IN ITS RIGHT TO REQUEST COLLATERAL. ...................................................................................7

    A.    Neither the Clearance Agreement nor the triparty custody agreements obligated JPMorgan to extend credit. ......................................................7

    B.    The words "with notice" do not create an obligation to extend credit....................9

    C.    An obligation to extend credit does not arise under the implied covenant of good faith and fair dealing. ...................................................11

    D.    None of the parties' agreements restricts JPMorgan's requests for collateral........................................................................................12

POINT II:    THE SEPTEMBER AGREEMENTS AND THE SEPTEMBER COLLATERAL TRANSFERS ARE VALID AND ENFORCEABLE. ...............13

    A.    The September Agreements and the collateral transfers did not result from coercion or duress. ...............................................................13

    B.    JPMorgan did not violate the implied covenant of good faith and fair dealing under the September Agreements. ...........................................14

    C.    JPMorgan gave ample consideration to sustain the September Agreements.........15

    D.    The September Guaranty was authorized. ...........................................16

    E.    The waiver of defenses clause bars plaintiffs' claims seeking to invalidate and rescind the September Agreements..................................................17

    F.    LBHI ratified the agreements and waived any purported breaches......................18

POINT III:   LBHI'S PLEDGE OF COLLATERAL WAS NOT THE PRODUCT OF FRAUD OR EGREGIOUS MISCONDUCT. ......................................20

    A.   There is no evidence that LBHI intended to hinder, delay or defraud its creditors, as required for plaintiffs' actual-intent fraudulent transfer claims. ...........................................................................................21

    B.   JPMorgan did not engage in "egregious and severely unfair" conduct warranting equitable subordination.........................................................22

    C.   JPMorgan did not fraudulently induce LBHI to provide collateral. .....................23

POINT IV:   JPMORGAN DID NOT FORFEIT ITS LIEN ON $6.9 BILLION......................24

    A.   JPMorgan retained its security interest in the cash collateral. ...............................25

        1.   JPMorgan did not agree to release its security interest..............................27

        2.   JPMorgan's security interest attaches to the deposit in the general ledger account as "proceeds." ....................................................28

    B.   JPMorgan also retained a right of setoff. ................................................29

POINT V:   PLAINTIFFS' REMAINING CLAIMS FAIL. ........................................30

    A.   The failure of plaintiffs' claims to invalidate JPMorgan's contracts and liens necessarily results in the failure of the remaining claims. ...........................30

    B.   Plaintiffs' claims of conversion, unjust enrichment and constructive trust are preempted and also fail on the merits. .............................................32

    C.   There is no provision of the Clearance Agreement or August Agreements that JPMorgan could have breached by requesting or retaining collateral. ..........34

    D.   The claims to avoid a setoff fail.........................................................36

POINT VI:   CONSEQUENTIAL DAMAGES ARE BARRED AS A MATTER OF LAW. ....................................................................................36

    A.   Consequential damages are precluded by contract. .............................................37

    B.   Consequential damages are too speculative as a matter of law. ...........................37

CONCLUSION....................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*4 B's Realty 1530 CR39, LLC* v. *Toscano*,
2009 WL 702011 (S.D.N.Y. Mar. 12, 2009) .................................................................. 24 n.30

*Acevado* v. *Citibank, N.A.*,
2012 WL 996902 (S.D.N.Y. Mar. 23, 2012) ................................................................. 33 n.44

*ADT Operations, Inc.* v. *Chase Manhattan Bank, N.A.*,
173 Misc. 2d 959 (N.Y. Sup. Ct. 1997) ....................................................................... 34 n.48

*AmeriCredit Fin. Servs., Inc.* v. *Oxford Mgmt. Servs.*,
627 F. Supp. 2d 85 (E.D.N.Y. 2008) .................................................................................. 11

*AP Servs. LLP* v. *Silva*,
483 B.R. 63 (S.D.N.Y. 2012).......................................................................................... 33 n.42

*Bank Leumi Trust Co. of N.Y.* v. *D'Evori Int'l, Inc.*,
558 N.Y.S.2d 909 (1st Dep't 1990) ....................................................................... 13 n.16, 19

*Bank of R.I.* v. *Mixitforme, Inc.*,
2007 WL 299361 (R.I. Super. Ct. Jan. 11, 2007) ........................................................ 29 n.35

*Barclays Capital Inc.* v. *Giddens*,
2014 WL 3822868 (2d Cir. Aug. 5, 2014) ...................................................................... 1 n.2

*B.E.L.T., Inc.* v. *Wachovia Corp.*,
403 F.3d 474 (7th Cir. 2005) ......................................................................................... 33 n.46

*CDO Plus Master Fund Ltd.* v. *Wachovia Bank, N.A.*,
2009 WL 2033048 (S.D.N.Y. July 13, 2009) ....................................................................... 20

*Citibank, N.A.* v. *Plapinger*,
66 N.Y.2d 90 (1985) ................................................................................................... 18 nn.24-25

*Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009).......................................................................... 40 n.57

*Contemporary Indus. Corp.* v. *Frost*,
564 F.3d 981 (8th Cir. 2009) ........................................................................................ 33 n.42

*Crossland Fed. Sav. Bank* v. *A. Suna & Co.*,
935 F. Supp. 184 (E.D.N.Y. 1996).............................................................................. 18 n.24

*Eighth Ave. Coach Corp.* v. *City of N.Y.*,
286 N.Y. 84 (1941) ............................................................................................................... 9

*Export-Import Bank of the U.S.* v. *Asia Pulp & Paper Co.*,
    2008 WL 465169 (S.D.N.Y. Feb. 6, 2008)..................................................... 18 n.25

*Fasolino Foods Co.* v. *Banca Nazionale del Lavoro*,
    961 F.2d 1052 (2d Cir. 1992)............................................................................. 12

*Fed. Ins. Co.* v. *Diamond Kamvakis & Co.*,
    536 N.Y.S.2d 760 (1st Dep't 1989)..................................................................... 16

*Fenton* v. *Ives*,
    634 N.Y.S.2d 833 (3d Dep't 1995)....................................................................... 30

*First N.Y. Bank for Bus.* v. *DeMarco*,
    130 B.R. 650 (S.D.N.Y. 1991)................................................................. 15-16 n.19

*Five Star Dev. Resort Cmtys.* v. *iStar RC Paradise Valley LLC*,
    2012 WL 4119561 (S.D.N.Y. Sept. 18, 2012) ................................................ 37 n.53

*Gen. Trading Co.* v. *A&D Food Corp.*,
    738 N.Y.S.2d 845 (1st Dep't 2002) ................................................................ 18 n.27

*Gillman* v. *Chase Manhattan Bank, N.A.*,
    73 N.Y.2d 1 (1988) ............................................................................................ 28

*Golden Archer Invs., LLC* v. *Skynet Fin. Sys.*,
    908 F. Supp. 2d 526 (S.D.N.Y. 2012)................................................. 11, 14, 36 n.50

*Grede* v. *FCStone, LLC*,
    746 F.3d 244 (7th Cir. 2014) ........................................................................ 33 n.42

*Gross Mach. Grp.* v. *M.V. "Alligator Independence,"*
    1993 WL 77326 (S.D.N.Y. Mar. 17, 1993) ........................................................... 16

*Harris* v. *Provident Life & Accident Ins. Co.*,
    310 F.3d 73 (2d Cir. 2002)........................................................................... 36 n.50

*HSH Nordbank AG* v. *Street*,
    421 F. App'x 70 (2d Cir. 2011) ..................................................................... 11 n.14

*In re Akanmu*,
    502 B.R. 124 (Bankr. E.D.N.Y. 2013).............................................................. 33 n.47

*In re Borriello*,
    329 B.R. 367 (Bankr. E.D.N.Y. 2005).............................................................. 33 n.45

*In re Chin*,
    492 B.R. 117 (Bankr. E.D.N.Y. 2013)................................................................... 22

*In re CJL Co.*,
   71 B.R. 261 (Bankr. D. Or. 1987) .................................................................... 28

*In re Colonial Realty Co.*,
   980 F.2d 125 (2d Cir. 1992) .................................................................. 32 n.40

*In re First Cent. Fin. Corp.*,
   377 F.3d 209 (2d Cir. 2004) ............................................................ 34 nn.48-49

*In re Hechinger Inv. Co. of Del.*,
   274 B.R. 71 (D. Del. 2002) ................................................................... 33 n.42

*In re Kalisch*,
   413 B.R. 115 (Bankr. S.D.N.Y. 2008) ................................................................ 22

*In re KDI Holdings, Inc.*,
   277 B.R. 493 (Bankr. S.D.N.Y. 1999) ................................................................ 22

*In re Lehman Bros. Holdings Inc.*,
   404 B.R. 752 (Bankr. S.D.N.Y. 2009) ......................................................... 25 n.32

*In re Lehman Bros. Holdings Inc.*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) ....................................... 2 n.5, 21, 31, 32

*In re Lehman Bros. Holdings Inc.*,
   480 B.R. 179 (S.D.N.Y. 2012) ..................................................................... 31

*In re Metiom, Inc.*,
   301 B.R. 634 (Bankr. S.D.N.Y. 2003) ......................................................... 32 n.40

*In re Minpeco, USA, Inc.*,
   237 B.R. 12 (Bankr. S.D.N.Y. 1997) ................................................................ 12

*In re Pomilio*,
   425 B.R. 11 (Bankr. E.D.N.Y. 2010) ......................................................... 32 n.40

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   499 B.R. 310 (S.D.N.Y. 2013) ................................................................. 33 n.43

*In re U.S. Mortg. Corp.*,
   491 B.R. 642 (Bankr. D.N.J. 2013) ............................................................ 33 n.42

*In re Vargas Realty Enters., Inc.*,
   440 B.R. 224 (S.D.N.Y. 2010) ............................................................. 17 n.22, 19

*In re W.T. Grant Co.*,
   4 B.R. 53 (Bankr. S.D.N.Y. 1980) ............................................................. 22-23

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1983) ................................................................. 22-23

*Interpharm, Inc.* v. *Wells Fargo Bank, Nat'l Assoc.*,
    655 F.3d 136 (2d Cir. 2011) ................................................................. 13, 14

*Jill Stuart (Asia) LLC* v. *Sanei Int'l Co., Ltd.*,
    566 F. App'x 29 (2d Cir. 2014) ............................................................. 37, 38

*John St. Leasehold LLC* v. *Fed. Deposit Ins. Corp.*,
    1996 WL 737196 (S.D.N.Y. Dec. 24, 1996) .......................................... 24 n.30

*Joseph Stephens & Co.* v. *Cikanek*,
    588 F. Supp. 2d 870 (N.D. Ill. 2008) ..................................................... 25

*Keeseville Nat'l Bank* v. *Gulati*,
    599 N.Y.S.2d 175 (3d Dep't 1993) ......................................................... 18 n.28

*Kenford Co.* v. *Cnty. of Erie*,
    67 N.Y.2d 257 (1986) ..................................................... 38, 39 n.56, 40 nn.57-58

*Kham & Nate's Shoes No. 2, Inc.* v. *First Bank of Whiting*,
    908 F.2d 1351 (7th Cir. 1986) ............................................................... 11, 23

*Kidder, Peabody & Co.* v. *IAG Int'l Acceptance Grp. N.V.*,
    28 F. Supp. 2d 126 (S.D.N.Y. 1998) ...................................................... 38, 39, 40 n.58

*King World Prods., Inc.* v. *Fin. News Network, Inc.*,
    660 F. Supp. 1381 (S.D.N.Y. 1987) ....................................................... 16 n.20

*Liberty Mut. Fire Ins. Co.* v. *Mystic Transp., Inc.*,
    2004 WL 2071703 (S.D.N.Y. Sept. 16, 2004) ........................................ 18 n.27

*Lippe* v. *Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003) .................................................... 21, 22

*Martinez* v. *Capital One, N.A.*,
    863 F. Supp. 2d 256 (S.D.N.Y. 2012) .................................................... 33 n.44

*Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ................................................................. 23

*Metro. Life Ins. Co.* v. *Noble Lowndes Int'l, Inc.*,
    84 N.Y.2d 430 (1994) ........................................................................... 37

*Nat'l Westminster Bank, U.S.A.* v. *Ross*,
    130 B.R. 656 (S.D.N.Y. 1991) ............................................................... 11 & n.14

*Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.,*
    273 F. Supp. 2d 436 (S.D.N.Y. 2003)..............................................................37 n.53

*Pan Am Corp.* v. *Delta Air Lines, Inc.,*
    175 B.R. 438 (S.D.N.Y. 1994)...........................................................................22

*Philips Credit Corp.* v. *Regent Health Grp., Inc.,*
    953 F. Supp. 482 (S.D.N.Y. 1997) ....................................................................24

*Point Prods. A.G.* v. *Sony Music Entm't, Inc.,*
    215 F. Supp. 2d 336 (S.D.N.Y. 2002)..............................................................39 n.56

*Pot Luck LLC* v. *Freeman,*
    2010 WL 908475 (S.D.N.Y. Mar. 8, 2010) .......................................................24

*Preferred Equities Corp.* v. *Ziegelman,*
    593 N.Y.S.2d 548 (2d Dep't 1993) ..................................................................18 n.24

*Quest Commercial, LLC* v. *Rovner,*
    825 N.Y.S.2d 766 (2d Dep't 2006)...................................................................18 n.26

*Red Tulip LLC* v. *Neiva,*
    842 N.Y.S.2d 1 (1st Dep't 2007) .....................................................................18 n.24

*RJ Capital, S.A.* v. *Lexington Capital Funding III, Ltd.,*
    2011 WL 3251554 (S.D.N.Y. July 28, 2011) ...............................................12, 15

*Safka Holdings LLC* v. *iPlay, Inc.,*
    2013 WL 9636959 (S.D.N.Y. May 20, 2013) .....................................................37

*Santa Fe Pointe LP* v. *Greystone Servicing Corp.,*
    2009 WL 1438285 (N.D. Cal. May 19, 2009) ..................................................18 n.26

*Scott* v. *Harris,*
    550 U.S. 372 (2007)............................................................................................3

*Sec. Investor Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC,*
    501 B.R. 26 (S.D.N.Y. 2013)...........................................................................32 n.40

*Sterling Investor Servs., Inc.* v. *1155 Nobo Assocs., LLC,*
    818 N.Y.S.2d 513 (2d Dep't 2006)....................................................................10

*Three Crown Ltd. P'ship* v. *Salomon Bros.,*
    906 F. Supp. 876 (S.D.N.Y. 1995) .......................................................39 n.56, 40 n.57

*Trademark Research Corp.* v. *Maxwell Online Inc.,*
    995 F.2d 326 (2d Cir. 1993)............................................................................40 n.57

*U.S. Bank N.A.* v. *Verizon Commc'ns Inc.*,
 892 F. Supp. 2d 805 (N.D. Tex. 2012) ............................................ 33 n.42

*UBS AG, Stamford Branch* v. *HealthSouth Corp.*,
 645 F. Supp. 2d 135 (S.D.N.Y. 2008) ............................................ 18 n.28

*Ultramar Energy Ltd.* v. *Chase Manhattan Bank, N.A.*,
 599 N.Y.S.2d 816 (1st Dep't 1993) ............................................ 33 n.46

*Ursa Minor Ltd.* v. *AON Fin. Prods., Inc.*,
 2000 WL 1010278 (S.D.N.Y. July 21, 2000) ............................................ 18 n.25

*VCG Special Opportunities Master Fund Ltd.* v. *Citibank, N.A.*,
 594 F. Supp. 2d 334 (S.D.N.Y. 2008) ............................................ 20

*VKK Corp.* v. *Nat'l Football League*,
 244 F.3d 114 (2d Cir. 2001) ............................................ 19

*Weiner* v. *McGraw-Hill, Inc.*,
 57 N.Y.2d 458 (1982) ............................................ 16

*White* v. *Cont'l Cas. Co.*,
 9 N.Y.3d 264 (2007) ............................................ 10 n.13

*Whyte* v. *Barclays Bank PLC*,
 494 B.R. 196 (S.D.N.Y. 2013) ............................................ 33 n.42

*Wiener* v. *Lazard Freres & Co.*,
 672 N.Y.S.2d 8 (1st Dep't 1998) ............................................ 34 n.48

*Wolff & Munier, Inc.* v. *Whiting-Turner Contracting Co.*,
 946 F.2d 1003 (2d Cir. 1991) ............................................ 37

*W.W.W. Assocs., Inc.* v. *Giancontieri*,
 77 N.Y.2d 157 (1990) ............................................ 10 n.13

**Other Authorities**

5 Collier on Bankruptcy (16th ed. 2013) ............................................ 21, 36

AMER. HERITAGE DICTIONARY (4th ed. 2009) ............................................ 10

Bruce A. Markell, *From Property to Contract and Back:  An Examination of Deposit
Accounts and Revised Article 9*, 74 Chi.-Kent L. Rev. 963 (1999) ............................................ 26

John F. Hilson et al., *Report of the Deposit Accounts Task Force to the Article 9
Drafting Committee*, 54 Consumer Fin. L.Q. Rep. 203 (2000) ............................................ 29 n.35

**Statutes and Rules**

N.Y. D.C.L. § 151 ................................................................................................ 30

N.Y. U.C.C. § 1-208 ............................................................................................ 11

N.Y U.C.C. § 9-102 .......................................................................... 26, 28, 29 n.37

N.Y. U.C.C. § 9-104 ..................................................................................... 25, 26

N.Y. U.C.C. § 9-208 ............................................................................................ 29

N.Y. U.C.C. § 9-312 ............................................................................................ 25

N.Y. U.C.C. § 9-314 ............................................................................................ 25

N.Y. U.C.C. § 9-315 ................................................................................... 26 & n.33

N.Y. U.C.C. § 9-332 ........................................................................... 26 n.34, 29 n.35

N.Y. U.C.C. § 9-340 ................................................................................... 29 n.38

11 U.S.C. § 362 .................................................................................................. 31

11 U.S.C. § 502 ....................................................................................... 31, 32 n.40

11 U.S.C. § 506 ....................................................................................... 31, 32 n.40

11 U.S.C. § 542 .................................................................................................. 31

11 U.S.C. § 546 ....................................................................................... 32, 33 n.43

11 U.S.C. § 548 ................................................................................... 21, 31, 32

11 U.S.C. § 550 ....................................................................................... 31, 32 n.40

11 U.S.C. § 553 .................................................................................................. 31

**TABLE OF CLAIMS**

| Count Number | Count Title | Brief Section[1] |
|---|---|---|
| Count 1 | Avoidance of September Agreements as Actually Fraudulent Under Section 548 of the Bankruptcy Code | Point III.A |
| Count 2 | Avoidance of August Guaranty and August Security Agreement as Actually Fraudulent Under Section 548 of the Bankruptcy Code | Point III.A |
| Count 3 | Avoidance of Collateral Transfers as Actually Fraudulent Under Section 548 of the Bankruptcy Code | Point III.A |
| Count 4 | Recovery of Avoided Fraudulent Transfers Under Section 550 of the Bankruptcy Code | Point V.A |
| Count 5 | Avoidance of September Agreements as Constructively Fraudulent Under Section 548 of the Bankruptcy Code | Dismissed |
| Count 6 | Avoidance of September Guaranty as Constructively Fraudulent Under Section 548 of the Bankruptcy Code | Dismissed |
| Count 7 | Avoidance of August Guaranty as Constructively Fraudulent Under Section 548 of the Bankruptcy Code | Dismissed |
| Count 8 | Avoidance of Collateral Transfers as Constructively Fraudulent Under Section 548 of the Bankruptcy Code | Dismissed |
| Count 9 | Recovery of Avoided Fraudulent Transfers Under Section 550 of the Bankruptcy Code | Dismissed |
| Count 10 | Avoidance of September Agreements as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law | Dismissed |
| Count 11 | Avoidance of September Guaranty as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law | Dismissed |
| Count 12 | Avoidance of August Guaranty as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law | Dismissed |
| Count 13 | Declaratory Judgment Invalidating August Security Agreement | Dismissed |

---

[1] Point I does not discuss particular counts but supports summary judgment on multiple claims.

| Count Number | Count Title | Brief Section[1] |
|---|---|---|
| Count 14 | Declaratory Judgment Invalidating the September Security Agreement, the September Amendment, and the Account Control Agreement | Dismissed |
| Count 15 | Avoidance of Collateral Transfers as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law | Dismissed |
| Count 16 | Recovery of Avoided Fraudulent Transfers Under Section 550 of the Bankruptcy Code | Dismissed |
| Count 17 | Avoidance of Funds Sweep as Constructively Fraudulent Under Section 548 of the Bankruptcy Code | Dismissed |
| Count 18 | Recovery of Avoided Fraudulent Transfer Under Section 550 of the Bankruptcy Code | Dismissed |
| Count 19 | Avoidance of Funds Sweep as Constructively Fraudulent Under Section 544 and Applicable State Fraudulent Conveyance or Fraudulent Transfer Law | Dismissed |
| Count 20 | Recovery of Avoided Fraudulent Transfer Under Section 550 of the Bankruptcy Code | Dismissed |
| Count 21 | Avoidance of Preferential Transfer of September Security Agreement Under Section 547 of the Bankruptcy Code | Dismissed |
| Count 22 | Avoidance of Preferential Transfer of Account Control Agreement Under Section 547 of the Bankruptcy Code | Dismissed |
| Count 23 | Avoidance of Preferential Transfer of September Transfers Under Section 547 of the Bankruptcy Code | Dismissed |
| Count 24 | Recovery of Avoided Preferential Transfers Under Section 550 of the Bankruptcy Code | Dismissed |
| Count 25 | Turnover of Property Held by JPMorgan Under Section 542 of the Bankruptcy Code | Point V.A |
| Count 26 | Avoidance of September Transfers as Transfers Made for Purpose of Obtaining a Right to Setoff Under Section 553(a)(3) of the Bankruptcy Code | Points V.A, V.D |
| Count 27 | Turnover of Property Held by JPMorgan Under Section 542 of the Bankruptcy Code | Point V.A |
| Count 28 | Avoidance of September Transfers as Improvement in Position Under Section 553(b) of the Bankruptcy Code | Points V.A, V.D |

| Count Number | Count Title | Brief Section[1] |
|---|---|---|
| Count 29 | Recovery of Avoided Transfers as Impermissible Improvement in Position Under Section 550 of the Bankruptcy Code | Point V.A |
| Count 30 | Equitable Subordination Under Sections 510(c) and 105(a) of the Bankruptcy Code | Point III.B |
| Count 31 | Disallowance of Claims Under Section 502(d) of the Bankruptcy Code and Avoidance of Liens Securing Such Claims Under Section 506(d) | Point V.A |
| Count 32 | Imposition of Constructive Trust and Turnover of $5 Billion of Cash | Points V.A-B |
| Count 33 | Violation of Automatic Stay | Point V.A |
| Count 34 | Turnover of Funds Seized in Violation of Automatic Stay | Point V.A |
| Count 35 | Declaratory Judgment Invalidating the September Agreements | Point II |
| Count 36 | Unjust Enrichment:  All Collateral | Points V.A-B |
| Count 37 | Conversion:  All Collateral | Points V.A-B |
| Count 38 | Declaratory Judgment That JPMorgan Has No Lien Over LBHI's $6.9 Billion Pursuant to Either the August Agreements or the September Agreements | Point IV |
| Count 39 | Unjust Enrichment:  $8.6 Billion in Cash and Money Market Funds | Points V.A-B |
| Count 40 | Conversion:  $8.6 Billion in Cash and Money Market Funds | Points V.A-B |
| Count 41 | In the Alternative, Breach of the 2000 Clearance Agreement: Improper Collateral Demands | Points II.F, V.A, V.C |
| Count 42 | In the Alternative, Breach of the 2000 Clearance Agreement: Improper Withholding of Collateral | Points II.F, V.A, V.C |
| Count 43 | In the Alternative, Breach of the August Agreements: Improper Collateral Demands | Points II.F, V.A, V.C |
| Count 44 | In the Alternative, Breach of the August Agreements: Improper Withholding of Collateral | Points II.F, V.A, V.C |

| Count Number | Count Title | Brief Section[1] |
|---|---|---|
| Count 45 | In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing:  August Agreements | Points II.F, V.A, V.C |
| Count 46 | Coercion and/or Duress With Respect to the September Agreements | Points II.A, II.E-F |
| Count 47 | In the Alternative, Breach of the Implied Covenant of Good Faith and Fair Dealing:  September Agreements | Points II.B, II.F |
| Count 48 | Coercion and/or Duress With Respect to Demands for $8.6 Billion in Cash and Cash Equivalents | Points II.A, II.E-F |
| Count 49 | Fraud With Respect to the September 12, 2008 Demand for $5 Billion Cash | Point III.C |

## PRELIMINARY STATEMENT

JPMorgan Chase Bank, N.A. ("JPMorgan") was the primary securities clearing bank for Lehman Brothers Inc. ("LBI"), the U.S. broker-dealer subsidiary of plaintiff Lehman Brothers Holdings Inc. ("LBHI," together with its subsidiaries, "Lehman"). During the week of September 8, 2008, when Lehman suffered its "run on the bank," and in the week following LBHI's September 15, 2008 bankruptcy filing, JPMorgan advanced hundreds of billions of dollars of discretionary credit to Lehman. As a result of those advances, LBHI was able to seek a rescue and, following its bankruptcy, arrange an emergency sale of LBI's business to Barclays.[2]

As LBHI acknowledged the day after its bankruptcy filing, JPMorgan had the "sole discretion" to decide whether to extend credit to Lehman. Thus, during Lehman's meltdown, JPMorgan simply could have refused to extend credit and avoided further exposure. Instead, JPMorgan requested additional collateral from Lehman and received a total of $8.6 billion between September 9 and 12. With the assurance the collateral provided, JPMorgan extended many multiples of that amount in new credit. By choosing to support Lehman through its collapse, JPMorgan took extraordinary risk, leaving it with nearly $30 billion in unpaid claims after LBI's bankruptcy. Most of that amount—over $25 billion—arose from advances made to LBI *after* LBHI's bankruptcy. Without the $8.6 billion received in the week of September 8, JPMorgan would have had substantial losses from credit it voluntarily extended in Lehman's last days.

Memories are conveniently short. Almost two years after JPMorgan provided staggering amounts of credit to Lehman at the height of its crisis, LBHI and its Official Committee of Unsecured Creditors brought this lawsuit, which boils down to the theory that JPMorgan is to *blame* for LBHI's bankruptcy filing on September 15, 2008 and should be forced to return the collateral

---

[2] *See Barclays Capital Inc.* v. *Giddens*, 2014 WL 3822868, at *1 (2d Cir. Aug. 5, 2014) (noting the LBI sale "saved thousands of jobs and avoided losses estimated to be in the hundreds of billions").

it received the prior week—even though it proved necessary to satisfy JPMorgan's claims—as well as pay "billions of dollars" in consequential damages. SOF ¶ 1(a) ("Compl.") at ¶¶ 7-8.[3]

In March 2010, however, well before this lawsuit was brought, the Examiner appointed by the bankruptcy court to assess potential causes of action available to the Lehman estate concluded after an extensive investigation that "the decision to advance credit was wholly within JPMorgan's discretion" and that virtually no claims against JPMorgan were even "colorable."[4]

In the four years since the Examiner rejected them, plaintiffs' claims have only become weaker. Much of this lawsuit was dismissed by the bankruptcy court based on the Bankruptcy Code's safe harbors,[5] and plaintiffs' remaining counts, nearly all of which require proof of wrongful conduct, have not been borne out in discovery. No evidence has been developed that would change the plain meaning of the parties' agreements, which imposed no obligation on JPMorgan to extend credit and which did not restrict, much less render wrongful, JPMorgan's requests for collateral to secure its discretionary extensions of credit. Discovery also dealt devastating blows to plaintiffs' claim that JPMorgan, through its collateral requests, caused LBHI's bankruptcy filing on September 15. Timothy Geithner, then-President of the Federal Reserve Bank of New York (the "Fed"), testified that JPMorgan's collateral requests were *immaterial* to Lehman's fate, and another senior Fed official testified that, even with $25 billion more, LBHI could not have avoided bankruptcy because the market was running away from Lehman.

At this point, with discovery concluded, none of plaintiffs' remaining claims can survive

---

[3] JPMorgan's accompanying Statement of Undisputed Facts ("SOF") further sets forth the undisputed facts. Exhibits ("Ex.") are annexed to the Wolf Declaration submitted herewith.

[4] SOF ¶ 1(s) (Examiner Report) at 1072-73, 1177, 1203. The Examiner found one claim, for violation of the implied covenant of good faith and fair dealing, potentially "colorable," but "not strong" in light of the "substantial evidence" that JPMorgan acted reasonably and lawfully and evidence that LBHI waived that claim by continuing to accept credit from JPMorgan. *Id.* at 1210-24.

[5] The bankruptcy court dismissed 20 of the Complaint's 49 claims (Counts 5 through 24). *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012).

summary judgment.  Much of the Complaint relies on the erroneous premise that JPMorgan was *obligated* to extend credit to LBI and *prohibited* from conditioning such advances on the receipt of additional collateral.  As demonstrated in Points I and II, rejection of that premise—based on the plain, unambiguous language of the governing agreements—disposes of an array of claims, including claims of coercion, duress and breach of contract by requesting collateral.  Plaintiffs' second key premise—that it was wrongful for JPMorgan to attempt to ensure that its exposures to Lehman, in the event of a bankruptcy, would be paid in full—is similarly meritless.  There is nothing unlawful or improper about requesting collateral, particularly before extending new credit.  As shown in Point III, no claims requiring evidence of actual fraud or egregious misconduct can arise from such permissible collateral requests.  Further, as set forth in Points IV through VI, plaintiffs' other assorted claims also fail and their demand for consequential damages is both barred by contract and too speculative as a matter of law.

## STATEMENT OF FACTS

While plaintiffs may try to identify disputes of fact in the sprawling record, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Scott* v. *Harris*, 550 U.S. 372, 380 (2007).  There are no such disputes here.

JPMorgan was one of Lehman's principal banks and trading partners, serving as securities clearing bank for LBI under a Clearance Agreement dated June 15, 2000 (as amended in May 2008, the "Clearance Agreement"), and as custodian and agent for LBI's overnight financing of its securities in the triparty repo market pursuant to triparty custody agreements entered into among JPMorgan, LBI and investors.  SOF ¶¶ 2-7.

In the period leading up to the 2008 financial crisis, Lehman chose a highly leveraged business model.  Its principal sources of financing were short-term, uncommitted credit, includ-

ing "triparty repos"—*i.e.*, overnight financing of LBI securities via repurchase agreements with various investors, and intraday borrowing from JPMorgan of the amount of cash LBI needed to repay the investors each morning ("unwind" the repos) and operate until the investors returned in the evening to renew their positions.  SOF ¶¶ 75-77.[6]  At its peak in March 2008, LBI borrowed as much as *$242 billion* each day from JPMorgan.  SOF ¶ 76.  The parties' agreements created no obligation for JPMorgan to extend this financing.  SOF ¶¶ 64, 66.  LBI paid no commitment fee to JPMorgan to make credit available and did not even pay interest on the amounts advanced, which aggregated many trillions of dollars over the eight-year life of the Clearance Agreement. SOF ¶¶ 60-62, 101.

In 2008, at the urging of the Fed, JPMorgan reviewed its risks as clearing bank and asked its broker-dealer clients for margin to cover those risks.  SOF ¶ 8.  In response, Lehman pledged securities collateral in June 2008 that it claimed was worth over $5 billion (the "Summer Collateral").  SOF ¶ 9.  After JPMorgan raised concerns as to the enforceability of its lien, the Summer Collateral was transferred to LBHI, and LBHI entered into agreements (the "August Agreements"), which, among other things:  (1) guaranteed payment of LBI's obligations under the Clearance Agreement (the "August Guaranty"); and (2) granted JPMorgan a lien on the Summer Collateral to secure those obligations (the "August Security Agreement").  SOF ¶¶ 11-15.

By September 2008, the financial markets were in turmoil and Lehman was in serious trouble.  Over the weekend of September 6-7, Fannie Mae and Freddie Mac were placed into conservatorship, focusing market attention on Lehman's difficulties and exposure to risky real estate assets.  SOF ¶¶ 16-17.  On September 9, Korea Development Bank announced it was no longer pursuing a transaction with Lehman, and Lehman's stock plunged 45%.  SOF ¶¶ 18-19.

---

[6] *See also* Ex. 10 ("Tri-Party Repo Infrastructure Reform," *Federal Reserve Bank of New York*, May 17, 2010 at 5-11) (describing triparty repos and role of clearing bank).

Concerned about the firm-wide risks it was incurring in continuing not only to extend credit to Lehman but also to transact with Lehman in the financial and derivatives markets, JPMorgan on September 9 requested cash collateral and broader agreements (the "September Agreements") so that the requested collateral would be available to secure any of its increasingly risky exposures to Lehman entities.  SOF ¶¶ 20-22, 101-02.  Similar in form to the August Agreements, the September Agreements included a Guaranty, whereby LBHI guaranteed all of its subsidiaries' obligations to JPMorgan and its affiliates, and a Security Agreement, which granted a lien on the collateral posted by LBHI to secure those obligations and gave LBHI the right to transfer its collateral upon three days' written notice.  SOF ¶¶ 22-24, 88.  Over the next two days, LBHI delivered $3.6 billion in cash collateral and money market funds.  SOF ¶ 26.

On September 10, Lehman preannounced its third-quarter earnings, a $3.9 billion loss, and vague plans for a spin-off of its troubled assets.  SOF ¶ 27.  The market reacted negatively, and the next day Lehman's stock price dropped another 42%.  SOF ¶ 28.

By September 11, amidst even greater turmoil in the markets, JPMorgan had increasing concerns about the quality of the collateral that secured its massive extensions of credit in the triparty repo unwind.  SOF ¶¶ 10-11, 17-19, 28, 99.  On September 11, JPMorgan requested an additional $5 billion in cash collateral in a phone call involving, among others, CEOs Jamie Dimon and Richard Fuld.  SOF ¶ 29.  Fuld agreed to the request, and LBHI deposited $5 billion in its account at JPMorgan during the morning of Friday, September 12.  SOF ¶¶ 30-31, 33, 155.  Throughout the week of September 8, both before and after LBHI provided the requested collateral, JPMorgan was extending over $120 billion in new credit each day.  SOF ¶¶ 32, 99, 101-02.

By September 12, as Treasury Secretary Henry Paulson testified, "an acquisition of Lehman was needed to avoid a failure."  SOF ¶ 36.  Over the weekend of September 13-14, Lehman

sought, but could not achieve, a rescue transaction despite round-the-clock meetings at the Fed

of Lehman's regulators and largest counterparties.  SOF ¶ 34.  Following the failure of rescue

attempts, Fed President Geithner and Treasury Secretary Paulson concluded it was impossible

for Lehman to open on Monday.  Geithner thus testified "that Lehman's bankruptcy became

truly inevitable."  SOF ¶¶ 35-36.  On Sunday, the instruction from the Fed was to "convene the

board, and make sure the board passes a resolution to go into bankruptcy."  SOF ¶¶ 38, 41-43.

LBHI filed a chapter 11 petition before U.S. markets opened on Monday, September 15.

SOF ¶ 44.  Despite LBHI's bankruptcy filing and the fact that JPMorgan had limited clearance

exposure to LBI at the time, JPMorgan voluntarily extended $87 billion in new credit to LBI on

the morning of September 15 so that LBI could repay its triparty repos and continue to operate.

SOF ¶ 45.  On September 16, LBHI sought a "Comfort Order" from the bankruptcy court to

induce JPMorgan to continue to provide discretionary credit to LBI, representing that such advances

were "necessary" and within JPMorgan's "sole discretion."  SOF ¶¶ 124-29.  The court found that

"a comfort order . . . for the benefit of JPMorgan Chase under these clearance agreements" was

"entirely appropriate and consistent with the need to provide market liquidity for this debtor."  SOF

¶ 130.  Thereafter, JPMorgan extended tens of billions of dollars of credit to LBI so that it could

operate until its business was sold to Barclays.  SOF ¶¶ 51-53, 100, 126-27.

Ultimately, JPMorgan was left with over $25 billion in unpaid claims against LBI from

the funding it provided *after* LBHI's bankruptcy filing.  SOF ¶ 48.  Those claims were satisfied

in full only as a result of JPMorgan's application, with LBHI's agreement and bankruptcy court

approval, of the $8.6 billion in collateral pledged by LBHI during the week before bankruptcy.

SOF ¶¶ 1(q), 49-50, 54-56 (CDA at ¶¶ 1, 5).[7]

---

[7] LBHI challenged the use of a portion of its collateral to pay claims of funds managed by JPMorgan Asset Management on grounds not relevant here.  Under a settlement of that separate dispute, $700 million of the $8.6 billion was returned to LBHI, and is no longer at issue here.  SOF ¶ 57.

**ARGUMENT**

**POINT I:     JPMORGAN HAD NO OBLIGATION TO LEND TO LEHMAN AND WAS NOT RESTRICTED IN ITS RIGHT TO REQUEST COLLATERAL.**

The fundamental premise of this lawsuit is that JPMorgan's requests for collateral were wrongful, indeed egregious, because JPMorgan had an obligation to continue to extend hundreds of billions of dollars of new intraday credit to LBI and could not condition that credit on the provision of additional collateral.  Plaintiffs' claims are contradicted by the unambiguous terms of the governing agreements and unsupported by the record evidence.[8]

**A.     Neither the Clearance Agreement nor the triparty custody agreements obligated JPMorgan to extend credit.**

The Clearance Agreement is not an agreement to extend credit.  Rather, the Clearance Agreement states its purpose in its opening paragraph:  JPMorgan is "to act as [Lehman's] non-exclusive clearance agent for securities transactions."[9]  SOF ¶¶ 1(e), 6 (Clearance Agreement ("CA") at 1).  The role of the clearing bank is to execute transfers of cash and securities as agent for the counterparties based on their instructions.  SOF ¶¶ 1(e), 4-5 (CA at § 3).  Section 5 is the sole credit-related provision in the Clearance Agreement; it grants authority to JPMorgan, *solely at JPMorgan's discretion*, to advance funds to LBI in connection with the clearance and settlement of securities transactions.  SOF ¶¶ 1(e), 58 (CA at § 5).  Section 5 states three times that all extensions of credit are at JPMorgan's discretion.[10]  SOF ¶ 58.  Consistent with the nature of the

---

[8] While JPMorgan disputes any charge that its requests were unreasonable and reserves all rights to present contrary evidence, the lack of any obligation to extend credit and concomitant lack of any contractual limitation on JPMorgan's right to request collateral renders irrelevant, for this motion, any inquiry into the "reasonableness" of JPMorgan's collateral requests.

[9] Unless otherwise noted, emphasis is added and internal quotation marks are omitted.

[10] By contrast to Section 5, in Schedule A to the Clearance Agreement, "[JPMorgan] agree[d] to make Lehman an interest free overnight loan" to the extent an operational delay by JPMorgan results in a failure to complete a securities transaction by the end of the trading day.  SOF ¶¶ 1(e), 63.  The parties thus knew how to state a commitment when they intended one to exist.

credit authorized by Section 5—the advance of funds in connection with Lehman's intraday securities trading, expected to be extinguished no later than the close of the trading day—Section 5 stipulates that "[a]ll loans, whether of money or securities, shall be payable on demand." SOF ¶¶ 1(e), 58 (CA at § 5). Section 5 concludes by underscoring the parties' agreement that any prior practice of extending credit will not obligate JPMorgan to continue to extend credit; rather, JPMorgan could cease extending credit *at any time*. *Id.*; SOF ¶ 70.

In Section 9 of the Clearance Agreement, JPMorgan agreed to act as custodian with respect to triparty repos pursuant to triparty custody agreements in the form attached as Exhibit A. SOF ¶¶ 6-7. As triparty custodian, JPMorgan's role was to hold cash and securities on behalf of LBI and the overnight investors in LBI's securities; to transfer the investors' cash to LBI and LBI's securities to the investors at the start of the transaction; and to reverse those transfers in the repurchase leg of the transaction. SOF ¶¶ 1(e), 4-5 (CA Ex. A ("Custody Agreement") at §§ 2, 4, 6). Neither the Clearance Agreement nor the Custody Agreement contains any language obligating JPMorgan to advance the cash needed by LBI to unwind the repos. SOF ¶¶ 64-66.[11] The Custody Agreement provides that if LBI lacks adequate cash to fund the repurchase of its securities, LBI is to instruct JPMorgan which securities to buy back consistent with the amount of cash LBI has available. SOF ¶¶ 1(e), 65-66 (Custody Agreement at § 4(b)).[12]

---

[11] *See* Ex. 11 ("Market for Tri-Party Repo," *Federal Reserve Bank of New York*, Jan. 25, 2008 ("FRBNY Mem.") at 3) ("By the nature of the tri-party repo market, the credit extensions are discretionary decisions that can be withdrawn on a daily basis."); *see also id.* at 4 ("Under its tri-party repo agreement with dealers and investors, each clearing bank is not required to provide the intraday credit necessary to execute the daily early morning unwind process.").

[12] In prior briefing, plaintiffs acknowledged that neither the Clearance Agreement nor the Custody Agreement required JPMorgan to extend credit to fund the unwind, stating both that "the 2000 Clearance Agreement contained no provisions relating to extensions of credit in tri-party repos," and that "[t]he Barclays Custodial Undertaking also made it very clear that JPMorgan had no obligation to extend such credit." SOF ¶¶ 1(dd), 67 (Pl. MTD Counterclaims) at 8, 10-11.

**B.      The words "with notice" do not create an obligation to extend credit.**

In the face of the unambiguous language vesting JPMorgan with discretion (and the absence of any language creating a lending commitment), plaintiffs have pointed to two words in the last sentence of Section 5 of the Clearance Agreement—a sentence that specifically disavows any implication of an obligation to lend from any historical practice and confirms that JPMorgan can decline to extend credit at any time:

> Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, with notice and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling.

SOF ¶¶ 1(e), 58 (CA at § 5).

Turning this additional protective language on its head, plaintiffs seize upon the words "with notice" to argue that JPMorgan was *obligated* to advance tens of billions of dollars of credit on a daily basis to LBI until the expiration of some unmentioned and undefined notice period, regardless of LBI's financial condition or the adequacy of the collateral that it had posted, and notwithstanding the multiple clear and unambiguous statements in the preceding twenty lines that any credit would be extended solely at JPMorgan's discretion.  SOF ¶¶ 1(e), 58 (CA at § 5).

The words "with notice" simply cannot be read to transform JPMorgan's discretion to extend credit that is immediately repayable on demand into a commitment to extend credit.  "[T]he fundamental canon of construction" is that a "contract must be read as a whole in order to determine its purpose and intent, and that single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Eighth Ave. Coach Corp.* v. *City of N.Y.*, 286 N.Y. 84, 88 (1941).  Rewriting the Clearance Agreement to impose an advance notice period—during which JPMorgan would be *required* to extend credit, notwithstanding its discretion not to do so—puts the words "with notice" in irrec-

oncilable conflict with the preceding twenty lines of Section 5, which unequivocally provide that it is always JPMorgan's *choice* to make loans or to decline to do so.  SOF ¶ 58.  Indeed, it makes a nullity of the words in the same sentence that JPMorgan could in its discretion decline to extend credit "at any time."

The unambiguous meaning of "with notice" is concurrent—not prior—notice, as "with" means "accompanying" or "at the same time as."[13]  AMER. HERITAGE DICTIONARY (4th ed. 2009).  The phrase "with notice" cannot be rewritten to mean "with X days' advance notice" or "with commercially reasonable notice"—during which time JPMorgan is obligated to extend credit on a daily basis for a period of undefined length.  SOF ¶ 69.  When the parties intended to impose an advance notice requirement in the Clearance Agreement, they did so expressly.  Section 17, for example, explicitly requires 30 days' or 12 months' notice to terminate the agreement itself.  SOF ¶¶ 1(e), 68 (CA at § 17).  By contrast, in Section 5, the parties merely stated that JPMorgan may decline to extend credit "with notice," and could do so "at any time."  SOF ¶¶ 1(e), 58 (CA at § 5).  "[W]hen certain language is omitted from a provision [of a contract] but placed in other provisions, it must be assumed that the omission was intentional."  *E.g.*, *Sterling Investor Servs., Inc.* v. *1155 Nobo Assocs., LLC*, 818 N.Y.S.2d 513, 516 (2d Dep't 2006).

Plaintiffs' construction of "with notice" also cannot be reconciled with the requirement that all extensions of credit are payable on demand.  *See* SOF ¶¶ 1(e), 58 (CA at § 5).  It simply makes no sense to conclude that the drafters intended "with notice" to obligate JPMorgan to extend credit for an undefined time period while, at the same time, expressly permitting JPMorgan to require repayment of the very same credit the instant after it was extended.  That runs afoul of

---

[13] Such unambiguous words in a contract "must be given their plain and ordinary meaning." *White* v. *Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007).  Where, as here, the parties have "set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  *W.W.W. Assocs., Inc.* v. *Giancontieri*, 77 N.Y.2d 157, 162 (1990).

the basic principle that "a contract should be interpreted so as not to render its terms nonsensical." *AmeriCredit Fin. Servs., Inc.* v. *Oxford Mgmt. Servs.*, 627 F. Supp. 2d 85, 99 (E.D.N.Y. 2008).

> ### C.   An obligation to extend credit does not arise under the implied covenant of good faith and fair dealing.

For these same reasons, plaintiffs cannot transform the "with notice" language into an obligation to lend by invoking the implied covenant of good faith and fair dealing. The covenant of good faith and fair dealing exists simply to aid in the performance and enforcement of express contract provisions, and hence cannot create new contractual rights or obligations. *See, e.g.*, *Golden Archer Invs., LLC* v. *Skynet Fin. Sys.*, 908 F. Supp. 2d 526, 536 (S.D.N.Y. 2012).

First, because the Clearance Agreement expressly provides that any discretionary loan is payable on demand, the law imposes no requirement to act reasonably. *See* U.C.C. § 1-208, cmt. (obligation to act in good faith "has no application to demand instruments or obligations whose very nature permit call at any time with or without reason"); *Nat'l Westminster Bank, U.S.A.* v. *Ross*, 130 B.R. 656, 680 (S.D.N.Y. 1991), *aff'd*, 962 F.2d 1 (2d Cir. 1992).

Moreover, courts have consistently refused to infer an obligation by a bank to lend where none exists in the contract. In *Kham & Nate's Shoes No. 2, Inc.* v. *First Bank of Whiting*, 908 F.2d 1351, 1357-58 (7th Cir. 1986), the Seventh Circuit rejected the use of the implied covenant of good faith to create an obligation to lend in the face of express language allowing the bank to stop making further advances. Invoking the Official Comment to U.C.C. § 1-208, the court held that a bank had the right to act in its own economic interest even if that left the borrower unable to obtain funding and "propelled it down hill." *Id. Kham & Nate's* has been widely followed by New York courts.[14]

---

[14] *See, e.g.*, *Ross*, 130 B.R. at 675 (borrower's claim that bank breached loan agreement by "failing to advance the amounts requested" and "terminating the lending relationship" was "precluded by the express terms" of the agreement giving bank "sole discretion" to make advances); *see also HSH Nordbank AG* v. *Street*, 421 F. App'x 70, 73-74 (2d Cir. 2011) (rejecting implied covenant claim against bank for refusal to fund draw request, even though that refusal led to borrower's default, because bank had "no obligation to fund" under "express terms of the [l]oan").

Even when there is a consistent pattern of lending over time, courts are unwilling to imply an obligation to lend.  *See Fasolino Foods Co.* v. *Banca Nazionale del Lavoro*, 961 F.2d 1052, 1058 (2d Cir. 1992) ("[Bank] never represented that credit of a certain amount would be provided, and [debtor] had no reasonable expectation of continued . . . credit."); *In re Minpeco, USA, Inc.*, 237 B.R. 12, 28 (Bankr. S.D.N.Y. 1997) ("[C]ourts have rejected any duty to give advance notice in cases where the lender had made no contractual commitment to provide specific or ongoing financing.").  Here, the Clearance Agreement *expressly* refuted any implication of a continuing duty to lend from a prior practice of lending.  SOF ¶¶ 1(e), 58 (CA at § 5 (last sentence)).  "[W]here the instrument contains an express covenant in regard to any subject, no covenants are to be implied in respect to the same subject."  *RJ Capital, S.A.* v. *Lexington Capital Funding III, Ltd.*, 2011 WL 3251554, at *13 (S.D.N.Y. July 28, 2011).

### D.   None of the parties' agreements restricts JPMorgan's requests for collateral.

As the Clearance Agreement and triparty custody agreements imposed no obligation on JPMorgan to extend credit, simple logic dictates that there would be no provisions restricting JPMorgan's right to request additional collateral as a condition to exercising its discretion to extend such credit.  And, in fact, the agreements contain no such provisions.  The resolution of this case can thus be stated as simply as this:  a bank that can choose not to make a loan at all can request whatever conditions it deems necessary to make such a loan.

In the Complaint, plaintiffs extract two words—"fully collateralized"—from Section 3 of the Clearance Agreement, and assert that these words restricted JPMorgan's right to request collateral.  Compl. ¶¶ 25, 311.  But rather than restricting JPMorgan's ability to request collateral prior to making new discretionary advances, Section 3 *protects* JPMorgan's collateral position when there are outstanding advances against the securities, stating that JPMorgan "shall only permit transfers" of such securities into unencumbered accounts if, after any transfer, JPMorgan

"remain[s] fully collateralized." SOF ¶¶ 1(e), 71-73 (CA at § 3). Moreover, Section 3 is irrelevant

to requests made of LBHI, which did not have clearance obligations to JPMorgan. SOF ¶ 188.

**POINT II:    THE SEPTEMBER AGREEMENTS AND THE SEPTEMBER COLLATERAL TRANSFERS ARE VALID AND ENFORCEABLE.**

As there is no genuine dispute that JPMorgan was neither obligated to extend credit nor

restricted in its right to request collateral prior to doing so, claims that are premised on JPMor-

gan's having violated such nonexistent obligations or restrictions, including coercion, duress and

breach of contract or the implied covenant, necessarily fail.

### A.    The September Agreements and the collateral transfers did not result from coercion or duress.

Plaintiffs claim in Counts 35, 46 and 48 that JPMorgan caused LBHI to provide it with

$8.6 billion in collateral, and to enter into the September Agreements, by threatening to withhold

credit to LBI. Because JPMorgan had no obligation to extend credit to LBI, but rather could

cease extending credit "at any time," with notice—which notice was provided—JPMorgan's

purported threat to withhold credit was not "wrongful."[15] Only threats of conduct "outside a

party's legal rights" can sustain a claim of economic duress. *Interpharm, Inc.* v. *Wells Fargo

Bank, Nat'l Assoc.*, 655 F.3d 136, 142 (2d Cir. 2011).[16]

Even if one were to lend credence to plaintiffs' portrayal of JPMorgan as having "life and

death power" over Lehman because, without its massive extensions of credit, Lehman's business

would have faced "immediate collapse" (Compl. ¶¶ 1, 5), the result would be the same. "[A]

mere demonstration of financial pressure or unequal bargaining power will not, by itself,

---

[15] *See* Ex. 11 (FRBNY Mem. at 17) ("The threat of refusing to unwind a dealer's portfolio is real. Refusal may be the only weapon a clearing bank might have for persuading a dealer to provide more credit protection.").

[16] *Accord Bank Leumi Trust Co. of N.Y.* v. *D'Evori Int'l, Inc.*, 558 N.Y.S.2d 909, 914 (1st Dep't 1990) (refusal to extend discretionary credit was not a "wrongful" threat).

establish economic duress." *Interpharm*, 655 F.3d at 142.  That Lehman—a large, sophisticated financial institution—made a business decision to operate with a highly risky financial model, and to have its broker-dealer subsidiary rely on low-cost, discretionary, day-to-day financing against its securities portfolio, ultimately leaving it vulnerable in a time of financial stress, cannot shift responsibility for the consequences of that decision to its clearing bank, which was only a discretionary, intraday provider of credit.[17]

In any event, not a single witness supports plaintiffs' allegation that "[o]n the evening of September 9, 2008, JPMorgan threatened that, if LBHI did not execute the proposed agreements before LBHI's earnings call scheduled for 7:30 a.m. the next day, JPMorgan would immediately stop extending intra-day credit to, and clearing trades for, Lehman."  Compl. ¶ 276; SOF ¶¶ 78-79.  To the contrary, key Lehman employees testified that JPMorgan made *no* threats in the negotiation of the September Agreements.  SOF ¶¶ 80-84.  And the undisputed evidence as to Lehman's decision to post the $5 billion of cash collateral on September 11 is the testimony of Lehman CEO Richard Fuld—who made the decision (SOF ¶¶ 30-31)—that he was not aware of *any* threat by JPMorgan to cease clearing or extending credit.  SOF ¶¶ 84-86.

**B.**     **JPMorgan did not violate the implied covenant of good faith and fair dealing under the September Agreements.**

As discussed above, the covenant of good faith and fair dealing cannot create new contractual rights or obligations.  *Golden Archer*, 908 F. Supp. 2d at 536.  In an effort to identify an express contractual provision to serve as a basis for an implied covenant claim challenging JPMorgan's requests for collateral, plaintiffs allege in Count 47 that "JPMorgan deprived LBHI of any right under the September Agreements to refuse unreasonable and excessive collateral de-

---

[17] *See* Ex. 11 (FRBNY Mem. at 1) (warning that dealers' reliance on "day-to-day . . . financing decisions" leaves them "more vulnerable to decisions by investors or clearing banks to reduce their level of credit extensions in times of market stress").

mands."[18]  Compl. ¶ 353.  But no such right exists.  The September Agreements include a Guaranty, whereby LBHI guaranteed its subsidiaries' obligations to JPMorgan, and a Security Agreement, which created a lien on LBHI's pledged assets to secure those obligations.  SOF ¶¶ 23-24.  None of those agreements contains a provision restricting or regulating JPMorgan's right to request collateral as a condition to making discretionary extensions of credit.  SOF ¶ 74.

Count 47 further alleges that JPMorgan violated the implied covenant by "refusing" to return the collateral at the end of the business day on Friday, September 12 (although plaintiffs do not allege and the evidence does not reflect any request for its return on Friday), and over the weekend.  SOF ¶ 87.  Yet plaintiffs do not even purport to tie this implied covenant claim to any contractual provision under the September Agreements.  Nor could they, as the September Security Agreement explicitly provided LBHI with the right to transfer the collateral only on *three days'* written notice to JPMorgan.  SOF ¶ 88.  LBHI never gave JPMorgan such notice.  SOF ¶¶ 90-91.  Any purported implied covenant cannot override this express contractual requirement. *See, e.g.*, *RJ Capital*, 2011 WL 3251554, at *13.

### C.    JPMorgan gave ample consideration to sustain the September Agreements.

Count 35 alleges that the September Agreements are invalid because JPMorgan gave LBHI no "new" consideration, since it purportedly had a preexisting duty to extend credit. Compl. ¶ 281.  Because the agreements do not create such a duty, it is beyond dispute that the hundreds of billions of dollars of discretionary credit that JPMorgan provided to LBI subsequent to receiving the collateral, as well as a wide range of discretionary credit to other LBHI subsidiaries, constituted consideration.[19]  SOF ¶¶ 99-100, 102-04.  This credit provided Lehman with

---

[18] Plaintiffs allege in Count 45 that this same conduct constituted a breach of the August Agreements; that claim is discussed in more detail *infra*, Point V.C.

[19] JPMorgan extended billions of dollars of credit to Lehman subsidiaries as to which plaintiffs make no claim that there was a preexisting duty.  SOF ¶¶ 102-04.  *See First N.Y. Bank for Bus.* v.

far more than the law requires—consideration of "the most minimal value," *i.e.*, "the proverbial peppercorn." *Gross Mach. Grp.* v. *M.V. "Alligator Independence,"* 1993 WL 77326, at *1 (S.D.N.Y. Mar. 17, 1993) (quoting *Weiner* v. *McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982)).

### D.    The September Guaranty was authorized.

Count 35 also alleges that JPMorgan has no rights under the September Guaranty because Paolo Tonucci, Lehman's Global Treasurer, lacked authority to sign it.  Compl. ¶ 280; *see* SOF ¶¶ 105-07.  This is easily disposed of.  *See Fed. Ins. Co.* v. *Diamond Kamvakis & Co.*, 536 N.Y.S.2d 760, 763 (1st Dep't 1989) (dismissing lack of authority claim on summary judgment based on representations of a corporation's agents that the corporation later tried to disclaim as contrary to corporate policies).

The negotiation of the September Agreements was conducted for Lehman by both its in-house and outside counsel, whose authority to represent Lehman in those negotiations is unquestioned.  SOF ¶ 109.  Lehman's attorneys delivered to JPMorgan agreements in which Lehman expressly represented that "this Guaranty . . . has been duly authorized by all necessary corporate action . . . and . . . is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms."  SOF ¶¶ 110-13, 121.  There is no evidence that any representative of Lehman raised any issue with JPMorgan about Tonucci's authority at that time; to the contrary, Lehman's counsel told JPMorgan that the agreements were being sent to "our executive officers" for signature.[20]  SOF ¶¶ 110, 114, 119, 122-23, 139.

---

*DeMarco*, 130 B.R. 650, 654 (S.D.N.Y. 1991) ("Consideration passing from a creditor to a principal obligor is sufficient . . . to support a . . . guaranty of the principal obligor's debts.").

[20] *See King World Prods., Inc.* v. *Fin. News Network, Inc.*, 660 F. Supp. 1381, 1385 (S.D.N.Y. 1987) (finding agent's authority could be relied upon when "dealing with top executives and counsel" and noting with "great significance, it was [defendant's general counsel] who directed that [plaintiff] bring the sublease to [the agent] for execution").

Moreover, the undisputed evidence establishes that Ian Lowitt, Lehman's CFO, who un-questionably had signing authority, learned from Tonucci on the afternoon of September 10 that he had signed agreements that gave JPMorgan additional protection.  SOF ¶¶ 116-17.  Lowitt expressed no objection, and took no action to disavow the agreements.  SOF ¶¶ 118-19.  Lowitt's failure to repudiate the "unauthorized" Guaranty ratified the agreement.  Similarly, Fuld, Leh-man's CEO, decided on the evening of September 11 that LBHI would provide additional collat-eral in connection with the September Agreements.  SOF ¶¶ 30-31, 120.  After its bankruptcy filing, LBHI further ratified the Guaranty when it caused LBI to continue to obtain credit from JPMorgan and, in order to induce JPMorgan to do so, sought and obtained the Comfort Order without ever repudiating the Guaranty.  SOF ¶¶ 46-47, 100, 124-29, 139.[21]  These acts of ratifi-cation preclude plaintiffs' belated challenge to the Guaranty as purportedly lacking authority.[22]

### E.     The waiver of defenses clause bars plaintiffs' claims seeking to invalidate and rescind the September Agreements.

Besides failing on the merits, each of plaintiffs' challenges to the validity of the Septem-ber Agreements is precluded by the express waiver of defenses in the September Guaranty:

> The liability of the Guarantor under this Guaranty is absolute and unconditional irrespec-tive of . . . any lack of validity or enforceability of any . . . Facility Document or . . . any other setoff, defense, or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) or circumstance whatsoever with respect to . . . the Facility Docu-ments . . . which might constitute a legal or equitable defense available to. . . a guarantor; and the Guarantor irrevocably waives the right to assert such defenses, setoffs or counter-claims in any litigation or other proceeding relating to . . . the Facility Documents.[23]

---

[21] JPMorgan does not contend that the Comfort Order *itself* validated the August Agreements or September Agreements or waived plaintiffs' breach of contract claims.  Rather, LBHI's *conduct* in filing the motion and arguing before the bankruptcy court for the express purpose of inducing JPMorgan to continue to perform under the agreements constituted ratification.

[22] *See infra* Point II.F; *In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 237 (S.D.N.Y. 2010) (dismissing claim that contract was unauthorized where party "failed to object or attempt to undo the transaction upon learning of it").

[23] SOF ¶¶ 1(k), 94-95 (September Guaranty ("SG") at § 2).  "Facility Documents" are defined to include, *inter alia*, the September Guaranty and the September Security Agreement.  *Id.* at 1.

Such "hell or high water" clauses are routinely upheld under New York law.[24]   Courts are particularly firm in enforcing waivers where, as here, the waiver was executed by a sophisticated party and clearly waived any challenge to the guaranty itself.[25]   Each of the defenses plaintiffs raise to invalidate the September Agreements—coercion/duress,[26] lack of consideration[27] and lack of authority[28]—has been held to be barred by waivers similar to the one at issue here.

### F.    LBHI ratified the agreements and waived any purported breaches.

Plaintiffs' challenges to the September Agreements and collateral transfers also fail by virtue of Lehman's subsequent actions and acceptance of benefits from JPMorgan that served to ratify the agreements and waive any belated claims of breach.

---

[24] *See, e.g.*, *Citibank, N.A.* v. *Plapinger*, 66 N.Y.2d 90, 92 (1985) (absolute and unconditional waiver barred claim of fraudulent inducement); *see also Red Tulip, LLC* v. *Neiva*, 842 N.Y.S.2d 1, 5-6 (1st Dep't 2007); *Crossland Fed. Sav. Bank* v. *A. Suna & Co.*, 935 F. Supp. 184, 192-93 (E.D.N.Y. 1996); *Preferred Equities Corp.* v. *Ziegelman*, 593 N.Y.S.2d 548, 549 (2d Dep't 1993).

[25] *See Plapinger*, 66 N.Y.2d at 94-95; *Export-Import Bank of the U.S.* v. *Asia Pulp & Paper Co.*, 2008 WL 465169, at *3-5 (S.D.N.Y. Feb. 6, 2008); *Ursa Minor Ltd.* v. *AON Fin. Prods., Inc.*, 2000 WL 1010278, at *8 (S.D.N.Y. July 21, 2000).

[26] *Quest Commercial, LLC* v. *Rovner*, 825 N.Y.S.2d 766, 766 (2d Dep't 2006) (defendant unable to raise duress claim where defendant had "validly waived all defenses, counterclaims, and set-offs"); *Santa Fe Pointe LP* v. *Greystone Servicing Corp.*, 2009 WL 1438285, at *5 (N.D. Cal. May 19, 2009) (duress defense "foreclosed" under New York law by statement that obligations were "continuing, absolute and unconditional, irrespective of any circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a guarantor").

[27] *Liberty Mut. Fire Ins. Co.* v. *Mystic Transp., Inc.*, 2004 WL 2071703, at *3 (S.D.N.Y. Sept. 16, 2004) ("individual who executes an absolute and unconditional guaranty is precluded from raising not only lack of consideration, but also various contractual defenses such as fraud in the inducement"); *Gen. Trading Co.* v. *A&D Food Corp.*, 738 N.Y.S.2d 845, 845 (1st Dep't 2002) ("guarantee, which states that it is absolute and unconditional and that the guarantors waive the right to interpose any defenses, effectively waived the defense of . . . failure of consideration").

[28] *UBS AG, Stamford Branch* v. *HealthSouth Corp.*, 645 F. Supp. 2d 135, 138, 143 (S.D.N.Y. 2008) ("absolute and unconditional" waiver "preclude[d defendant's] . . . argument that the Agreement is unenforceable because its agent's authorization was suspect"); *Keeseville Nat'l Bank* v. *Gulati*, 599 N.Y.S.2d 175, 176 (3d Dep't 1993) (waiver of "all defenses, rights of set-off and rights to interpose counterclaims" waived right to assert defense based on lack of authority).

If, as plaintiffs allege, JPMorgan was obligated to continue to extend credit to LBI and had no right to the $8.6 billion in collateral, LBHI had a unique opportunity to repudiate those allegedly invalid agreements once it had filed for bankruptcy. It did not do so. Instead, in order to induce JPMorgan to continue extending credit to LBI, one of LBHI's first acts after petitioning for bankruptcy was to seek a Comfort Order from the bankruptcy court. SOF ¶¶ 46, 126-27. LBHI represented to the court that the parties' agreements allowed JPMorgan to "elect" to provide credit advances "in its sole discretion," that JPMorgan's need for comfort regarding the status of the parties' agreements and related collateral was "completely understandable," and that "[a]ny cloud on the guarantees vis-à-vis the Holding Company Collateral [would] inhibit [JPMorgan] from [making] clearing advances." SOF ¶¶ 124-29. Nowhere in its filing did LBHI repudiate the September Agreements, take the position that LBHI was not bound by the September Agreements, or claim JPMorgan had breached any of its contracts. SOF ¶¶ 131-39.

LBHI's conduct precludes plaintiffs' claims. A party that executes a contract that it claims is voidable for reasons of duress or lack of authority must "promptly" repudiate the contract, or else be "deemed to have ratified it." *VKK Corp.* v. *Nat'l Football League*, 244 F.3d 114, 122-23 (2d Cir. 2001); *Vargas Realty*, 440 B.R. at 235. A party may also ratify a contract by "intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *VKK*, 244 F.3d at 123; *accord Bank Leumi*, 558 N.Y.S.2d at 914 (guarantees not voidable for duress where plaintiff "accepted the benefits of the bank's [extension of credit] in reliance upon the[] guarantees and thereby ratified the same"). Similarly, "where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accept the benefits of the contract, such continuing

performance constitutes a waiver of the breach." *VCG Special Opportunities Master Fund Ltd.*
v. *Citibank, N.A.*, 594 F. Supp. 2d 334, 342 (S.D.N.Y. 2008) (plaintiff waived claim that bank
breached parties' agreement by demanding additional collateral where plaintiff posted requested
collateral and continued to accept bank's payments), *aff'd*, 355 F. App'x 507 (2d Cir. 2009);
*CDO Plus Master Fund Ltd.* v. *Wachovia Bank, N.A.*, 2009 WL 2033048, at *6 (S.D.N.Y. July
13, 2009) (same). The rules governing waiver apply with equal force to claims for breach of the
implied covenant of good faith and fair dealing. *VCG*, 594 F. Supp. 2d at 343-44.

By accepting billions of dollars of discretionary advances before and after LBHI's bank-
ruptcy, seeking the Comfort Order, and failing to do what the law requires, *i.e.*, promptly and
unequivocally repudiate the agreements, LBHI ratified the September Agreements and waived
any claims for breach.

**POINT III:    LBHI'S PLEDGE OF COLLATERAL WAS NOT THE PRODUCT OF
FRAUD OR EGREGIOUS MISCONDUCT.**

Plaintiffs have attempted to transform a case involving a financial institution receiving
additional collateral for its claims, most of which arose from loans extended after the collateral
was provided, into a hyped-up case of intentional misconduct. But all that plaintiffs can allege is
that JPMorgan was secured, while unsecured creditors were not. At most, these allegations state
a (baseless) claim that JPMorgan obtained a preference, a claim that has been dismissed and
cannot be sustained because it conflicts with the safe harbors. But there is no basis to conclude
either that LBHI intended to defraud its creditors by providing JPMorgan with credit support to
induce it to make new advances of hundreds of billions of dollars and continue transacting with
Lehman in the marketplace, or that JPMorgan engaged in egregious misconduct justifying
subordination of its secured claims simply because it obtained collateral.

**A.   There is no evidence that LBHI intended to hinder, delay or defraud its creditors, as required for plaintiffs' actual-intent fraudulent transfer claims.**

Counts 1 through 3 of the Complaint are the only fraudulent transfer claims that remain in the case, as the sole exception to the safe harbors is for transfers made with actual intent to defraud creditors under 11 U.S.C. § 548(a)(1)(A).  To succeed on those claims, plaintiffs must prove that the debtor—LBHI—acted with the "actual intent to hinder, delay, or defraud" its creditors when it provided collateral to JPMorgan.  This requires a showing that LBHI "had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends."  5 Collier on Bankruptcy ¶ 548.04[1][a] (16th ed. 2013).  To forestall summary judgment, plaintiffs must marshal "sufficient evidence from which a reasonable jury could find *actual fraud* under the clear and convincing standard."  *Lippe* v. *Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

Plaintiffs cannot carry this burden.  *First*, they have *admitted* that LBHI did not intend to hinder, delay or defraud creditors by entering into the August Agreements (SOF ¶ 140), which disposes of the fraudulent transfer claims directed at those contracts.  *Second*, there is *no* evidence that LBHI entered into the September Agreements, and transferred collateral to JPMorgan, to injure its creditors.  To the contrary, LBHI executives uniformly *denied* that they had such intent.  SOF ¶¶ 140-46.  Indeed, Fuld testified that, at the time of the September Agreements and collateral transfers, "the idea of bankruptcy had not entered [his] brain."  SOF ¶ 147.  Moreover, Fuld testified that Lehman raised JPMorgan's collateral request with then-Fed President Geithner and Geithner's response was that Lehman had "plenty" of collateral and should "post it."  SOF ¶ 148.  Quite simply, there is no evidence of fraudulent intent here.

The "badges of fraud" referenced by the bankruptcy court in denying JPMorgan's motion to dismiss (*Lehman*, 469 B.R. at 447-48) do not preclude summary judgment.  Badges of fraud

serve as circumstantial evidence of fraudulent intent absent direct evidence of actual intent. *Lippe*, 249 F. Supp. 2d at 374-75. At this stage, however, when a robust discovery record shows that the debtor's intent was *not* to harm creditors, the "badges of fraud"—few of which are even arguably present here—cannot defeat summary judgment. *See id.* at 382 (granting summary judgment despite allegations of badges of fraud where, "[a]fter years of discovery, including the production of hundreds of thousands of pages of documents, dozens upon dozens of depositions, and numerous experts, plaintiffs [had] not uncovered any direct evidence of intent to defraud"); *accord In re Chin*, 492 B.R. 117, 132 (Bankr. E.D.N.Y. 2013).

**B.    JPMorgan did not engage in "egregious and severely unfair" conduct warranting equitable subordination.**

Count 30 seeks a judgment equitably subordinating JPMorgan's secured claims against the LBHI estate under Section 510(c) of the Bankruptcy Code. Equitable subordination is "an extraordinary remedy that is to be used sparingly." *In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009). It has no application here.

The threshold question on any equitable subordination claim is whether the defendant was an insider of the debtor. A third-party creditor is considered an "insider" for purposes of equitable subordination only if it "dominated and controlled the debtor." *In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999). The degree of domination and control must be so substantial that there is a "merger of identity" in which "the creditor has become, in effect, the *alter ego* of the debtor." *Pan Am Corp.* v. *Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y. 1994). JPMorgan's relationship with Lehman does not support a finding that JPMorgan and LBHI were "alter egos" or that there was a "merger of identity." *Id.*; *KDI*, 277 B.R. at 511; SOF ¶¶ 149-50.

Since JPMorgan was not an insider, plaintiffs must establish that the bank "committed fraud, overreaching or spoliation to the detriment of others." *In re W.T. Grant Co.*, 4 B.R. 53, 75

(Bankr. S.D.N.Y. 1980), *aff'd*, 699 F.2d 599, 609 (2d Cir. 1983).  As the Second Circuit has ex-

plained, apart from voidable preferences and fraudulent conveyances proscribed by bankruptcy

law, "there is generally no objection to a creditor's using his bargaining position, including his

ability to refuse to make further loans needed by the debtor, to improve the status of his existing

claims."  *In re W.T. Grant Co.*, 699 F.2d at 610; *accord Kham & Nate's Shoes*, 908 F.2d at 1357.

JPMorgan's alleged use of its bargaining position to obtain additional collateral therefore cannot

justify equitable subordination of its secured claims under Second Circuit law.  Moreover, inas-

much as JPMorgan's claims result largely from its advancing hundreds of billions of dollars of

credit, including after the collateral transfers and after LBHI's bankruptcy, with no obligation to

do so, there would be nothing "equitable" about subordinating those claims.

### C.    JPMorgan did not fraudulently induce LBHI to provide collateral.

Count 49 of the Amended Complaint alleges that JPMorgan defrauded LBHI by its

Chairman and CEO, Jamie Dimon, inducing LBHI to post $5 billion in collateral by promising

Lehman's CEO, Richard Fuld, that JPMorgan would return the collateral at the close of trading

the next day, but that this promise was made with the undisclosed intention of not performing.

Compl. ¶¶ 366, 368.

To sustain a fraud claim at the summary judgment stage, a plaintiff must put forth "clear

and convincing" evidence as to each element.  *See Merrill Lynch & Co.* v. *Allegheny Energy,*

*Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).  Plaintiffs cannot do so here.  Not only do they lack

"clear and convincing" evidence that Dimon made the alleged promise,[29] they have no evidence

---

[29]  Neither Dimon nor Steven Black, co-head of JPMorgan's Investment Bank, testified that there
was any such promise.  SOF ¶¶ 152-53.  Lehman CFO Lowitt testified that he had no recollec-
tion of Dimon promising to return the collateral.  SOF ¶ 154.  Lehman Treasurer Tonucci also
testified that Dimon did not promise to return the collateral.  SOF ¶ 151.  The fraud claim thus
appears to rest on CEO Fuld's equivocal testimony that during the call he asked:  "I assume we
get this back tomorrow?" and *either* Dimon or Black supposedly said yes.  Ex. 4 (Fuld Tr.
4/27/12 at 156:16-157:8).  There is nothing "clear and convincing" about this.

of scienter, *i.e.*, that Dimon spoke with the purpose of deceiving Lehman.  Under New York law, "[f]raudulent intent not to perform a promise cannot be inferred merely from the fact of nonper- formance."  *Philips Credit Corp.* v. *Regent Health Grp., Inc.*, 953 F. Supp. 482, 520 (S.D.N.Y. 1997); *accord Pot Luck LLC* v. *Freeman*, 2010 WL 908475, at \*4 (S.D.N.Y. Mar. 8, 2010).

Plaintiffs also cannot adduce evidence of reasonable reliance.  The September Security Agreement could only be amended in writing, and it provided that LBHI could transfer its collat- eral only "upon three days written notice."  SOF ¶¶ 1(*l*), 88, 156 (September Security Agreement ("SSA") at 3, 6).  The supposed "promise" that JPMorgan would return $5 billion in collateral *the same day* it was posted would have been an unenforceable oral modification of the Security Agreement and, as a matter of law, could not reasonably have been relied upon.[30]

**POINT IV:    JPMORGAN DID NOT FORFEIT ITS LIEN ON $6.9 BILLION.**

Summary judgment is warranted on plaintiffs' claim that JPMorgan *forfeited* its lien on $6.9 billion of collateral when, in an effort to preserve its lien rights, it moved the collateral from a demand deposit account into a more secure general ledger cash collateral account (Count 38).

In the September Security Agreement, LBHI granted JPMorgan a "security interest in, and a general lien upon and/or right of set-off of, the Security."  SOF ¶¶ 1(*l*), 159 (SSA at 2). "Security" is defined to include "*all accounts* of [LBHI] at [JPMorgan]";[31] "*all . . . funds and/or other assets* from time to time held in or credited to" those accounts; and "*all proceeds* of any and all of the foregoing Security."  SOF ¶¶ 1(*l*), 160-61 (SSA at 1).

---

[30] *See John St. Leasehold LLC* v. *Fed. Deposit Ins. Corp.*, 1996 WL 737196, at \*7 (S.D.N.Y. Dec. 24, 1996) ("Where a written agreement expressly bars oral modification of the agreement, a party cannot argue that it reasonably relied on an oral modification for purposes of establishing a fraud . . . claim."); *see also 4 B's Realty 1530 CR39, LLC* v. *Toscano*, 2009 WL 702011, at \*5-6 (S.D.N.Y. Mar. 12, 2009) (reliance on alleged oral modification not reasonable).

[31] One LBHI account, the "Overnight Account," was excluded from the definition of "Security." *See* SOF ¶ 1(*l*) (SSA at 1); SOF ¶ 1(i) (August Security Agreement ("ASA") at 3).

Between September 9 and 12, LBHI deposited $6.9 billion into an LBHI demand deposit account at JPMorgan (the "Deposit Account"), which JPMorgan then moved into a cash collateral account maintained on the bank's general ledger, G/L 2103940020 NIB TRIPARTY CASH COLLATERAL (the "GL Cash Collateral Account").  SOF ¶¶ 162-63.  The GL Cash Collateral Account was not a proprietary account of JPMorgan; rather, it was an omnibus account used to hold cash collateral pledged by JPMorgan's dealer clients, including Lehman.  Funds in the GL Cash Collateral Account were especially secure because, unlike the Deposit Account, they could only be transferred through an instruction initiated within JPMorgan.  SOF ¶¶ 164-65, 171.

The crux of plaintiffs' argument is that JPMorgan's security interest was purportedly "limited to the accounts of LBHI held at JPMorgan" (and the funds held "from time to time" in those accounts), and the GL Cash Collateral Account was not an account "of LBHI."  Compl. ¶ 295.  Plaintiffs' argument (1) cannot be squared with the plain language of the September Security Agreement or the Uniform Commercial Code as adopted in New York ("U.C.C."), which provides that a security interest in collateral "continues" when it is moved *and* attaches to any identifiable "proceeds" of that collateral; and (2) ignores that, even without a lien, JPMorgan still would have a right of setoff against the collateral.

### A.    JPMorgan retained its security interest in the cash collateral.

Under the U.C.C., a security interest in a "deposit account" may be perfected only by "control" of the account.  U.C.C. §§ 9-312(b)(1), 9-314(a); *Joseph Stephens & Co.* v. *Cikanek*, 588 F. Supp. 2d 870, 874-76 (N.D. Ill. 2008); SOF ¶ 1(*l*) (SSA at 2-3) (incorporating U.C.C.'s provisions).[32]  JPMorgan had control of the Deposit Account under U.C.C. § 9-104(a)(1), because it was

---

[32] A "deposit account" is the right to payment from a bank arising out of a deposit of funds; a security interest in a deposit account attaches to the depositor's right to be paid by the bank.  *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 404 B.R. 752, 758 (Bankr. S.D.N.Y. 2009).

"the bank with which the deposit account [was] maintained," and under U.C.C. § 9-104(a)(2), because it was granted the right to "direct disposition of any and all of the funds in the deposit accounts . . . without the consent of [LBHI]."  SOF ¶ 1(*l*) (SSA at 2); U.C.C. § 9-104(a)(2) & cmt. 3.

JPMorgan's movement of the collateral to another account at the bank over which it had control did not result in the loss of its perfected security interest.  Article 9 makes plain that a security interest in collateral "continues" following an exchange or other disposition, unless the secured party "authorize[s] the disposition free of the security interest"[33] or some provision of Article 9 terminates it.[34]  U.C.C. § 9-315(a)(1).  A secured party's lien also attaches to any "proceeds" of the collateral, including "whatever is acquired" upon its exchange or other disposition.  U.C.C. §§ 9-315(a)(2), 9-102(a)(64)(A); *see* SOF ¶ 1(*l*) (SSA at 1) (granting JPMorgan a security interest in "all proceeds" of the "Security").  Thus, "in any transaction, there is a presumption that the security interest 'sticks' to the collateral regardless of the change of ownership and also adheres to whatever the transferor received in exchange for the transfer."  Bruce A. Markell, *From Property to Contract and Back:  An Examination of Deposit Accounts and Revised Article 9*, 74 Chi.-Kent L. Rev. 963, 991 (1999).  As a result, whether the general ledger deposit is treated as a *continuation* of the same deposit obligation (under § 9-315(a)(1)) or as *proceeds* of that obligation (under § 9-315(a)(2)), JPMorgan's security interest remained intact.

---

[33] *See* U.C.C. § 9-315 & cmt. 2 ("[Section 9-315(a)(1)] contains the general rule that a security interest survives disposition of the collateral . . . [and] makes explicit that the authorized disposition [that would terminate the security interest] . . . is an authorized disposition '*free of* the security interest.").

[34] U.C.C. § 9-332(b) protects an innocent third-party transferee of funds from an encumbered deposit account by providing that the "transferee" "takes the funds free of" the security interest.  That section has no application here.  It does not permit *the debtor* (LBHI) to take free of a security interest, and does not apply to a transfer from one account at a bank to another account at the same bank.  *See* U.C.C. § 9-332(b) & cmt. 2 ("[T]he debtor itself is not a transferee.  Thus, this section does not cover . . . the case in which a bank debits an encumbered account and credits another account it maintains for the debtor.").

### 1.    JPMorgan did not agree to release its security interest.

The September Security Agreement is explicit with respect to the limited circumstances in which JPMorgan agreed to release its security interest:  "Notwithstanding anything provided for herein, *the undersigned* [LBHI] may *upon three days written notice* to the Bank *transfer any Security* . . . and *upon any such transfer* the security interest hereunder *shall be released*." SOF ¶¶ 1(*l*), 88 (SSA at 3).  These circumstances did not occur.  LBHI never gave three days' written notice, nor transferred any of the Security, as would be required for JPMorgan's security interest to be released.  SOF ¶ 170.

Nor is there any basis to suggest that JPMorgan, by itself transferring the deposit into the GL Cash Collateral Account, agreed to *release* its security interest.  To the contrary, the evidence is clear that JPMorgan transferred the deposit into the GL Cash Collateral Account in order to *preserve* that interest, *i.e.*, ensuring that LBHI would not be able to withdraw the collateral absent an instruction initiated by JPMorgan.  SOF ¶ 171.

Contrary to plaintiffs' assertions (Compl. ¶ 295), JPMorgan's transfer of the collateral was entirely consistent with its rights under the September Security Agreement.  In that agreement, "[t]he right is expressly granted" to JPMorgan to "transfer to . . . the Bank . . . any of the Security" in order to "*preserve the Security or its value*."  SOF ¶ 1(*l*) (SSA at 2) (also granting JPMorgan the right "to direct disposition of . . . the funds in the deposit accounts . . . without the consent of [LBHI]"); SOF ¶ 172.  The transfer of funds into the GL Cash Collateral Account was exactly that:  a "transfer" to "the Bank" in order "to preserve the Security or its value."  If LBHI had withdrawn any amount from the Deposit Account, JPMorgan's "Security," *i.e.*, the right to payment associated with the account, would have been diminished by that amount.

Plaintiffs' contention that JPMorgan lost its security interest is further undermined by decisions that have upheld a bank's security interest following similar protective transfers.  In

*Gillman* v. *Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (1988), the New York Court of Appeals rejected the debtor's claim that Chase acted unlawfully in transferring, without notice, a cash deposit from the debtor's checking account into a general deposit account over which the debtor had no withdrawal rights.  The Court concluded that "Chase cannot be held to have acted in bad faith when it took steps to safeguard the fund in which it had an existing security interest and which would, in all likelihood, constitute the only available asset for its reimbursement."  *Id.* at 6-7, 15-16.  The court in *In re CJL Co.*, 71 B.R. 261 (Bankr. D. Or. 1987), confronted a similar set of facts.  In that case, the debtor pledged a cash deposit as security for a letter of credit.  The deposit was placed in a "restricted account" and a "hold" was placed on the funds (to be released after the expiration of the letter of credit).  Exactly as in this case, the bank "became worried that because of [the debtor's] worsening financial condition it might attempt to withdraw the funds."  "[T]o insure that this could not happen," the bank transferred the funds "from the restricted account to the *general ledger account of the Bank*," where "the [d]ebtor completely and totally lost whatever possible ability it had to access those funds."  On summary judgment, the court upheld the bank's security interest following the transfer.  *Id.* at 262-63, 266.

### 2.    JPMorgan's security interest attaches to the deposit in the general ledger account as "proceeds."

Summary judgment is also warranted because the general ledger deposit constitutes "proceeds" of the Deposit Account.  *See supra*, p. 26.  The U.C.C. defines "[p]roceeds" broadly to include "whatever is acquired upon the sale . . . exchange, or other disposition of collateral" (§ 9-102(a)(64)(A)) and all "rights arising out of collateral" (§ 9-102(a)(64)(C)).  Consistent with this broad definition, the U.C.C. expressly contemplates that, in the event of a transfer of funds from one deposit account to another account, the second account—*i.e.*, the right to payment from

the bank maintaining the account—will constitute "proceeds" of the first account.[35]   In this case, the collateral was transferred from the Deposit Account to the GL Cash Collateral Account. JPMorgan's security interest therefore attached to LBHI's right to payment with respect to the collateral in the GL Cash Collateral Account, as identifiable proceeds of the Deposit Account.[36]

Plaintiffs have previously argued that LBHI had no such right to payment following the transfer.  Even if relevant,[37] this is not correct.  LBHI had a right to payment unless and until the collateral was applied to satisfy LBHI's obligations to JPMorgan.  *See, e.g.*, U.C.C. §§ 9-208(a), (b).  The factual record is also clear that the $6.9 billion deposit was treated at all times before its application to JPMorgan's claims as LBHI's pledged collateral.  The deposit was moved into an account used to hold cash *collateral* pledged by JPMorgan's dealer customers, with each dealer's funds identified as that dealer's pledged collateral.  That is exactly how the $6.9 billion deposit was held at the time:  specifically identified as *LBHI's* pledged collateral.  SOF ¶¶ 164, 174-81.

### B.   JPMorgan also retained a right of setoff.

In addition to its rights as a secured party, JPMorgan had a right of setoff with respect to the collateral—a right expressly preserved by Article 9 and the parties' agreements.[38]  In New

---

[35] *See* U.C.C. § 9-332, cmt. 2, ex. 2; *see also* John F. Hilson et al., *Report of the Deposit Accounts Task Force to the Article 9 Drafting Committee*, 54 Consumer Fin. L.Q. Rep. 203, 205 (2000) ("[I]f the debtor transfers funds from a collateralized deposit account to a new deposit account, the security interest attaches to the new deposit account as proceeds of the old."); *Bank of R.I.* v. *Mixitforme, Inc.*, 2007 WL 299361 (R.I. Super. Ct. Jan. 11, 2007) (debtor's bank retained perfected security interest in debtor's rights in escrow account maintained at third-party bank as "proceeds," where escrow account was funded by withdrawal from account at debtor's bank).

[36] The result is the same if the August Agreements govern.  *See* SOF ¶¶ 1(i), 182-84 (ASA at 1-2) (granting JPMorgan security interest in the Deposit Account, funds therein and all "proceeds").

[37] It is not relevant.  Revised Article 9 "contains *no* requirement that property be 'received' by the debtor . . . to qualify as proceeds."  Rather, it is "necessary *only* that the property be traceable . . . to the original collateral"—which is indisputably the case here.  U.C.C. § 9-102 cmt. 13d.

[38] *See* U.C.C. § 9-340(b) & cmt. 3; *see* SOF ¶ 1(k) (SG at § 11) ("*Setoff*.  [LBHI] agrees that, in addition to (and without limitation of) any right of setoff . . . the Bank may otherwise have, the

York, setoff rights are confirmed by statute.  N.Y. D.C.L. § 151.  "[W]hen a depositor is indebted to a bank, and the debts are mutual—that is, between the same parties and in the same right—the bank may apply [a] deposit . . . to the payment of the debt due it by the depositor, provided there is no express agreement to the contrary and the deposit is not specifically applicable to some other purpose."  *Fenton* v. *Ives*, 634 N.Y.S.2d 833, 834 (3d Dep't 1995).

All requirements for setoff are met.  There is mutuality, because LBHI owed JPMorgan under the Guaranty and JPMorgan owed LBHI as a result of the deposit.  The parties' agreements specifically contemplated setoff as an alternative remedy, and JPMorgan would be exercising its setoff rights for the very purpose for which the funds were deposited:  "[a]s security for the payment" of "all obligations and liabilities," "whether now existing or hereafter incurred" of LBHI and its subsidiaries to JPMorgan.[39]  Thus, even if JPMorgan had no lien, the argument gets plaintiffs nowhere:  JPMorgan still would have the right to set off against the collateral.

**POINT V:   PLAINTIFFS' REMAINING CLAIMS FAIL.**

  **A.   The failure of plaintiffs' claims to invalidate JPMorgan's contracts and liens
      necessarily results in the failure of the remaining claims.**

Each of the claims in the Complaint yet to be addressed herein requires plaintiffs first to succeed on their *other* causes of action to invalidate JPMorgan's contracts and liens, or to avoid LBHI's transfers of collateral.  Since those predicate claims fail, it follows that the claims that are dependent on their success must fail as well.

  ***Conversion, Unjust Enrichment, Constructive Trust.***  These claims (Counts 32, 36, 37, 39 and 40) are predicated on the alleged invalidity of *both* the August and September Agreements *and*

---

Bank shall be entitled . . . to offset balances (general or special, time or demand, provisional or final) held by it for the account of [LBHI] . . . against any amount payable . . . under this Guaranty."); SOF ¶ 1(*l*) (SSA at 2) (granting JPMorgan a security interest "and/or right of set-off").

[39] *See* SOF ¶ 1(*l*) (SSA at 1-2); SOF ¶ 1(k) (SG at 1) ("Liabilities").

of JPMorgan's liens on the $6.9 billion resulting from its transfer to a cash collateral account.

Since JPMorgan's agreements with LBHI and its liens are valid and enforceable, these claims fail.

> **Voidable Setoff, Violation of Automatic Stay.**   The provisions of the Bankruptcy Code,

Sections 553 and 362(a), on which plaintiffs rely for these claims (Counts 26, 28 and 33),

contain express safe harbors protecting "contractual rights" of setoff and other secured-party

remedies under agreements related to specified financial-industry transactions when the exercise

of those rights might otherwise clash with those sections.   The September Guaranty and Security

Agreement—which the bankruptcy court has already held are "precisely the sort of contractual

arrangements" that are entitled to safe-harbor protection (*Lehman*, 469 B.R. at 422)—expressly

granted JPMorgan a lien on and setoff rights as to the collateral LBHI posted.   SOF ¶¶ 1(k) (SG

at § 11), 1(*l*) (SSA at 2), 159, 185.   The failure of plaintiffs' causes of action to invalidate those

contracts thus eliminates any argument that the Section 362 and 553 safe harbors do not apply.

> **Turnover, Transfer Recovery, Claim Disallowance.**   These claims (Counts 4, 25, 27, 29,

31 and 34) are "remedial" in nature, entirely contingent upon plaintiffs' success on their Bank-

ruptcy Code causes of action, including under Sections 548, 553 and 362.   These "remedial"

claims seek turnover of collateral shown to be "property of the estate" (§ 542), recovery of

avoided transfers (§ 550) and disallowance of JPMorgan's claims and liens (§§ 502(d) and

506(d)).   As this Court previously ruled, these remedial claims are precluded by LBHI's agree-

ment that payment of any avoidance claims would be deferred until all the parties' disputes are

resolved.   *In re Lehman Bros. Holdings Inc.*, 480 B.R. 179, 192 (S.D.N.Y. 2012); *see* SOF

¶¶ 1(q), 192 (CDA).   In any event, because plaintiffs cannot establish JPMorgan's liability on the

underlying avoidance claims (most of which were already dismissed), the remedies provided in

these sections of the Bankruptcy Code are not triggered.[40]

***Breach of the Clearance Agreement and August Agreements and Breach of the Implied Covenant under the August Agreements.***   These claims (Counts 41, 42, 43, 44 and 45) have relevance only *if* "the September Agreements are invalid and unenforceable." Compl. ¶¶ 310, 318, 323, 330, 335.  Because plaintiffs cannot succeed on claims to invalidate the September Agreements, these claims, which depend on that predicate, necessarily fail.

### B.    Plaintiffs' claims of conversion, unjust enrichment and constructive trust are preempted and also fail on the merits.

The Bankruptcy Code's "safe harbors" declare that a bankruptcy trustee—or other representative of the bankruptcy estate—"*may not avoid*" transfers to financial institutions relating to protected financial-industry transactions such as securities contracts, "*except under section 548(a)(1)(A) of this title.*"  11 U.S.C. § 546(e); *see also id.* §§ 546(f)-(g) (similar protections for transfers relating to repos and swaps).  As the bankruptcy court has already held in this case, "[t]he transactions in question [here] are precisely the sort of contractual arrangements" that are entitled to safe-harbor protection.  *Lehman*, 469 B.R. at 422.

By bringing state-law claims aimed at avoiding transfers that, according to the Bankruptcy Code, can only be avoided by estate representatives under Section 548(a)(1)(A), plaintiffs seek to work a transparent end-run around federal law.[41]  Enforcing well-established principles of federal preemption, courts have repeatedly rejected this litigation tactic (and declined to

---

[40] *See, e.g.*, *In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992) (transferred funds not "property of the estate" until transfer is avoided); *Sec. Investor Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 33 (S.D.N.Y. 2013) (no recovery of transfer under § 550 until transfer is avoided); *In re Metiom, Inc.*, 301 B.R. 634, 641-42 (Bankr. S.D.N.Y. 2003) (no § 502(d) claims disallowance until transfer is avoided); *In re Pomilio*, 425 B.R. 11, 16 (Bankr. E.D.N.Y. 2010) (same for § 506(d)).

[41] *See, e.g.*, Compl. ¶¶ 288, 292, 303, 308 (alleging that LBHI is entitled to the return of collateral as remedy for conversion and unjust enrichment); *id.* at ¶ 265 (alleging in constructive trust claim that "JPMorgan should be ordered to turn over the $5 billion to LBHI immediately").

embrace Judge Peck's ruling in this case), concluding that a debtor cannot invoke state law to claw back transfers protected by the safe harbors.[42]  The result should be the same here.[43]

In any event, the doctrine of conversion "does not apply to the bank-depositor relationship,"[44] thus precluding any conversion claim for return of LBHI's deposited funds.  And plaintiffs' unjust enrichment claims require proof that JPMorgan was enriched at the expense of *the debtor*;[45] it is irrelevant that it might have been "preferred" over other *creditors*.[46]  The notion that JPMorgan was "unjustly enriched" by receiving collateral, which was needed to satisfy its claims against Lehman, and $5.7 billion of which was needed to satisfy advances made *after* the collateral was received, would turn this equitable doctrine on its head.[47]  SOF ¶ 191.

---

[42] *See, e.g.*, *Whyte* v. *Barclays Bank PLC*, 494 B.R. 196, 200 (S.D.N.Y. 2013) (litigation trustee's state-law fraudulent conveyance claims preempted); *AP Servs. LLP* v. *Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (litigation trustee's unjust enrichment claims preempted); *accord Grede* v. *FCStone, LLC*, 746 F.3d 244, 259 (7th Cir. 2014) (trustee's unjust enrichment claims preempted); *Contemporary Indus. Corp.* v. *Frost*, 564 F.3d 981, 988 (8th Cir. 2009) (debtor's unjust enrichment claim preempted); *U.S. Bank N.A.* v. *Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 825 (N.D. Tex. 2012) (litigation trustee's unlawful cash dividend claim preempted); *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 95-98 (D. Del. 2002) (creditors committee's unjust enrichment claims preempted); *In re U.S. Mortg. Corp.*, 491 B.R. 642, 673-76 (Bankr. D.N.J. 2013) (liquidation trustee's claims of conversion, civil conspiracy and aiding and abetting fraud preempted).

[43] This Court's decision in *In re Tribune Co. Fraudulent Conveyance Litigation*, 499 B.R. 310 (S.D.N.Y. 2013), further supports finding preemption here.  Hewing to the literal language of the safe harbor, this Court held in *Tribune* that there was no preemption because the statute expressly places limitations on the transfer avoidance powers of a *trustee* as estate representative.  *See id.* at 316-20.  Here, with the claims against JPMorgan brought by representatives of a bankruptcy estate, the literal language of Section 546 directly applies to bar plaintiffs' claims.

[44] *Martinez* v. *Capital One, N.A.*, 863 F. Supp. 2d 256, 266 (S.D.N.Y. 2012), *aff'd*, 742 F.3d 520 (2d Cir. 2013); *Acevado* v. *Citibank, N.A.*, 2012 WL 996902, at *11 (S.D.N.Y. Mar. 23, 2012).

[45] *In re Borriello*, 329 B.R. 367, 381-82 (Bankr. E.D.N.Y. 2005).

[46] *See, e.g.*, *Ultramar Energy Ltd.* v. *Chase Manhattan Bank, N.A.*, 599 N.Y.S.2d 816, 819 (1st Dep't 1993) (preference does not constitute "unjust enrichment"); *accord B.E.L.T., Inc.* v. *Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) (same).

[47] *In re Akanmu*, 502 B.R. 124, 138 (Bankr. E.D.N.Y. 2013) ("As long as the transferor received a benefit . . . the transferee is not liable on an unjust enrichment claim.").

Finally, plaintiffs' claim for constructive trust fails because plaintiffs cannot raise a triable issue concerning the elements of such a claim, *i.e.*, whether JPMorgan defrauded Lehman, whether JPMorgan was unjustly enriched as a result, and whether JPMorgan and LBHI had a "confidential or fiduciary relationship."[48]   Moreover, plaintiffs cannot demonstrate that money damages would be "inadequate," as the equitable remedy of constructive trust requires.[49]

### C.   There is no provision of the Clearance Agreement or August Agreements that JPMorgan could have breached by requesting or retaining collateral.

***Clearance Agreement.***   Count 41 alleges that JPMorgan breached the Clearance Agreement by requesting an amount of collateral in excess of *LBHI's* obligations under the Clearance Agreement.  Compl. ¶ 313.  This claim does not make sense, since it is conceded that LBHI did not engage in clearance activities and thus had no obligations to JPMorgan under the Clearance Agreement.  SOF ¶ 188.  And in any event, the Clearance Agreement imposed no restrictions on requests for collateral, as shown in Point I.D.

Count 42 then alleges that JPMorgan breached the Clearance Agreement by refusing to return collateral to LBHI at the end of the trading day on September 12 because Section 3 restricted JPMorgan to being "fully collateralized."  Compl. ¶¶ 25, 320.  Again, this claim makes no sense because the collateral at issue was posted by LBHI in its capacity as guarantor/pledger and governed by the August and September Security Agreements, not the Clearance Agreement. SOF ¶¶ 189-90.  Moreover, this claim is premised on plaintiffs' indisputably false allegation that

---

[48] *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004).  "New York law generally requires four elements for a constructive trust:  (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment."  *Id.*  Under New York law, banks and their customers do not owe fiduciary duties to one another, *Wiener* v. *Lazard Freres & Co.*, 672 N.Y.S.2d 8, 13-14 (1st Dep't 1998), and a customer's communication of confidential financial information to its bank—"a necessary incident of virtually any extension of credit"—does not change this basic precept.  *ADT Operations, Inc.* v. *Chase Manhattan Bank, N.A.*, 173 Misc. 2d 959, 967 (N.Y. Sup. Ct. 1997).

[49] *First Cent.*, 377 F.3d at 215-16.

at the end of the trading day on September 12, "Lehman had no clearance-related obligations or debts to JPMorgan whatsoever." Compl. ¶ 320. The undisputed evidence establishes that LBI received more than $120 billion in clearance credit from JPMorgan on September 12, which was not repaid (and not in full) until 11 p.m. that night, that LBI had $1.4 billion still outstanding throughout the weekend of September 13-14, and that LBI received $87 billion in advances on the morning of September 15. SOF ¶¶ 92-93, 100. As guarantor of that debt, LBHI had outstanding obligations to JPMorgan; hence, even if the Clearance Agreement were applicable to collateral posted by LBHI, there is no genuine issue of disputed fact, and Count 42 must fail.

*August Agreements.* Count 43 alleges that JPMorgan breached the August Agreements by requesting more collateral than was required to secure the "obligations arising under the August Guaranty." Compl. ¶ 325. Yet there is no provision in the August Agreements imposing a restriction on JPMorgan's right to request collateral, and thus there is no provision that JPMorgan could have breached. SOF ¶ 74. Count 44, which alleges that JPMorgan breached the August Agreements by not allowing Lehman to access the collateral on the evening of September 12, requires that "Lehman had no clearance-related obligations or debts to JPMorgan whatsoever," but, as shown, that is at odds with the undisputed facts. Compl. ¶ 332.

Finally, Count 45 alleges that the same acts of requesting and retaining collateral that are the subject of Counts 43 and 44 also breached the implied covenant of good faith and fair dealing. But there can be no implied covenant claim when there is no contractual right to which it relates. Just as the August Agreements contain no contractual limitations on JPMorgan's ability to make requests for collateral, they also do not imply any right "to refuse unreasonable and excessive collateral demands by JPMorgan." Compl. ¶ 337. Similarly, as LBHI had no contractual right to take back the collateral on the night of September 12, when obligations to JPMorgan re-

mained outstanding, JPMorgan could not have violated the implied covenant by allegedly frustrating any such right by transferring the cash to its GL Cash Collateral Account.[50]

**D.      The claims to avoid a setoff fail.**

Counts 26 and 28, which allege that JPMorgan engaged in a voidable setoff, also fail because there is no evidence that JPMorgan actually effectuated a setoff prior to LBHI's bankruptcy filing; rather, it merely received transfers of collateral from LBHI.  SOF ¶ 186.  *See* 5 Collier on Bankruptcy ¶ 553.09[1][a] (16th ed. 2013) (transfers are not setoffs under Bankruptcy Code).

**POINT VI:     CONSEQUENTIAL DAMAGES ARE BARRED AS A MATTER OF LAW.**

Even if any of plaintiffs' claims could survive this motion for summary judgment, which they cannot, consequential damages are barred as a matter of law.  The premise of plaintiffs' damages claim is that JPMorgan caused LBHI to file for bankruptcy on September 15 and that, but for JPMorgan's collateral requests, each of the following hypothetical events could have occurred:  (1) LBHI could have opened for business on September 15, despite being directed to file by its principal regulators; (2) LBHI could have avoided bankruptcy for at least five days, despite many pressures, including a run on the bank and the potential failure of LBIE, its U.K. subsidiary; (3) LBHI could have completed multiple, massive, expedited transactions in the same five days, in the middle of the biggest financial panic since the Great Depression and at the same time as its sale of LBI to Barclays;[51] and (4) those transactions could have created billions of dollars of additional value for LBHI's creditors, *if* a plethora of additional, underlying assumptions

---

[50] Moreover, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *accord Golden Archer*, 908 F. Supp. 2d at 536 (dismissing duplicative breach of implied covenant claim on summary judgment).

[51] The LBI sale has been characterized as the "largest, most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy history."  SOF ¶ 53.

about those purely hypothetical transactions and a myriad of other variables in plaintiffs' damages calculation are accurate.[52]  Due to the magnitude of the damages sought, the large amount of testimony, including from multiple experts, that would be required at trial, and the clear bars to recovering these damages as a matter of law, this is an important issue to adjudicate now.

### A.   Consequential damages are precluded by contract.

The Clearance Agreement states:  "IN NO EVENT SHALL WE [JPMorgan] BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WE HAVE BEEN ADVISED AS TO THE POSSIBILITY THEREOF AND REGARDLESS OF THE FORM OF ACTION."  SOF ¶¶ 1(e), 193 (CA at § 13).  Lehman's triparty custody agreements contain similar waivers.  *See, e.g.*, SOF ¶¶ 1(e), 194 (Custody Agreement at § 9(a)).  These consequential damages waivers are enforceable according to their terms.  *See Metro. Life Ins. Co.* v. *Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994).[53]

Moreover, plaintiffs must show that consequential damages "were contemplated at the time the contract was executed."  *Safka Holdings LLC* v. *iPlay, Inc.*, 2013 WL 9636959, at *4 (S.D.N.Y. May 20, 2013).  But there is simply no evidence of that at all.

### B.   Consequential damages are too speculative as a matter of law.

In any event, "New York law does not countenance damage awards based on speculation or conjecture."  *Wolff & Munier, Inc.* v. *Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1010 (2d Cir. 1991); *accord Jill Stuart (Asia) LLC* v. *Sanei Int'l Co., Ltd.*, 566 F. App'x 29, 32 (2d

---

[52] As the Complaint prays for but does not plead the specific bases for an award of all "damages suffered as a result of JPMorgan's misconduct," plaintiffs rely on opinions of experts presented four years after initiating this case to create this scenario.  JPMorgan reserves the right to challenge those opinions but does not contest them now because, regardless of their claimed merit, they illustrate the abundant and fanciful speculations underlying plaintiffs' damages theory.

[53] *See also Five Star Dev. Resort Cmtys.* v. *iStar RC Paradise Valley LLC*, 2012 WL 4119561 at *3-5 (S.D.N.Y. Sept. 18, 2012) (damages waivers "routinely enforced"); *Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 449-56 (S.D.N.Y. 2003) (enforcing damages waiver).

Cir. 2014).  A plaintiff bears the burden of establishing that its damages were caused by the defendant and proving with "reasonable certainty" any consequential damages claimed.  *Kidder, Peabody & Co.* v. *IAG Int'l Acceptance Grp.*, 28 F. Supp. 2d 126, 131, 137 (S.D.N.Y. 1998), *aff'd*, 205 F.3d 1323 (2d Cir. 1999); *Kenford Co.* v. *Cnty. of Erie*, 67 N.Y.2d 257, 261 (1986).  If plaintiffs fail to do so, consequential damages cannot be recovered as a matter of law, and summary judgment is warranted.  *Kidder*, 28 F. Supp. 2d at 137; *Jill Stuart*, 566 F. App'x at 32.

Plaintiffs' theory of consequential damages layers conjecture upon conjecture, with each conjecture in turn requiring a myriad of further assumptions.  This compounding of speculations is the antithesis of the "reasonable certainty" required by New York law.  *See Kidder*, 28 F. Supp. 2d at 132 ("[T]he occurrence of numerous successive hypothetical transactions . . . constitutes precisely the sort of conjecture that the reasonable certainty standard prohibits.").

*First*, it is highly speculative to conclude that LBHI could have avoided filing for bankruptcy on September 15 and every day for at least the next five days.  This requires that, for the entire period, LBHI's board would not decide to file for bankruptcy and that a filing would not be compelled by the conceded run on the bank or an independent decision by LBHI's U.K. subsidiary, LBIE, to file for administration, as it actually did.  *See SOF* ¶¶ 39, 196.  But LBHI received a "direct and authoritative" instruction to file from its regulators, and its regulators testified that JPMorgan's collateral requests were "immaterial" to LBHI's fate and that LBHI could not have survived even if it "had $25 billion more in cash" as "the entire Street was running away from Lehman."[54]  Moreover, LBHI has admitted that, prior to its bankruptcy, it "did not determine how long the bankruptcy filing could have been delayed" if it had any of the collateral posted to JPMorgan.  SOF ¶ 207.  And there is nothing but conjecture to suggest that the deci-

---

[54] *See SOF* ¶¶ 37-38, 197-200; *see also* SOF ¶ 201 (the Fed's "view was that Lehman couldn't survive Lehman weekend" and "was not dependent on a particular collateral posting at JPMorgan").

sion to file for bankruptcy on September 15 would have changed if LBHI had the $8.6 billion

that it posted to JPMorgan given the many market and regulatory pressures that LBHI faced at

the time and the numerous other drains on LBHI's $41 billion in reported liquidity as of Septem-

ber 10.  *See* SOF ¶¶ 19, 28, 38-43, 195, 202-06.[55]  The consequential damages that LBHI claims

resulted from its bankruptcy filing thus cannot be traced to the $8.6 billion in collateral posted to

JPMorgan, which alone precludes such damages.[56]  And, in any event, it is inescapable that this

damages theory is "dependent upon a host of assumptions concerning uncertain contingencies,"

which also independently precludes recovery as a matter of law.  *Kidder*, 28 F. Supp. 2d at 134.

*Second*, even if LBHI could have survived for five extra days, the notion that any, let

alone all, of the transactions hypothesized would be completed is speculative at best.  Each

transaction—including the assignment of credit default swap positions facing special purpose

vehicles for billions of dollars, the netting of hundreds of thousands of derivatives positions

facing dozens of counterparties, and the sale of Lehman's investment management division on

better terms than were actually obtained in a competitive bidding process—faced numerous

daunting obstacles that would have to be overcome.  Moreover, a multitude of assumptions must

be made as to the details of each transaction.  For example, as to plaintiffs' largest category of

consequential damages, Lehman admits that it did not have a plan "to sell, transfer, novate,

---

[55] Plaintiffs' hypothetical scenario also makes the speculative assumption that JPMorgan would have continued providing tens of billions of dollars of funding to LBI without the $8.6 billion of requested collateral when, as discussed in Point I, JPMorgan had no obligation to do so.

[56] *See Kenford*, 67 N.Y.2d at 261 (damages "must be reasonably certain and directly traceable"); *Point Prods. A.G.* v. *Sony Music Entm't, Inc.*, 215 F. Supp. 2d 336, 344-46 & n.5 (S.D.N.Y. 2002) (rejecting damages purportedly arising from bankruptcy filing under summary judgment standard as "highly speculative and insufficiently reliable to allow a jury to consider" because the plaintiff had "not established with any certainty that it would have remained in business and made a profit"); *Three Crown Ltd. P'ship* v. *Salomon Bros.*, 906 F. Supp. 876, 887, 891-92 (S.D.N.Y. 1995) (granting summary judgment as to damages that "fail[ed] to establish with sufficient certainty a causal nexus" between the alleged acts and the injury to be redressed).

assign, restructure, unwind, close out, offset, terminate or dispose of any of the Lehman SPV positions prior to LBHI's bankruptcy filing" and that it never sold any of these positions before or during the week following LBHI's bankruptcy.  SOF ¶¶ 208-09.  Thus, every detail of these hypothetical transactions can only be imagined.  Courts consistently reject damages claims where such a "multitude of assumptions" like these are required.[57]

*Third*, still more speculation is required to arrive at the multibillion-dollar damages figure that plaintiffs seek.  At a minimum, such calculations rest on assumptions as to the value of each transaction, their related costs and the value that would flow to and be retained by LBHI—all of which add to the undue speculation that bars any recovery of consequential damages here.[58]

## CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that summary judgment be granted dismissing all remaining claims in the Complaint.

---

[57] *See Kenford*, 67 N.Y.2d at 261-62; *Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*, 650 F. Supp. 2d 314, 321-22 (S.D.N.Y. 2009) (rejecting consequential damages "built upon one baseless, flawed assumption after another"); *Three Crown*, 906 F. Supp. at 884 (rejecting consequential damages based on "unnegotiated and unconsummated trades"); *Trademark Research Corp.* v. *Maxwell Online Inc.*, 995 F.2d 326, 333 (2d Cir. 1993) (rejecting consequential damages requiring speculative predictions of third-party actions).

[58] *See Kidder*, 28 F. Supp. 2d at 131, 134-35 (concluding that consequential damages were not capable of measurement "without undue speculation" when damages calculation used "numerous variables about which an expert can only surmise"); *Kenford*, 67 N.Y.2d at 261-62 (rejecting consequential damages as "insufficient to meet the required standard" of "reasonable certainty" even though the "quantity of proof was massive" and represented the "most advanced and sophisticated method for projecting the probable results of contemplated projects").

Dated:  September 15, 2014
        New York, New York


                                    Respectfully submitted,

*Of Counsel*:                       WACHTELL, LIPTON, ROSEN & KATZ

Harold S. Novikoff                  By:   */s/ Paul Vizcarrondo, Jr.*
Marc Wolinsky                             Paul Vizcarrondo, Jr.
Amy R. Wolf
Douglas K. Mayer                    51 West 52nd Street
Ian Boczko                          New York, New York  10019
Emil A. Kleinhaus                   Telephone:  (212) 403-1000
                                    Facsimile:  (212) 403-2000

                                    *Attorneys for Defendant/Counterclaimant*
                                    *JPMorgan Chase Bank, N.A.*