**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

101 Park Avenue
New York, New York 10178
Telephone: (212) 696-6000
*Counsel for Plaintiff, Debtor Lehman Brothers Holdings Inc.*

**QUINN EMANUEL URQUHART**
**& SULLIVAN, LLP**

51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
*Special Counsel to Plaintiff Intervenor, the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., *et al.*, <br><br> Plaintiff and Plaintiff Intervenor, <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., <br><br> Defendant. | 11 Civ. 6760 (RJS) |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
<u>**SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ....................................................................................................4

    A.    JPMorgan's Role as Lehman's Tri-Party Repo Bank...............................4

    B.    JPMorgan Obtains Greater Security for Acting as Lehman's Tri-Party Repo Agent ............................................................................5

    C.    JPMorgan Makes Extraordinary and Crippling Demands of Lehman in Lehman's Last Week ........................................................6

    D.    JPMorgan Threatens to Put Lehman Out of Business Unless It Delivers An Additional $5 Billion On September 12, LBHI's Last Business Day ..............9

    E.    JPMorgan Refuses to Return Its Slush Fund to Lehman .......................11

    F.    JPMorgan Retains the Billions of Dollars of LBHI Cash and Securities and Applies $1.9 Billion of LBHI Cash to Inflated Derivatives Claims ..............12

    A.    The August Agreements ..................................................................13

    B.    The September Agreements................................................................14

    C.    JPMorgan Immediately Sweeps LBHI's $6.9 Billion to Its Own General Ledger Account.......................................................................16

    D.    JPMorgan Applies Nearly $2 Billion to Its Inflated Derivatives Claims, Without Seeking Relief From the Automatic Stay ................................16

PROCEDURAL HISTORY....................................................................................16

SUMMARY JUDGMENT STANDARD ...................................................................18

ARGUMENT ......................................................................................................18

I.    JPMORGAN RELEASED ANY LIEN WITH RESPECT TO LBHI'S $6.9 BILLION WHEN IT TRANSFERRED THOSE FUNDS TO ITS OWN ACCOUNT (COUNT XXXVIII) .......................................................................18

    A.    Pursuant to the Security Agreements, JPMorgan's Transfer of the $6.9 Billion Out of LBHI's Account Released Any Lien on Those Funds ..................18

    B.    JPMorgan's Transfer of the $6.9 Billion Was Not Authorized by the Security Agreements .............................................................................22

i

    C.      JPMorgan's Unauthorized Transfer of the $6.9 Billion Did Not Create "Proceeds" Over Which It Has a Security Interest ................................24

          1.      LBHI could not grant a security interest over JPMorgan's own general ledger account as proceeds..........................................24

          2.      Section 9-208 of the UCC did not provide LBHI with rights that could be attached as proceeds ...................................26

          3.      JPMorgan did not obtain the benefit of a conversion claim against itself as proceeds of the original collateral ................................27

II.      JPMORGAN'S UNAUTHORIZED TRANSFER OF THE $6.9 BILLION CONSTITUTED AN UNLAWFUL CONVERSION (COUNT XL) ...........................28

III.    ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO RETURN OF THE $6.9 BILLION PURSUANT TO CLAIMS FOR BREACH OF IMPLIED CONTRACTUAL OBLIGATIONS (COUNTS XLV, XLVII), UNJUST ENRICHMENT (COUNT XXXIX), AND TURNOVER (COUNT XXV) ....................29

IV.    JPMORGAN VIOLATED THE AUTOMATIC STAY (COUNTS XXXIII-XXXIV) ...............................................................................30

V.     PLAINTIFFS ARE ENTITLED TO STATUTORY INTEREST ....................................32

VI.    JPMORGAN'S AMENDED COUNTERCLAIMS FAIL AS A MATTER OF LAW ..................................................................................32

    A.      JPMorgan Cannot Prove Reasonable Reliance as a Matter of Law......................33

    B.      JPMorgan's Aiding and Abetting Claims Fail as a Matter of Law ......................36

    C.      JPMorgan's Counterclaims are Precluded by Waiver and Estoppel ....................37

    D.      JPMorgan's Other Claims Fail as a Matter of Law ................................37

CONCLUSION.......................................................................................................39

# TABLE OF AUTHORITIES

**Page**

## Cases

*Acquent, LLC v. Atl. Energy Servs., Inc.*,
No. 1:09-CV-00524, 2010 WL 3584287 (N.D.N.Y. Sept. 7, 2010).......................................30

*In re Adirondack Timber Enter., Inc.*,
No. 08-12553, 2010 WL 1741378 (Bankr. N.D.N.Y. Apr. 28, 2010).............................20, 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................................................19

*Annecca Inc. v. Lexent, Inc.*,
345 F. Supp. 2d 897 (N.D. Ill. 2004) ......................................................................................29

*Bank Nat'l Ass'n v. PMCC Calpine New England Inv. LLC*,
No. 06 Civ. 3906 (JSR), 2006 WL 1596725 (S.D.N.Y. June 12, 2006)..................................24

*Bank of Am., N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*,
439 B.R. 811 (Bankr. S.D.N.Y. 2010)...................................21, 22, 24, 25, 30, 31, 32

*Bekhor v. Josephthal, Grp., Inc.*,
96 Civ. 4156  2000 WL 1521198 (S.D.N.Y. Oct. 13, 2000) ...................................................29

*CP III Rincon Towers, Inc. v. Cohen*,
No. 10 Civ. 4638 (DAB), 2014 WL 1357323 (S.D.N.Y. Apr. 7, 2014)...................................21

*Cassedy v. Johnstown Bank*,
246 A.D. 337 (3d Dep't 1936).................................................................................................30

*Eurocredit Bank (Cayman) v. Citibank, N.A.*,
No. 95 Civ. 7713 (PKL), 1996 WL 556990 (S.D.N.Y. Oct. 1, 1996) ....................................30

*In re First Cent. Fin. Corp. v. Ochs*,
377 F.3d 209 (2d Cir. 2004).......................................................................................................3

*Grace v. Sterling, Grace & Co.*,
30 A.D.2d 61 (1st Dep't 1968) .................................................................................................24

*Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v.  AT&T Commc'ns Inc.*,
No. 92 Civ. 7862 (KMW), 1996 WL 312535 (S.D.N.Y. June 10, 1996)..................................34

*H & R Project Assocs., Inc. v. City of Syracuse*,
289 A.D.2d 967 (4th Dep't 2001) ............................................................................................35

*Harris v. Key Bank Nat'l Ass'n*,
89 F. Supp. 2d 408 (W.D.N.Y. 2000) ......................................................................................24

*Hernandez v. Coffey*,
582 F.3d 303 (2d Cir. 2009)......................................................................................................34

iii

*Kassover v. Prism Venture Partners, LLC*,
　53 A.D.3d 444 (2d Dep't 2008) ...................................................................................38

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
　935 F. Supp. 2d 666 (S.D.N.Y. 2013) ..........................................................................38

*Lane v. McCallion*,
　166 A.D.2d 688 (2d Dep't 1990) ..................................................................................35

*Layne v. Bank One, Kentucky, N.A.*,
　395 F.3d 271 (6th Cir. 2005) ........................................................................................24

*In re Lehman Bros. Holdings Inc.*,
　433 B.R. 101 (Bankr. S.D.N.Y. 2010) ..........................................................................32

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.*,
　469 B.R. 415 (Bankr. S.D.N.Y. 2012) ..........................................................3, 18, 23, 25

*MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co.*,
　193 N.Y. 92 (1908) .......................................................................................................28

*Mayo v. Fed. Gov't*,
　558 F. App'x 55 (2d Cir. 2014) ....................................................................................34

*In re Metaldyne Corp.*,
　409 B.R. 661 (Bankr. S.D.N.Y. 2009) ..........................................................................35

*Middle E. Banking Co. v. State Street Bank Int'l*,
　821 F.2d 897 (2d Cir. 1987) .........................................................................................30

*In re Modafferi*,
　45 B.R. 370 (S.D.N.Y. 1985) .......................................................................................20

*Morin v. Galan (In re Lanzatella)*,
　254 B.R. 84 (Bankr. W.D.N.Y. 2000) ..........................................................................21

*Neshewat v. Salem*,
　365 F. Supp. 2d 508 (S.D.N.Y. 2005) ..........................................................................19

*PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*,
　Nos. 05-6885-cv (L), 05-7040-cv (CON), 2006 WL 3370698 (2d Cir. Nov. 20, 2006) .........39

*Pittston Warehouse Corp. v. Am. Motorists Ins. Co.*,
　715 F. Supp. 1221 (S.D.N.Y. 1989) .............................................................................29

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
　309 A.D.2d 288 (1st Dep't 2003) .................................................................................35

*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*,
　746 F.3d 538 (2d Cir. 2014)..........................................................................................19

*Samson Res. Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*,
　407 B.R. 140 (Bankr. D. Del. 2009) .............................................................................25

*Shugrue v. Chem. Bank, Inc. (In re Ionosphere Clubs, Inc.),*
    177 B.R. 198 (Bankr. S.D.N.Y. 1995)......................................................31

*Singer Prods. Co. v. First Am. Bank of New York (In re Singer Prods. Co.),*
    102 B.R. 912 (Bankr. E.D.N.Y. 1989)....................................................20

*Strauss Paper Co., Inv. v. RSA Exec. Search, Inc.,*
    260 A.D.2d 570 (2d Dep't 1999).............................................................30

*Tri State Bank of E. Dubuque v. Colby,*
    141 Ill. App. 3d 807 (2d Dist. 1986).......................................................29

*Weber v. SEFCU (In re Weber),*
    719 F.3d 72 (2d Cir. 2013)......................................................................30

## **Statutes**

11 U.S.C. §§ 362(a)(3), (6) ...........................................................................31

11 U.S.C. § 542 ............................................................................................30

Fed. R. Civ. P. 56(c) ....................................................................................19

NY UCC § 9-102(a)(64)(A)..........................................................................26

NY UCC § 9-102(a)(64)(C)..........................................................................27

NY UCC § 9-201(a).......................................................................................20

NY UCC §§ 9-203(b).....................................................................................26

NY UCC §§ 9-203(b)(2).................................................................................26

NY UCC § 9-207(a).......................................................................................24

NY UCC § 9-207(b)(4)...................................................................................24

NY UCC § 9-208 ..........................................................................................27

NY UCC § 9-208(a).......................................................................................27

NY UCC § 9-322 ..........................................................................................26

NY UCC § 9-322 ..........................................................................................26

N.Y. C.P.L.R. § 5001(b) ..............................................................................33

## PRELIMINARY STATEMENT

Plaintiffs will prove at trial that JPMorgan exploited its extraordinary leverage and unparalleled inside information as Lehman's principal clearing bank to wrest from Lehman a multi-billion dollar slush fund just days ahead of Lehman's bankruptcy filing. As JPMorgan knew, Lehman could ill-afford JPMorgan's excessive cash demands, but had no choice. Lehman's broker-dealer subsidiary depended on JPMorgan as its tri-party repo and clearing bank to fund its business on a daily basis. During the week prior to Lehman's demise, JPMorgan extracted: (1) $8.6 billion of cash and cash equivalents; and (2) a set of guaranty and security agreements that JPMorgan characterized as a "fundamental change" in the parties' relationship literally overnight,[1] all under the threat that JPMorgan would cease providing essential clearing services and withhold funding, instantly putting Lehman out of business. Lehman struggled to meet JPMorgan's demands, which drained Lehman of all but its last drop of cash, leaving Lehman unable to open for business on Monday, September 15, 2008. At 1:45 a.m. on September 15, 2008, with $6.9 billion of Lehman's cash improperly locked down in JPMorgan's general ledger account, and Lehman short less than $5 billion of the amount needed to open for business in Europe, Lehman Brothers Holdings Inc. ("LBHI") filed for the largest chapter 11 in history. JPMorgan took Lehman's failure as an opportunity to manufacture bogus and hyper-inflated claims to keep the billions of dollars in cash and money market funds it reaped as windfall profits, while Lehman's other creditors lost billions of dollars.

JPMorgan will try to characterize its actions as prudent risk management in volatile markets. This is a charade. At the time JPMorgan made these demands, it was already fully secured and had no justification for grabbing billions of dollars in additional cash. Over the

---

[1]   Declaration of Christopher D. Kercher in Support of Plaintiffs' Motion for Partial Summary Judgment ("Kercher Decl.") Ex. A (Deposition of Steven Black) at 162:14-22.

years of discovery in this case, JPMorgan's ever-shifting, inventive and sometimes contradictory efforts to offer *post hoc* rationalizations for what amounts to a blatant cash grab have simply collapsed. The time is drawing near for JPMorgan to be held accountable by returning the improperly demanded cash and otherwise compensating Lehman and its creditor body for the harm caused by JPMorgan's overreaching conduct. Plaintiffs fully recognize that the parties vigorously dispute many of the central issues in the case, necessitating a trial. Accordingly, this motion targets a handful of claims relating to a narrow, albeit important, issue that is ripe for summary judgment in Plaintiffs' favor: Did JPMorgan lose its lien by improperly sweeping the $6.9 billion in cash into its own general ledger account prior to any default by LBHI?

What JPMorgan did with Lehman's cash is undisputed. Almost immediately upon receipt, JPMorgan "swept" $6.9 billion from Lehman's account into JPMorgan's own general ledger account. The consequences of that act present pure legal issues. JPMorgan violated the very agreements it forced LBHI to sign in September 2008 by seizing the funds in the absence of any default. Those same agreements provide that JPMorgan's security interest was limited to Lehman's accounts only and, thus, once JPMorgan put the funds in its own general ledger account, the funds ceased to be subject to JPMorgan's lien, which remained over Lehman's now-emptied account.

JPMorgan's proffered legal justifications for sweeping LBHI's cash have already been rejected in this case. On its motion to dismiss, JPMorgan argued that its seizure of LBHI's $6.9 billion was somehow authorized by the August and September security agreements, or that it maintained a valid lien under the Uniform Commercial Code ("UCC"), both of which arguments

Bankruptcy Judge Peck found "unpersuasive."[2]  JPMorgan has developed no evidence to revive its unsuccessful legal justifications, warranting summary judgment in Plaintiffs' favor.

Lacking a lien, JPMorgan also intentionally violated the automatic stay under Section 362 of the Bankruptcy Code by applying $1.9 billion of the $6.9 billion to purported derivatives claims.  JPMorgan certainly should have realized that court approval was required to lift the automatic stay in bankruptcy before exercising self-help by applying estate cash to its newly-manufactured claims.  Summary judgment is warranted for JPMorgan's deliberate stay violation.

At bottom, JPMorgan's scheme to profit from Lehman's demise included pre-petition and post-petition conduct that violated a fundamental principle of bankruptcy law, namely, equality of distribution.[3]  JPMorgan used the leverage conferred upon it as Lehman's tri-party repo agent and clearing bank to place itself ahead of virtually all of Lehman's creditors by extracting excess clearing collateral and then applying it to a myriad of other Lehman-facing businesses, such as derivatives trading.  While other counterparties to Lehman derivatives and other financial products received a fraction of what they were owed, JPMorgan levered its relationship with Lehman as the clearing bank to leapfrog other creditors to the tune of billions of dollars.

Finally, we note that still pending on the docket is Plaintiffs' motion to dismiss Defendants' counterclaims, which essentially allege that Lehman committed fraud by failing to predict accurately the actions of Barclays during the whirlwind post-bankruptcy deal to sell the assets of Lehman's broker-dealer subsidiary.  Plaintiffs respectfully request that, in the event the Court prefers at this stage to convert it to a Rule 56 motion or consider this brief as a standalone Rule 56 motion, that the Court grant summary judgment dismissing the counterclaims.

---

[2]  *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 460-61 (Bankr. S.D.N.Y. 2012).

[3]  *See In re First Cent. Fin. Corp. v. Ochs*, 377 F.3d 209, 217 (2d Cir. 2004).

# BACKGROUND[4]

## A.     JPMorgan's Role as Lehman's Tri-Party Repo Bank

JPMorgan acted as tri-party agent and clearing bank for Lehman's broker-dealer

subsidiary, Lehman Brothers Inc. ("LBI"), pursuant to a clearance agreement executed in 2000

(the "Clearance Agreement").[5]  LBI, like all major broker-dealers, primarily financed its daily

operations through short-term repos, the bulk of which were so-called tri-party repos.[6]

JPMorgan, as tri-party agent and clearing bank, served as the intermediary between LBI and repo

investors, primarily sophisticated financial institutions.  Critically, each morning JPMorgan

unwound LBI's entire tri-party repo book, meaning that it returned the money to overnight repo

investors and the securities to LBI.[7]  To facilitate the unwind, JPMorgan extended intraday credit

secured by the securities in LBI's tri-party repo book.[8]  If JPMorgan refused to unwind LBI's tri-

party repo book, LBI would be unable to fund its daily operations and Lehman would fail

immediately.[9]

---

[4]    Before proceeding to the undisputed facts underlying this narrow motion, for the
Court's benefit Plaintiffs provide a broader factual backdrop for context.

[5]    *See* Answer of JPMorgan Chase Bank, N.A., *In re Lehman Brothers Holdings, Inc., et
al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr. S.D.N.Y. July 16, 2012) [Dkt. # 150] ("Answer") ¶ 3.

[6]    Federal Reserve Bank of New York, *White Paper: Tri-Party Repo Infrastructure
Reform* (May 17, 2010), *available at*
http://www.newyorkfed.org/banking/nyfrb_triparty_whitepaper.pdf ("Fed White Paper"), at 6.

[7]    Fed White Paper at 10.

[8]    Fed White Paper at 10.

[9]    Memorandum of Law in Support of Motion to Dismiss of Defendant JPMorgan Chase
Bank, N.A., *In re Lehman Brothers Holdings, Inc., et al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr.
S.D.N.Y. Oct. 19, 2010) [Dkt. # 29] ("JPM Mot. to Dis.") at 3 ("[Lehman could not have]
survived for even one day without the financing provided by JPMorgan in reliance on that same
collateral.").

In 2008, it was the routine practice of JPMorgan (as well as the only other tri-party repo custodian bank, BNY Mellon) to extend trillions of dollars of intraday credit to their broker-dealer customers every trading day via the tri-party repo mechanism. JPMorgan's daylight extensions were secured by various securities in the inventory of the broker-dealers, including treasury bills, asset-backed securities and bonds without any margin with the exception of equities which required 125% margin. Typically, third party investors would request additional margin with respect to their overnight loans, such as 102% for treasuries. During the spring and summer of 2008, the Federal Reserve Bank of New York ("FRBNY") encouraged JPMorgan and BNYMellon to increase their intraday margins to match the level of margin required by overnight investors, but FRBNY President Timothy Geithner urged the banks' CEOs to "go slow" to avoid causing a liquidity crisis for the broker-dealers.[10] Lehman cooperated with JPMorgan's move to gradually increase its own margins to match those of overnight investors as a prudent risk management measure.

**B.** **JPMorgan Obtains Greater Security for Acting as Lehman's Tri-Party Repo Agent**

While it gradually increased margins on LBI's tri-party repo account, JPMorgan requested a stopgap measure. In response, LBHI and Lehman Commercial Paper, Inc. ("LCPI") posted securities with a value in excess of the margin posted by investors, which were to be returned once JPMorgan had finished ramping up the margins on LBI's account. By August 2008, JPMorgan had completed the gradual ramp up - in 20% increments - to full overnight investor margins on LBI's tri-party repo securities, while still retaining the additional securities

---

[10] Kercher Decl. Ex. B (Email from Lucinda Brickler dated August 13, 2008) at FRBNY-JPMC-43092 ("[M]y impression is that Tim has been very concerned about clearing banks pushing too hard, too soon on margins and other limits on dealer activity. When Dimon and Kelly were here, the message was 'go slow'.").

LBHI and LCPI had delivered.  As detailed below, in August, JPMorgan also obtained new agreements whereby LBHI would guarantee and secure the clearance obligations of LBI, including with the benefit of the additional collateral LBHI and LCPI had just posted.

### C.       JPMorgan Makes Extraordinary and Crippling Demands of Lehman in Lehman's Last Week

In the last four business days before Lehman's chapter 11 filing in September 2008, JPMorgan – with the benefit of inside information regarding Lehman's operations, financing, liquidity and prospects for a bailout, which it acquired as Lehman's principal clearing bank – demanded that Lehman provide extraordinarily broad new contracts and billions in cash, far exceeding what JPMorgan required for prudent risk management.

Following a series of meetings with senior government officials, including Treasury Secretary Paulson and Fed Chairman Bernanke, on Tuesday, September 9,[11] JPMorgan's top executives convened in their Washington, D.C. office to take immediate and dramatic steps to elevate JPMorgan's position over other Lehman creditors.  Steve Black, co-head of JPMorgan's investment bank, called Lehman CEO Richard Fuld and demanded at least $3 billion in cash,[12] as well as sweeping new legal agreements,[13] both to be delivered by the next day.[14]

---

[11]   First Amended Complaint, *In re Lehman Brothers Holdings, Inc., et al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr. S.D.N.Y. Sept. 15, 2010) [Dkt. # 19] ("Am. Compl.") ¶ 39; Answer ¶ 39.

[12]   While Black claims that he demanded $5 billion, other evidence in the record, including from JPMorgan, suggests that the initial demand was for $3 billion. For the purposes of this motion, it is not necessary to determine the precise demand.  *See* Kercher Decl. Ex. A (Deposition of Steven Black) at 219:8-17; Kercher Decl. Ex. C (Deposition of Jane Buyers-Russo) at 98:22-99:-6.

[13]   Kercher Decl. Ex. A  (Deposition of Steven Black) at 115:21-117:7.

[14]   Kercher Decl. Ex. A  (Deposition of Steven Black) at 177:16-21.

That evening – less than two weeks after negotiating and signing the August Agreements – JPMorgan delivered as essentially a *fait accompli* a new set of guaranty and security agreements that drastically expanded the scope of LBHI's guaranty without giving Lehman any new rights or benefits. Throughout the night on September 9, JPMorgan called and emailed Lehman to insist the agreements be signed before a Lehman earnings call scheduled for 8:00 a.m. the next morning.[15] The General Counsel of JPMorgan's Investment Bank told Lehman in-house lawyer Andrew Yeung that the agreements were to be signed that night pursuant to an understanding between Black and Fuld.[16] However, Black has since admitted that he never reached an agreement with Fuld on the terms of any new agreements.[17]

Lehman management had no time to meaningfully review the sweeping agreements, let alone negotiate them. After receiving a call from JPMorgan's Mark Doctoroff warning that Lehman "wouldn't want to deal with the consequences of not having [the] documents signed," senior Lehman treasury executive Dan Fleming understood that Lehman "couldn't afford to take [the] risk" of JPMorgan refusing to clear for Lehman.[18] Per Fleming's instruction that Yeung "proceed as though we will agree to all the terms laid out by JPM," Lehman's attorneys limited their comments to minor technical issues, believing the massive overhaul of the business

---

[15] Kercher Decl. Ex. D (Deposition of Paolo Tonucci) at 459:2-460:15.

[16] Kercher Decl. Ex. E (Email from Andrew Yeung, Lehman, to Ian Lowitt, et al., Lehman, dated September 9, 2008).

[17] See Kercher Decl. Ex. A (Deposition of Steven Black) at 185:7-16.

[18] Kercher Decl. Ex. F (Deposition of Daniel Fleming) at 328:22-331:16; 497:5-22; 498:18-499:20; 513:19-515:7.

.

relationship was a done deal.[19]  Lehman's senior executives, preoccupied with the critical

earnings announcement, were unaware of the substance of the agreements, except for the fact

that JPMorgan was demanding them.[20]  At 6:30 a.m. on September 10, Lehman Treasurer Paolo

Tonucci executed the "final versions" presented to him by Yeung.  Tonucci testified that if he

had had the opportunity to review and understand the agreements, he would have been reluctant

to sign.[21]  James Killerlane, a seasoned in-house lawyer who was responsible for negotiating

parent company guarantees on behalf of Lehman and later, Morgan Stanley, testified that the

September Guaranty was "broader than any guarantee that I believe I've assisted in

negotiating."[22]

In response to JPMorgan's demand for additional cash, LBHI deposited a total of $1.9

billion of cash into its pledged deposit account at JPMorgan, and granted a security interest to

JPMorgan on $1.7 billion of LBHI-owned money market funds.[23]  After LBHI deposited the

cash, JPMorgan, in contravention of the applicable security agreements, debited LBHI's pledged

Cash Account to zero, and transferred the cash into JPMorgan's own general ledger account.[24]

---

[19]  *See* Kercher Decl. Ex. G  (Email from Dan Fleming, Lehman, to Andrew Yeung, et al., Lehman, dated September 10, 2008, 1:14 a.m.) at LBHI_JPM_1083128.

[20]  *See, e.g.*, Kercher Decl. Ex. D  (Deposition of Paolo Tonucci) at 468:23-469:4.

[21]  *Id.* at 470:2-20; *id*. at 495:17-496:9.

[22]  Kercher Decl. Ex. H (Deposition of James Killerlane) at 124:2-129:18.

[23]  *See* Am. Compl. ¶66; Answer ¶ 66; Kercher Decl. Ex. I (JPMorgan Account Statement for Lehman Brothers Holdings Inc. Account No. 066-141-605 [the LBHI Cash Account] for the dates August 30, 2008 through September 30, 2008 "LBHI Account Statement") at JPM-LBHI00043916.

[24]  Kercher Decl. Ex. I (LBHI Account Statement) at JPM-LBHI00043918.

**D.** **JPMorgan Threatened to Put Lehman Out of Business Unless It Delivered An Additional $5 Billion On September 12, LBHI's Last Business Day**

On Thursday night, September 11, despite having just squeezed $3.6 billion in cash and money market funds from LBHI two days earlier, JPMorgan Chairman and CEO Jamie Dimon, Black and other top JPMorgan executives called once again and demanded that Lehman deliver yet another $5 billion of cash to JPMorgan by the next morning.[25] Steve Black vividly described Lehman's initial incredulous reaction: "they complained, they whined, they moaned, couldn't understand it, how could we possibly ask them for more . . . ."[26] Ed Corral, JPMorgan's head of tri-party repo, expressed that Lehman was right to complain about the excessive amount of collateral JPMorgan already held, writing: "I think we already have about $16 billion in total . . . Big numbers. I can see why Lehman is complaining."[27]

Lehman participants on the call testified that JPMorgan provided no explanation for why it needed the additional cash demanded.[28] As Tonucci recalled, when he asked why JPMorgan wanted the collateral, one of the JPMorgan participants, possibly Dimon himself, responded: "no reason."[29] Tonucci also recalls asking, "What is to stop you from asking for $10 billion tomorrow?" to which someone - perhaps Dimon again – replied "nothing" and "maybe we

---

[25] Kercher Decl. Ex. A (Deposition of Steven Black) at 492:3-21; *id.* at 508:3-17.

[26] Kercher Decl. Ex. A (Deposition of Steven Black) at 544:9-21.

[27] Kercher Decl. Ex. J (Emails from Edward Corral, JPMorgan, to Mark Doctoroff, JPMorgan, dated September 11, 2008).

[28] *See, e.g.*, Kercher Decl. Ex. D (Deposition of Paolo Tonucci) at 471:11-20; *id.* at 235:19-236:20.

[29] *Id.* at 235:19 -236:20.

will."[30]   To this day, JPMorgan has not produced any calculation justifying the additional $5 billion.

Tonucci recalled Dimon or Black stating on the call that JPMorgan "would not open [Lehman] unless the cash was there first thing in the morning."[31]   At 11:40 pm, JPMorgan's Jane Buyers-Russo sent Tonucci a letter entitled simply "Notice."[32]   The letter threatened that if the $5 billion was not received, JPMorgan would not unwind Lehman's tri-party repo book the next morning – an action which all knew would immediately cause Lehman to fail.[33]   Tonucci bluntly characterized the impact of the notice: "You know, short of saying that they are holding my child, this is as close to a ransom notice as I have ever – as I have ever read."[34]   Even Dimon was unwilling to defend this notice, testifying at his deposition that he did not authorize it.[35]

While on September 9, JPMorgan expressed a concern to make sure it had "all the hatches battened down without . . . pushing them over the cliff,"[36] by September 11, avoiding the ledge was evidently no longer a priority for JPMorgan, as Black recounted in an email late that night: "We asked them for another 5bl of intra day collateral and Fuld (and Rog Cohen) called to

---

[30]   *Id.* at 237:5-9.

[31]   *Id.* at 227:11-20; *id.* at 228:24-229:21.

[32]   Kercher Decl. Ex. K  (Letter from Jane Buyers-Russo to Paolo Tonucci, titled "Notice," attached to an Email dated September 11, 2008).

[33]   *Id.*

[34]   Kercher Decl. Ex. D  (Deposition of Paolo Tonucci) at 256:22-257:7.

[35]   Kercher Decl. Ex. L  (Deposition of Jamie Dimon) at 369:19-370:18.

[36]   Kercher Decl. Ex. M (Email from Steven Black, JPMorgan, to Bill Winters and Jamie Dimon, et al., JPMorgan, dated September 9, 2008).

say that would put them over the edge . . . Quite amusing dynamics on the phone call."[37]

JPMorgan Vice Chairman Jimmy Lee had a particularly eloquent take on Lehman going over the

edge, in an email to Dimon the night of September 11:

> Jamie-during the 1907 panic the old man saved some of the banks – and let others
> go.  It seems to me given all that we have-and are going to have on our plate – i
> would let this one go.  There will be prettier girls.[38]

On September 12, LBHI scrambled to pull virtually all of its unencumbered cash and

delivered the $5 billion into LBHI's pledged Cash Account at JPMorgan.[39]

### E.    JPMorgan Refuses to Return Its Slush Fund to Lehman

JPMorgan has acknowledged that as of Friday evening, September 12, 2008, it had

"relatively little clearance exposure to LBI."[40]  That Saturday and Sunday, September 13-14,

2008, Lehman made numerous pleas to JPMorgan that it release the cash.  Internal JPMorgan e-

mails exchanged among its top executives, including Dimon, described Lehman's efforts  as a

"full court press . . . to get us to release."[41]  JPMorgan refused or ignored all of LBHI's efforts.

---

[37]    Kercher Decl. Ex. N  (Email from Steven Black, JPMorgan, to Bill Winters, JPMorgan, dated September 11, 2008) at JPM-LBHI00568967.

[38]    Kercher Decl. Ex. O (Email from James Lee, JPMorgan, to Jamie Dimon, JPMorgan, dated September 11, 2008) at JPM-LBHI00533676.

[39]    *See* Kercher Decl. Ex. I (LBHI Account Statement) at JPM-LBHI00043917.

[40]    Amended Counterclaims of JPMorgan Chase Bank, N.A., *In re Lehman Brothers Holdings, Inc., et al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr S.D.N.Y. Feb. 17, 2011) [Dkt. # 63] ¶ 2.

[41]    *See, e.g.*, Kercher Decl. Ex. P (Email from Heidi Miller, JPMorgan, to Matthew Zames, et al., JPMorgan, dated September 15, 2008).

### F. JPMorgan Retains the Billions of Dollars of LBHI Cash and Securities and Applies $1.9 Billion of LBHI Cash to Inflated Derivatives Claims

JPMorgan regarded its stockpile of Lehman's cash and securities as a slush fund – or to use JPMorgan's own terminology: a "movable feast"[42] – not allocated to any particular claim or line of business, but just warehoused in JPMorgan's general ledger account, to be applied against any and all claims, real or manufactured, to profiteer from Lehman's demise. And profiteer JPMorgan did, unleashing its traders to close out and liquidate Lehman-facing positions in an uncontrolled feeding frenzy. Thus, JPMorgan kept its Lehman slush fund as a windfall by submitting wildly inflated bankruptcy claims that bore no resemblance to market reality, including: (1) a derivatives claim that relies on phantom losses to value JPMorgan's positions $2.3 billion higher than the marks the parties had agreed upon the day before;[43] and (2) a $6.2 billion claim under the Clearance Agreement that rests on a purported deficiency that only arose because JPMorgan allowed its traders to dump $21 billion of Lehman securities, without proper controls or procedures, at prices well below JPMorgan's own marks, including by selling securities to JPMorgan at a profit.

---

[42] Kercher Decl. Ex. Q (Deposition of Henry Steuart) at 326:14-327:13.

[43] Proof of Claim No. 66462, *In re Lehman Brothers Holdings, Inc., et al.,* Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Apr. 1, 2010) at 28, (incorporating by reference the LBI Proofs of Claim attached as Exhibit B); *id.* Exh. B at 2.A.I.; First Amended Complaint & Objection to Claim Nos. 66451, 66453, 66454, 66455, 66462, 66470, 66472, 66473, 66474, and 66476, *In re Lehman Brothers Holdings Inc., et al.*, Adv. Pro. No. 12-01874 (JMP) (Bankr. S.D.N.Y. Nov. 16, 2012) [Dkt. # 9] ¶¶ 3-5.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     The August Agreements

For eight years, LBI and JPMorgan's tri-party and clearing relationship operated under the Clearance Agreement, undergoing only minor changes.  That began to change in early August 2008, when JPMorgan requested that the parties negotiate a set of agreements whereby LBHI would guaranty, and pledge collateral to secure, the obligations of LBI and certain other Lehman subsidiaries under the Clearance Agreement.  Specifically, JPMorgan requested a Guaranty (the "August Guaranty"), a Security Agreement (the "August Security Agreement"), and an Amendment to the Clearance Agreement (the "August Clearance Amendment"; collectively, the "August Agreements").  The parties negotiated the August Agreements over the course of the next eleven days, and on August 29, 2008, the final August Agreements were executed and delivered to JPMorgan. Plaintiffs' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("SUF") ¶ 2.

In the first proposed draft of the August Security Agreement, JPMorgan sought a broad lien over "every deposit account," "all securities accounts," and "*all money*, instruments, securities, investment property, financial assets … documents, chattel paper, credits, claims, demands, precious metals and any other property, rights and interests of [LBHI] *which at any time shall come into the possession or custody or under the control*" of JPMorgan. SUF ¶ 3. JPMorgan further proposed that it have the right to transfer the Security to itself "*at its discretion*." SUF ¶ 4.

LBHI responded by rejecting the broad lien language proposed by JPMorgan. SUF ¶ 5. Instead, LBHI proposed to pledge specified LBHI deposit accounts and securities accounts (defined as the "Accounts"), and to limit JPMorgan's "Security" to the "funds or other assets *from time to time* held in or credited to the Accounts or otherwise carried in the Accounts." SUF

¶ 5. LBHI also rejected JPMorgan's request that it be given the right "at its discretion" to transfer the Security to itself. SUF ¶ 6. JPMorgan accepted the elimination of this proposed right, and the parties ultimately agreed that JPMorgan's right to transfer the Security would be triggered only "upon the occurrence and during the continuation of a Default or to preserve the Security or its value." SUF ¶ 7.

The August Security Agreement, as executed, provided JPMorgan with a lien over two identified LBHI accounts, a "Securities Account" identified as LCE, and a "Cash Account" bearing DDA# 066-141-605. SUF ¶¶ 8, 11. The definition of the Security subject to JPMorgan's lien encompassed only the two specified accounts and the assets or funds "*from time to time* held in or credited to the Accounts or otherwise carried in the Accounts." SUF ¶¶ 9, 10, 11.  The August Security Agreement further specified the limited circumstances under which JPMorgan's lien would continue over any other accounts to which cash was transferred from the pledged Cash Account.  It provided that the definition of Accounts subject to JPMorgan's lien also encompassed "any other account at the Bank to which *Guarantor* [*i.e.*, LBHI] transfers (A) cash from the Cash Account …" SUF ¶ 9.  JPMorgan's Security, in turn, was defined to include the "Accounts," "any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Security," and "all proceeds of any and all of the foregoing Security." SUF ¶ 10.

### B.    The September Agreements

The new agreements demanded by JPMorgan on September 9 included, *inter alia*, a new guaranty (the "September Guaranty") and a new security agreement (the "September Security Agreement" and together with the September Guaranty, the "September Agreements").  Unlike the August Agreements, which were carefully negotiated over eleven days and narrowly tailored, the September Agreements were thrust upon Lehman overnight as a *fait accompli* and gave

JPMorgan substantially broader rights than any other creditor could hope to obtain. Unlike the August Security Agreement, which had granted JPMorgan a lien over two specified accounts of LBHI, the September Security Agreements gave JPMorgan a lien on nearly all of LBHI's accounts at the bank. *See* SUF ¶¶ 14 16, 17.

However, the new September Security Agreement left three fundamental provisions from the August Security Agreement, critical to this motion, unchanged. First, JPMorgan could only transfer LBHI collateral after "the occurrence and during the continuation of a Default … or to preserve the Security or its value." SUF ¶ 18. Second, JPMorgan's lien remained limited to the defined LBHI Accounts themselves, and the "funds and/or other assets *from time to time* held in or credited to the [LBHI] Accounts or otherwise carried in the Accounts" and "proceeds" thereof. SUF ¶¶ 14, 16, 17. Third, the September Security Agreement incorporated the definition of Accounts under the August Security Agreement, providing that JPMorgan would only have a lien over other accounts at JPMorgan if *LBHI* – and not JPMorgan – transferred to such other accounts cash from the Cash Account. SUF ¶¶ 14, 15.

The September Security Agreement did not extend the scope of JPMorgan's lien to JPMorgan's own general ledger account. The document itself does not mention JPMorgan's general ledger account, or any intent by JPMorgan to transfer LBHI's funds to that account. JPMorgan's counsel admitted they never raised that possibility during the overnight "negotiation," and there was no discussion about JPMorgan's own general ledger account being subject to the September Security Agreement prior to the document being executed. SUF ¶ 19.

### C. JPMorgan Immediately Sweeps LBHI's $6.9 Billion to Its Own General Ledger Account

During the week of September 8, in response to JPMorgan's calls, LBHI deposited $6.9 billion in cash into the pledged LBHI Cash Account. Immediately upon deposit, JPMorgan swept the cash into JPMorgan's own general ledger account. *See* SUF ¶ 20.

JPMorgan's only stated justification for its unilateral transfer of the $6.9 billion to its general ledger account was that it was purportedly necessary "to ensure that LBHI did not withdraw the cash collateral" from the pledged LBHI Cash Account. SUF ¶ 21. According to JPMorgan, its "protective transfer" moved the $6.9 billion "into a safer place to protect that lien." SUF ¶ 22. However, JPMorgan has admitted that it "had the operational ability to place a DDA block on account #066-141-605 [the LBHI Cash Account] such that no cash could be removed from that account." SUF ¶ 23

### D. JPMorgan Applies Nearly $2 Billion to Its Inflated Derivatives Claims, Without Seeking Relief From the Automatic Stay

On October 29, 2008, JPMorgan applied $1,917,612,055.50 of the $6.9 billion of LBHI cash held in the JPMorgan general ledger account to alleged claims arising under derivatives contracts with Lehman. SUF ¶ 24. JPMorgan did not seek, let alone obtain, judicial permission to lift the automatic stay before paying itself on those claims with LBHI's $1.9 billion. SUF ¶ 25.

### PROCEDURAL HISTORY

Among other claims, Plaintiffs' Amended Complaint seeks:

- A declaratory judgment that JPMorgan lost any security interest over the $6.9 billion of LBHI funds initially deposited in the LBHI Cash Account when it unilaterally transferred those funds to its own account prior to any default by LBHI (Count XXXVIII).

- Return of the $6.9 billion pursuant to theories of conversion (Count XL), unjust enrichment (Count XXXIX), breach of JPMorgan's implied contractual obligations under the Security Agreements (Counts XLV, XLVII), or turnover (Count XXV).

- Relief, including sanctions, stemming from JPMorgan's willful violation of the automatic stay when it applied $1.9 billion of the $6.9 billion to pay itself on alleged claims against the estate, when JPMorgan did not have a valid lien over that estate property (Counts XXXIII-XXXIV).

JPMorgan filed a motion to dismiss the Amended Complaint, arguing that these claims, related to JPMorgan's loss of its security interest, should be dismissed because (i) the text of the Security Agreements authorized its unilateral transfer of the $6.9 billion to its general ledger account, or (ii) even if unauthorized, the UCC allowed JPMorgan to retain its lien with respect to the $6.9 billion.[44] Judge Peck found these arguments "unpersuasive" and declined JPMorgan's invitation to dismiss the claims as a matter of law.[45] Judge Peck also noted the existence of factual issues "regarding the proper reading of the Security Agreements and whether the collateral transferred to JPMC's general ledger account constitutes proceeds of the LBHI deposit account under the UCC[.]"[46]

After 300 witnesses have been deposed and millions of pages of documents produced, JPMorgan has been unable to develop *any* facts to support its previously rejected interpretations of the Security Agreements or the UCC. The evidence uniformly confirms the conclusion that JPMorgan violated the Security Agreements and lost its lien over the $6.9 billion.

---

[44] JPM Mot. to Dis. 82-87; Reply Brief in Further Support of Motion to Dismiss of Defendant JPMorgan Chase Bank, N.A., *In re Lehman Brothers Holdings, Inc., et al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr. S.D.N.Y. Feb. 2, 2011) [Dkt. # 53] ("JPM Reply") at 51-61.

[45] *Lehman Bros. Holdings Inc.*, 469 B.R. at 460-61.

[46] *Lehman Bros. Holdings Inc.*, 469 B.R. at 460-61.

As a final matter, we note that Plaintiffs' motion to dismiss JPMorgan's Amended Counterclaims in their entirety has been fully briefed and is pending before the Court,[47] having never been heard or decided by the Bankruptcy Court.[48]

## SUMMARY JUDGMENT STANDARD

Plaintiffs are entitled to summary judgment if the Court determines that no genuine issue of material fact exists. *Neshewat v. Salem*, 365 F. Supp. 2d. 508, 518 (S.D.N.Y. 2005); *see* Fed. R. Civ. P. 56(c). A fact is material "if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ARGUMENT

I. **JPMORGAN RELEASED ANY LIEN WITH RESPECT TO LBHI'S $6.9 BILLION WHEN IT TRANSFERRED THOSE FUNDS TO ITS OWN ACCOUNT (COUNT XXXVIII)**

A. **Pursuant to the Security Agreements, JPMorgan's Transfer of the $6.9 Billion Out of LBHI's Account Released Any Lien on Those Funds**

Plaintiffs are entitled to a declaratory judgment that JPMorgan has no lien or other security interest with respect to the $6.9 billion of LBHI cash that JPMorgan transferred into its own general ledger account during the last week that LBHI was in business. (Count XXXVIII). As explained below, JPMorgan's lien attached to the LBHI Cash Account and funds held in it "from time to time," and not to the $6.9 billion generally or to any account owned by JPMorgan.

---

[47] Plaintiffs moved to dismiss the Amended Counterclaims on April 4, 2011. (Dkt. ## 70-72.) JPMorgan opposed the motion to dismiss on June 3, 2011 (Dkt. ## 78-79), and Plaintiffs replied on July 18, 2011. (Dkt. # 86).

[48] Plaintiffs would be pleased to submit courtesy copies of the motion to dismiss briefing to the Court.

When JPMorgan transferred the $6.9 billion to itself, it reduced the value of its security interest in the Cash Account to the zero balance in that account, extinguishing its lien over the $6.9 billion pursuant to the terms of the Security Agreements.

The essential facts necessary for this motion are undisputed. JPMorgan admits that it demanded $6.9 billion of cash from LBHI on September 9 and September 11 and that from September 9-12, LBHI deposited those funds into the LBHI Cash Account, which was pledged to JPMorgan under the Security Agreements. (Answer ¶ 294). JPMorgan also admits that each time LBHI deposited cash into the LBHI Cash Account to satisfy JPMorgan's $6.9 billion demand, JPMorgan immediately withdrew (*i.e.* debited) the cash from the LBHI Cash Account and credited the cash to JPMorgan's own general ledger account, to which LBHI had no access.[49] By no later than September 13, 2008, the LBHI Cash Account had a zero balance, while JPMorgan enjoyed the use of the $6.9 billion in its own account.

Under New York law, "'[u]nless the grant of a security interest is contained in the security agreement, there is no security interest' . . . When an agreement is clear and complete, the writing should be enforced according to its terms." *In re Adirondack Timber Enter., Inc.*, No. 08-12553, 2010 WL 1741378, at *3 (Bankr. N.D.N.Y. Apr. 28, 2010) (quoting *In re Modafferi*, 45 B.R. 370, 371 (S.D.N.Y. 1985) (collecting authority)); *Singer Prods. Co. v. First Am. Bank of New York (In re Singer Prods. Co.)*, 102 B.R. 912, 923 (Bankr. E.D.N.Y. 1989) ("Case law makes clear that a security interest granted by a debtor to a creditor is *limited strictly to the property or collateral described in the security agreement*.") (emphasis added) (internal quotations marks and citation omitted); *see also* NY UCC § 9-201(a) ("a security agreement is

---

[49]    Answer ¶ 294; *see also* Kercher Decl. Ex. I (LBHI Account Statement) at JPM-LBHI00043916-18. These transfers occurred in the week prior to LBHI's September 15, 2008, bankruptcy filing (*see id.* at JPM-LBHI00043918), and therefore prior to any default occurring under either Security Agreement.

effective according to its terms between the parties . . . .").  Bankruptcy courts consistently require strict adherence to the terms of security agreements and the requirements of the UCC when considering a creditor's claim that it is secured and therefore has priority over other estate creditors.  *In re Modafferi*, 45 B.R. at 373 ("The U.C.C.'s requirements for the creation of a security interest are simple and clearly set forth.  It is not unreasonable to require that a creditor who seeks to obtain priority over other creditors comply with these minimal requirements as a condition for being accorded such favored treatment."); *In re Adirondack Timber Enter., Inc.*, 2010 WL 1741378, at *4 (same); *Morin v. Galan (In re Lanzatella)*, 254 B.R. 84, 88 (Bankr. W.D.N.Y. 2000) (same).

Neither Security Agreement grants JPMorgan a security interest in all LBHI cash generally within the possession, custody or control of JPMorgan.  That type of lien was requested by JPMorgan, and rejected by LBHI, during negotiation of the August Security Agreement.[50]  *Cf. Bank of Am., N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 439 B.R. 811, 830 (Bankr. S.D.N.Y. 2010) ("That rejection of a broad definition of 'Indebtedness' was followed by the ultimate selection of a tightly worded definition . . . This process of revision reflected the negotiations and effectuated the agreement of the parties."); *CP III Rincon Towers, Inc. v. Cohen*, No. 10 Civ. 4638 (DAB), 2014 WL 1357323, at *9-10 (S.D.N.Y. Apr. 7, 2014) (rejecting interpretation that a right existed in a contract, given that a clause expressly providing that right was proposed in the first draft but the parties agreed to remove it).  Nor was the provision included in the September Security Agreement.

Instead, JPMorgan's lien under the Security Agreements covered only the defined LBHI accounts themselves, "funds and/or other assets *from time to time* held in or credited to the

---

[50]  *See supra* at 13-14.

Accounts," and proceeds thereof. (Security Agreements at p. 1, "Security" (emphasis supplied)). Pursuant to this language, JPMorgan's lien attaches to the pledged accounts and the balance held in or credited to those accounts "from time to time" and the amount of the security adjusts upwards and downwards with the balance in the account.

The very nature of this lien is that the transfer of funds or securities out of the pledged accounts releases the security interest with respect to those assets, except in agreed-upon circumstances. As set forth in the August Security Agreement's definition of Accounts, JPMorgan's lien would also extend to other accounts "at the Bank to which Guarantor [*i.e.* LBHI] transfers . . . cash from the Cash Account." This agreement was expressly incorporated into the September Security Agreement.[51] The Security Agreements do not purport to provide JPMorgan with a security interest over JPMorgan's own accounts to which *JPMorgan* itself unilaterally transfers cash from the LBHI Cash Account. Nor do the Security Agreements even mention JPMorgan's general ledger account. When JPMorgan removed the $6.9 billion from the Cash Account to its own general ledger account, JPMorgan moved those funds from the ambit of its lien, and left itself with only a security interest in the then empty LBHI Cash Account.[52]

---

[51] Kercher Decl. Ex. T (September Agreements) at p.1 of Security Agreement (defining "Accounts" as including "but not limited to the accounts included in the defined term "Accounts" set forth in the Existing [August] Security Agreement").

[52] The possibility that JPMorgan would do so was never raised by JPMorgan prior to the September Security Agreement being executed. Kercher Decl. Ex. U (Deposition of Gail Inaba) at 314:7-17, *id.* at 315:5-11; *see also Bank of Am.*, 439 B.R. at 818-19 (rejecting Bank of America's proposed interpretation of a security agreement with Lehman, in part, because "that concept was never specifically mentioned by the parties at any times during their negotiations" and "it was incumbent upon BOA" to do so).

**JPMorgan's Transfer of the $6.9 Billion Was Not Authorized by the Security Agreements**

In moving to dismiss Plaintiffs' claims, JPMorgan offered two arguments to justify its unilateral transfer of the $6.9 billion under the Security Agreements. Judge Peck deemed both to be "unpersuasive," and after exhaustive discovery they remain unpersuasive.

JPMorgan first argued that the Security Agreements authorized it to "issue instructions to direct disposition of any and all of the funds in the deposit accounts . . . without the consent of [LBHI.]"[53] JPMorgan ignored, however, that the Security Agreements did not give JPMorgan an unfettered right to transfer or dispose of LBHI's funds. Indeed, JPMorgan's request that it have the right "at its discretion" to transfer the Security to itself was rejected by LBHI in the course of negotiating the August Security Agreement, and that rejected provision was never added to the September Security Agreement.[54] Rather, the Security Agreements provided that JPMorgan could transfer the Security in the name of JPMorgan only under two specified conditions: "upon the occurrence and during the continuation of a Default or to preserve the Security or its value."[55] Neither of those two conditions apply here and, therefore, JPMorgan's unauthorized transfer of the cash to its own account violated the parties' agreements.

Indisputably, LBHI was not in default when JPMorgan transferred the $6.9 billion to itself. JPMorgan thus strained to argue that the transfer was authorized to "preserve the Security or its value." (JPM Mot. to Dis. at 86-87). According to JPMorgan, this provision allowed it to transfer the funds to its general ledger account, in order to prevent LBHI from accessing them

---

[53]   JPM Mot. to Dis. at 83 (quoting Security Agreements at p. 2).

[54]   *See* Kercher Decl. Ex. S (Email from James J. Killerlane, Lehman, to Jeffrey Aronson, et al., JPMorgan, dated August 22, 2008). Discussed supra at 13-14.

[55]   Kercher Decl. Ex. R   (August Agreements) at p. 2 of Security Agreement; Kercher Decl. Ex. T   (September Agreements) at p. 2 of Security Agreement.

and thereby "diminish" the value of the collateral.  Judge Peck also found this dubious

interpretation of the Security Agreements to be "unpersuasive," and for good reason.  *Lehman*

*Bros. Holdings Inc.*, 469 B.R. at 460-61.

The Security Agreements' authorization to transfer collateral to "preserve the Security or

its value" is standard in security agreements, and it merely grants the secured party the right to

safeguard physical collateral or its value if necessary, not to transfer collateral for the purpose of

preventing the pledgor from accessing it.  Thus, Section 9-207 of the UCC imposes on secured

parties in possession of collateral the duty to "use reasonable care in the custody and

preservation of collateral in the secured party's possession."  NY UCC § 9-207(a); *see also*

*Harris v. Key Bank Nat'l Ass'n*, 89 F. Supp. 2d 408, 412-13 (W.D.N.Y. 2000); *Grace v. Sterling,*

*Grace & Co.*, 30 A.D.2d 61, 64 (1st Dep't 1968); *Layne v. Bank One, Kentucky, N.A.*, 395 F.3d

271, 276 (6th Cir. 2005) ("the rule of reasonable care expressed in this Section is confined to the

*physical care* of the chattel, whether an object such as a horse or piece of jewelry or a negotiable

instrument or document of title." (quoting Restatement of Security § 17 cmt. A (1941) (emphasis

in original))).  The Security Agreements simply provided JPMorgan with the contractual

authority to transfer, use or operate the collateral for the limited purpose of complying with its

UCC-imposed obligation to preserve the collateral against damage or loss in value, consistent

with Section 9-207(b)(4) of the UCC.  *See* NY UCC § 9-207(b)(4) ("the secured party may use

or operate the collateral . . . for the purpose of preserving the collateral or its value"); *U.S. Bank*

*Nat'l Ass'n v. PMCC Calpine New England Inv. LLC*, No. 06 Civ. 3906 (JSR), 2006 WL

1596725 , at *2 (S.D.N.Y. June 12, 2006) (invoking UCC § 9-207(b)(4) as authority for secured

party to use or operate its collateral – two power plants – to avoid damage to equipment and

preserve the value of the facilities as a going concern).  The only purpose JPMorgan has offered

for effecting the transfer – "to ensure that LBHI did not withdraw the cash collateral"[56] – has nothing to do with fulfilling JPMorgan's duty of reasonable care to protect cash from damage or decline in value. *See Bank of Am.*, 439 B.R. at 834 (noting there was "no risk" of "any decline in value of the funds held by BOA" in a deposit account pledged by LBHI).[57]

## C. JPMorgan's Unauthorized Transfer of the $6.9 Billion Did Not Create "Proceeds" Over Which It Has a Security Interest

JPMorgan has also argued that it retained its security interest because the transfer of $6.9 billion to its own general ledger account resulted in "proceeds" over which its lien continued to attach, which Judge Peck also found "unpersuasive." *Lehman Bros. Holdings Inc.*, 469 B.R. at 460-61. Though the Court left open the possibility that further factual development could inform the meaning of "proceeds," *see id.*, JPMorgan did not develop any evidence on this issue at all. JPMorgan's "proceeds" argument should now be rejected as a matter of law.

### 1. LBHI could not grant a security interest over JPMorgan's own general ledger account as proceeds.

JPMorgan has argued that, by virtue of the unauthorized transfer, JPMorgan had a lien that continued over such "proceeds." (JPM Mot. to Dis. at 78-79); *see also Lehman Bros. Holdings Inc.*, 469 B.R. at 460-61. Yet, as a matter of law, JPMorgan could not have a lien on its general ledger account, as proceeds or otherwise.

---

[56] JPM Mot. to Dis. at 83-84.

[57] Nor does JPMorgan's explanation have the slightest factual support. By its own admission, JPMorgan did not have to take the extraordinary step of transferring the $6.9 billion to its general ledger account, because JPMorgan "had the operational ability to place a DDA block on account #066-141-605 [the LBHI Cash Account] such that no cash could be removed from that account . . ." Kercher Decl. Ex. V (Responses and Objections of JPMorgan Chase Bank, N.A. to Plaintiffs' Requests for Admissions, Request for Admission #11). As Judge Peck observed in the *Bank of America* decision, funds held in a pledged deposit account and subject to a bank's administrative hold are "unquestionably" secure. *Bank of Am.*, 439 B.R. at 834.

First, JPMorgan is the sole owner of the general ledger account, and a property owner cannot have a lien on its own property. *See, e.g.*, *Samson Res. Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 407 B.R. 140, 157 n.10 (Bankr. D. Del. 2009) ("[I]t is axiomatic that a party cannot hold a lien in its own property."); *Black's Law Dictionary* (9th ed. 2009) (defining a lien as "[a] legal right or interest that a creditor has *in another's property*.") (emphasis added).

Moreover, Section 9-203 of the UCC is clear that "a security interest is enforceable against the debtor and third parties with respect to the collateral *only if . . . the debtor has rights in the collateral* or the power to transfer rights in the collateral to the secured party."  NY UCC § 9-203(b)(2) (emphasis added).  This basic rule applies to proceeds as well:  "a security interest in proceeds of original collateral does not attach and is not perfected *until the proceeds come into existence and the debtor acquires rights in them*."  NY UCC § 9-322 Official cmt. 6 (emphasis added); *see also* NY UCC §§ 9-203(b), (f).

Here, when JPMorgan transferred the $6.9 billion from the pledged LBHI Cash Account to the JPMorgan general ledger account, LBHI did not receive rights to JPMorgan's general ledger account, such as an ownership interest in, or right to withdraw its funds from that account.  Indeed, the very purpose of JPMorgan's transfer was to ensure that LBHI could not access the funds.  JPMorgan's general ledger account therefore could not constitute proceeds over which a security interest could attach, under either the UCC or the Security Agreements.  *See* NY UCC § 9-322 Official cmt. 6; NY UCC §§ 9-203(b)(2).

JPMorgan's argument to the contrary relies on one comment to a UCC section that has no application to the facts presented here.  Comment 2 to Section 9-332 describes the scenario where the debtor maintains a deposit account with Bank A, subject to a lender's security interest, and the debtor moves the funds to another account owed by the debtor – the debtor's own deposit

account at Bank B.  According to the comment, although the security interest would not attach to the funds themselves pursuant to Section 9-332(b), the security interest could attach to the debtor's right to withdraw its funds from the debtor's own account at Bank B "inasmuch as the deposit account maintained with Bank B constitutes proceeds of the deposit account at Bank A." *See* NY UCC § 9-332 Official cmt. 2, ex. 2.  By contrast, here JPMorgan took funds out of LBHI's account and transferred them to its own account.  Under Section 9-102(a)(64)(A) of New York's enactment of the UCC, "proceeds" include "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral."  NY UCC § 9-102(a)(64)(A).  In this case, by JPMorgan's own design, JPMorgan transferred the $6.9 billion to an account where nothing was "acquired" by LBHI in exchange, and where LBHI had no rights at all – JPMorgan's general ledger account.[58]

### 2.     Section 9-208 of the UCC did not provide LBHI with rights that could be attached as proceeds

JPMorgan was unable to seriously dispute that "proceeds" as defined under the UCC requires that there be something acquired upon the disposition or exchange of the original collateral, and that the pledgor must have some rights to the supposed "proceeds."  It therefore argued that LBHI received "'rights arising out of the collateral' insofar as JPMorgan was obligated, pursuant to section 9-208(a) & (b)(2), to return the collateral within ten days of demand to the extent there were no outstanding secured obligations."  (JPM Reply at 54 (quoting NY UCC § 9-102(a)(64)(C))).  This argument is circular, as it assumes JPMorgan had a valid security interest over the $6.9 billion transferred to its general ledger account.

Specifically, Section 9-208(a) & (b)(2) of the UCC only governs a depositor's right to the return of collateral from "a secured party," meaning a party that has a security interest over the

---

[58]     Kercher Decl. Ex. I (LBHI Account Statement).

collateral.  NY UCC § 9-208(a).  As explained in Official Comment 4 to Section 9-208, the return of property when the secured party ceases to hold a security interest is not governed by the UCC, but by common law.  *See* NY UCC § 9-208 Official cmt. 4.  Thus, if there is no security interest with respect to the $6.9 billion in the first instance, Section 9-208(a) & (b)(2) has no application and provides no rights to a depositor such as LBHI, let alone rights that could be attached as proceeds.

### 3. JPMorgan did not obtain the benefit of a conversion claim against itself as proceeds of the original collateral

JPMorgan goes so far as to assert that it would have a lien over any claim (tort or otherwise) LBHI had for "return of the funds of which it was allegedly wrongfully deprived . . . ."[59]  The New York Court of Appeals faced a similar argument over a century ago, in *MacDonnell v. Buffalo Loan, Trust & Safe Deposit Co.*, 193 N.Y. 92 (1908).  There, a lender and trustee of the plaintiff's collateral – bonds secured by a mortgage – transferred the bonds in violation of the parties' agreement.  When faced with the lender/trustee's argument that the mortgage's lien over the "choses in action" extended to the resulting conversion claim against the lender/trustee, the Court rejected it in the strongest terms.  *Id.* at 103-104 ("This is so repugnant to good morals and so shocking to the sense of justice that we find it difficult to discuss the subject with any degree of judicial moderation.").  As in *MacDonnell*, here JPMorgan cannot shield itself from its own wrongful conduct by claiming a security interest in LBHI's resulting cause of action against JPMorgan.  Likewise, JPMorgan should be estopped from taking advantage of its own breach of the Security Agreements in transferring the $6.9 billion, by claiming *any* rights as to alleged proceeds that resulted from that unauthorized transfer.  *See Arrowhead Capital Fin., Ltd. v. Seven Arts Pictures PLC*, 36 Misc. 3d 1205(A), at *8-9 (N.Y.

---

[59]  JPM Reply at 54-55.

Sup. Ct. 2012) (applying "the truism that a wrongdoer should not profit from his own wrong" to preclude defendant from claiming alleged benefits arising from its breach of contract).

## II. JPMORGAN'S UNAUTHORIZED TRANSFER OF THE $6.9 BILLION CONSTITUTED AN UNLAWFUL CONVERSION (COUNT XL)

Plaintiffs are also entitled to summary judgment on their claim that JPMorgan's unauthorized sweep of the $6.9 billion from LBHI's Cash Account to JPMorgan's own general ledger account constituted an unlawful conversion (Count XL). In New York, "when the secured party ceases to hold a security interest . . . the failure to relinquish possession of collateral" constitutes a conversion under common law. NY UCC § 9-208 Official cmt. 4; *see also Bekhor v. Josephthal, Grp., Inc.*, 96 Civ. 4156 (LMM), 2000 WL 1521198, at *6-7 (S.D.N.Y. Oct. 13, 2000) (holding that a clearing bank's debit of its customers' pledged cash account would constitute a conversion if the debit was not authorized by the clearance agreement or related side letter); *Pittston Warehouse Corp. v. Am. Motorists Ins. Co.*, 715 F. Supp. 1221, 1227 (S.D.N.Y. 1989) (granting plaintiff summary judgment for conversion where defendant held plaintiffs' cash collateral in the absence of a contractual right to do so), *recon. denied*, 739 F. Supp. 904, 906 (S.D.N.Y. 1990); *accord Tri State Bank of E. Dubuque v. Colby*, 141 Ill. App. 3d 807, 811 (2d Dist. 1986) (granting summary judgment for conversion where bank "acted improperly in seizing" a pledged savings account).[60]

---

[60] *Tri State Bank* was decided under Illinois law, however the underlying principles of a conversion claim in Illinois are identical to those of New York. *See Annecca Inc. v. Lexent, Inc.*, 345 F. Supp. 2d 897, 906 n.6 (N.D. Ill. 2004) ("Our Court of Appeals has subscribed to the proposition that the principles of what conduct constitutes conversion are universal . . . and New York law is the same as in Illinois.") (internal citations omitted).

**III. ALTERNATIVELY, PLAINTIFFS ARE ENTITLED TO RETURN OF THE $6.9 BILLION PURSUANT TO CLAIMS FOR BREACH OF IMPLIED CONTRACTUAL OBLIGATIONS (COUNTS XLV, XLVII), UNJUST ENRICHMENT (COUNT XXXIX), AND TURNOVER (COUNT XXV)**

In the alternative to its conversion claim (Count XL),  the LBHI estate is entitled to summary judgment ordering the return of its $6.9 billion based on JPMorgan's breach of its implied contractual obligations (Counts XLV, XLVII) and unjust enrichment (Counts XXXIX), or pursuant to this Court's power to order turnover of those funds (Count XXV).

New York law imposes on banks the implied contractual obligation to immediately return deposited funds that have been improperly transferred, used or seized by the bank, even in the absence of an express contractual term so stating.  *See Middle E. Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 901-02 (2d Cir. 1987) (finding State Street liable for breaching its "implied contract" as plaintiff's bank to "hold[] the deposit to be disbursed only in conformity with the customer's instructions," when State Street made an unauthorized transfer of the plaintiff's funds); *Eurocredit Bank (Cayman) v. Citibank, N.A.*, No. 95 Civ. 7713 (PKL), 1996 WL 556990, at *2 (S.D.N.Y. Oct. 1, 1996); *Cassedy v. Johnstown Bank*, 246 A.D. 337, 339 (3d Dep't 1936) ("upon failure to devote it to the designated purpose, . . . [the deposit] must be returned to the depositor"); *see also Bank of Am.*, 439 B.R. at 837 (ordering Bank of America to return a pledged $500 million deposit which it seized in contravention of its security agreement with LBHI.  JPMorgan is liable to LBHI for seizing and holding LBHI funds in violation of its implied contractual obligations under the Security Agreements (Counts XLV, XLVII).

Where a party is not contractually entitled to retain funds, keeping them would be unjust enrichment.  *See Acquent, LLC v. Atl. Energy Servs., Inc.*, No. 1:09-CV-00524, 2010 WL 3584287, at *5 (N.D.N.Y. Sept. 7, 2010) (granting plaintiff summary judgment on its unjust enrichment claim where defendant retained funds in violation of the parties' contract); *Strauss*

*Paper co., Inv. v. RSA Exec. Search, Inc.*, 260 A.D.2d 570, 570-71 (2d Dep't 1999). Here, JPMorgan had no lien over the $6.9 billion it swept into its general ledger account, yet it now asserts that it has rights superior to other creditors in those funds. JPMorgan should be required to return the $6.9 billion to avoid unjust enrichment (Count XXXIX).

Alternatively, this Court should issue a turnover order requiring JPMorgan to deliver the $6.9 billion to the LBHI estate pursuant to Section 542 of the Bankruptcy Code (Count XXV). *See* 11 U.S.C. § 542; *Weber v. SEFCU (In re Weber)*, 719 F.3d 72, 81 (2d Cir. 2013). JPMorgan has no right to continue to retain these funds and assert priority over the claims of other LBHI creditors, and they should be returned promptly.

## IV.    JPMORGAN VIOLATED THE AUTOMATIC STAY (COUNTS XXXIII-XXXIV)

On October 29, 2008, after LBHI's bankruptcy petition, JPMorgan applied $1.9 billion of the wrongfully converted $6.9 billion to pay itself on purported claims against the LBHI estate arising under the parties' derivatives contracts.[61] Because JPMorgan did not have a security interest in the $1.9 billion at the time, JPMorgan violated the automatic stay. *See* 11 U.S.C. §§ 362(a)(3), (6); *see also Bank of Am.*, 439 B.R. at 835; *Shugrue v. Chem. Bank, Inc.* (*In re Ionosphere Clubs, Inc.*), 177 B.R. 198, 206 (Bankr. S.D.N.Y. 1995).

JPMorgan deliberately engaged in self-help without seeking the requisite judicial approval by using the $1.9 billion of LBHI estate funds to pay itself on highly questionable and inflated derivative claims. Not only are JPMorgan's claim calculations based on aggressive, commercially absurd assumptions, the background facts demonstrate JPMorgan knew its claimed rights to the $1.9 billion were subject to serious doubt when it nonetheless applied those funds.

---

[61]    Am. Compl. ¶¶ 266-72; Answer ¶ 268.

For example:

- On September 16, 2008, JPMorgan submitted a statement to the Court acknowledging that the legitimacy of its liens was in dispute.[62]

- That same day, JPMorgan's counsel acknowledged to the Court that the validity of its liens over the purported collateral was subject to question. (*See* Hrg. Tr. 9/16/08 at 32:14-16 ("[w]e are not seeking a validation of our liens. We are not seeking a validation of the guaranty"; *id.* at 34:14-16 ("whatever the legitimacy of the guaranty, whatever the legitimacy of that collateral")).

- On October 2, 2008, the Committee filed a motion to conduct discovery into JPMorgan's asserted rights to apply this purported collateral to its claims, explaining: "on September 12, 2008, *JPMC refused to allow LBHI to access its excess assets and instead 'froze' LBHI's account . . . JPMC was purportedly holding all of LBHI's assets as a potential offset against any claims JPMC may have had against LBHI.*"[63]

Notwithstanding this history, JPMorgan decided to put itself at least $1.9 billion ahead of LBHI's other creditors by applying those funds to its own claims on October 29, 2008.[64]

It is precisely this type of cynical self-help behavior that bankruptcy courts are charged with policing. *In re Lehman Bros. Holdings Inc.*, 433 B.R. 101, 112 (Bankr. S.D.N.Y. 2010) ("nothing is more important to fair case administration than enforcing stay violations"). Judge Peck condemned similar behavior by Bank of America, which effectuated a post-petition setoff

---

[62] *See* Statement of JPMorgan in Support of September 16 Motion, *In re Lehman Brothers Holdings Inc., et al.*, Ch. 11 Case No. 08-1355 (JMP) (Bankr. S.D.N.Y. Sept. 16, 2008) [Dkt. # 31] ¶ 4 ("The Debtor's motion does not seek a validation of the Bank's guarantee from the Debtor or of the liens that secure that guarantee").

[63] Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. for Leave to Conduct Discovery of JPMorgan Chase Bank, N.A. Pursuant to 11 U.S.C. Sections 105(a) and 1103(c) and Federal Rule of Bankruptcy Procedure 2004, *In re Lehman Brothers Holdings Inc., et al.*, Ch. 11 Case No. 08-1355 (JMP) (Bankr. S.D.N.Y. Oct. 2, 2008) [Dkt. # 566] ¶¶ 27-28.

[64] Am. Compl. ¶ 268; Answer ¶ 268; Kercher Decl. Ex. W (JPM TSS - Lehman Account Balances) at JPM-LBHI01172016.

against $500 million held in a pledged LBHI deposit account against purported derivatives obligations, in violation of the parties' security agreement:

> Given the circumstances, the timing, the legal uncertainty and the material sums involved, some disagreement and conflict between the parties was clearly foreseeable if not inevitable. This background makes it even more astonishing that BOA would make the premeditated tactical decision to deliberately seize the collateral without first moving the Court for stay relief. Given the importance of the automatic stay and the adverse consequences for knowingly violating it, that is a decision not lightly made.

*Bank of Am.*, 439 B.R. at 836. JPMorgan's conduct is at least as egregious.

## V.    PLAINTIFFS ARE ENTITLED TO STATUTORY INTEREST

In addition to the return of the $6.9 billion of seized funds and appropriate relief stemming from JPMorgan's violation of the automatic stay, LBHI is entitled to statutory interest on the amount to be returned at the rate of 9% from the date(s) that the LBHI estate's cause(s) of action came into existence. *See* N.Y. C.P.L.R. § 5001(b) ("Interest shall be computed from the earliest ascertainable date the cause of action existed . . . ."); N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute"); *see also Bank of Am., N.A. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, Adv. Pro. No. 08-01753 (Bankr. S.D.N.Y. Dec. 3, 2010) [Dkt. # 98] (awarding 9% per annum prejudgment interest on LBHI's claim against Bank of America for return of the pledged $500 million deposit). As of the date of this filing – six years to the day of LBHI's demise – $3.7 billion of interest has accrued on the $6.9 billion, $1.0 billion on the $1.9 billion portion alone.

## VI.    JPMORGAN'S AMENDED COUNTERCLAIMS FAIL AS A MATTER OF LAW

JPMorgan's strategy to avoid returning any of its ill-gotten collateral includes what can only be described as "contingent" counterclaims that recast its largest bankruptcy claim against

LBHI as a post-filing tort claim.[65]  As noted above, Plaintiffs' motion to dismiss the Amended

Counterclaims is pending.  In the event the Court prefers procedurally to address the Amended

Counterclaims on summary judgment, Plaintiffs respectfully request that the Court either (i)

convert Plaintiffs' motion to dismiss into a Rule 56 motion and consider with it the following

facts,[66] or (ii) consider the following pages as a standalone Rule 56 motion.

However the Court chooses to proceed procedurally, JPMorgan's Amended

Counterclaims should be rejected.  They are legally infirm and the facts that have been

developed in discovery only confirm their lack of merit.

### A.    JPMorgan Cannot Prove Reasonable Reliance as a Matter of Law

JPMorgan's First, Second and Third Causes of Action all sound in fraud and therefore

require proof of reasonable reliance.  These causes of action rely on two alleged

misrepresentations: (1) on September 16, 2008, two Lehman executives told Jane Buyers-Russo

of JPMorgan "that Barclays had committed to support LBI fully until the deal [for Barclays to

purchase the Lehman broker-dealer, LBI] closed, including by providing overnight financing that

would reduce or eliminate LBI's dependence on the Fed . . . at which point JPMorgan would be

---

[65]  Counterclaim of JPMorgan Chase Bank, N.A., *Lehman Brothers Holdings Inc., et al. v. JPMorgan Chase Bank, N.A.* Adv. Pro. No. 10-03266 (JMP) (Bankr S.D.N.Y. Dec. 1, 2010) [Dkt. # 33].  Plaintiffs moved to dismiss the counterclaims on January 31, 2011, Plaintiffs Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors' Memorandum of Law in Support of Motion to Dismiss Counterclaims of Defendant JPMorgan Chase Bank, N.A., *In re Lehman Brothers Holdings, Inc., et al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr S.D.N.Y. Jan. 31, 2011)[Dkt. # 48], and JPMorgan filed its Amended Counterclaims on February 17, 2011, Amended Counterclaims of JPMorgan Chase Bank, N.A., *In re Lehman Brothers Holdings, Inc., et al.*, Adv. Pro. No. 10-03266 (JMP) (Bankr S.D.N.Y. Feb. 17, 2011) [Dkt. # 63] ("Am. Countercl.").

[66]  "[A] court may convert a motion to dismiss into a motion for summary judgment by considering extrinsic evidence, as long as the opposing party receives sufficient notice and an opportunity to respond." *Mayo v. Fed. Gov't*, 558 F. App'x 55, 56 (2d Cir. 2014) (citing *Hernandez v. Coffey*, 582 F.3d 303, 307-08 (2d Cir. 2009)).

taken out [of its exposure to LBI] in full;"[67] and (2) LBHI filed a draft Asset Purchase

Agreement with the Bankruptcy Court the morning of September 17, 2008, that JPMorgan

claims "explicitly caused JPMorgan to believe that LBHI, LBI, and Barclays had entered into a

transaction that would fully extinguish JPMorgan's clearance-related exposure to LBI."[68]

Reliance on predictive statements of what a third party will do in the future is

unreasonable as a matter of law. *Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v.

AT&T Commc'ns Inc.*, No. 92 Civ. 7862 (KMW), 1996 WL 312535, at *15 (S.D.N.Y. June 10,

1996) ("A speaker's representations about another party's future intentions or plans are generally

construed as opinion, not fact, and hence cannot give rise to a claim of fraud or fraudulent

inducement."); *Lane v. McCallion*, 166 A.D.2d 688, 690 (2d Dep't 1990) (holding that a land

seller's assurances that a future zoning application would be approved was not an actionable

misstatement because it was a "prediction or an expression as to future events" under the control

of a third party). It is acutely unreasonable to rely on such statements where, as here, JPMorgan

itself was in direct negotiations with the third party, Barclays. Likewise, reliance on a draft

agreement subject to court approval is unreasonable as a matter of law because its effectiveness

depends on unfulfilled contingencies. *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,

309 A.D.2d 288, 305 (1st Dep't 2003) ("The motion court correctly dismissed the [claim] for

fraud, because reliance on the contingent future event of an IPO was not reasonable . . . ."); *H &

R Project Assocs., Inc. v. City of Syracuse*, 289 A.D.2d 967, 968 (4th Dep't 2001) (stating that

when the plaintiff "was in a position to know that the [transaction] was contingent . . . and that

approval for such funding could be denied," it would "not be heard to complain that it was

---

[67] Am. Countercl. ¶ 33.

[68] *Id.* ¶ 40.

34

induced to enter into the transaction by misrepresentations") (internal quotation marks omitted); *see also In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009) ("[T]he debtor 'ha[s] the option to walk away [from the terms of an agreement] up until the moment the Court approved them.'"). Additionally, Ms. Buyers-Russo testified that LBHI's purported oral misrepresentation included the fact that the Barclays sale was contingent on future action of yet another third party by noting that "they were awaiting approval from the FSA [Financial Services Authority]." SUF ¶ 27. Such reliance is particularly unreasonable under these circumstances, where Bankruptcy Court approval was required and JPMorgan participated in the Court hearings.

The factual record confirms that JPMorgan did not in fact rely on those representations. On September 17, JPMorgan's lead bankruptcy counsel, Hal Novikoff, wrote to Barclays' counsel that JPMorgan did not know what to expect from the "draft APA," which he called "***totally unrealistic***," and was concerned that JPMorgan would have substantial exposure to LBI:

> JPM is deeply concerned because it does not understand what Barclays contemplates, either financially or operationally, with respect to JPM's clearing arrangement and relationships with Lehman.
>
> For example, . . . the draft APA and court documents do not address (a) the obvious requirement that JPM's tens of $billions of clearing advances must be paid to obtain a release of its liens . . . .
>
> [W]ithout knowing what Barclays actually has planned, JPM may have no choice to protect its interests with all of its available rights and remedies, including the termination of discretionary financing. SUF ¶ 28.

Mr. Novikoff has testified that the "principal concern" of his email was to learn "how were we going to be paid, since the asset purchase agreement did not appear to contemplate any payment by Barclays to JPMorgan to release their lien for securities that were being held. ***We also were inquiring as to what securities were being purchased.***" SUF ¶ 29. Mr. Novikoff also noted in an email that "Cleary and Barclays have been unresponsive to our and JPMorgan's requests for explanation, ***and the documents simply don't work.***" SUF ¶ 30. Mr. Novikoff

testified that, throughout the week, "important aspects of this transaction . . . had not been clarified . . . to [his] satisfaction." SUF ¶ 31. These critical admissions indisputably establish that JPMorgan did not rely on LBHI assurances about the Barclays sale, nor could it reasonably have done so. JPMorgan's fraud claims are therefore subject to summary judgment in LBHI's favor.

### B. JPMorgan's Aiding and Abetting Claims Fail as a Matter of Law

JPMorgan's Fifth Cause of Action asserting that LBHI aided and abetted Barclays' purported fraud fails, not only for lack of reasonable reliance, but also because JPMorgan cannot establish that LBHI "substantially assisted" Barclays' supposed fraud.[69] The claim is predicated on Barclays' decision not to continue (or "roll") a tri-party repo trade with LBI the night of September 18, 2008. But JPMorgan has failed to develop any evidence that LBHI caused JPMorgan to unwind the repo on the morning of September 18 or influenced Barclays' decisions not to roll the trade that night or purchase the securities left with JPMorgan. Thus, no finder of fact could conclude LBHI proximately caused JPMorgan injury.[70]

JPMorgan's Fourth Cause of Action for aiding and abetting a purported fraud by LBI is subject to the same failures as JPMorgan's fraud claims.[71] Moreover, the only allegations connecting LBHI to LBI's purported fraud are alleged actions of LBI personnel who were also officers of LBHI. SUF ¶ 32. Had those individuals substantially assisted an alleged fraud by

---

[69] Mot. to Dismiss Am. Countercl. at 66-70.

[70] Underscoring LBHI's lack of involvement in Barclays' purported fraud, the counterclaims identify only a single conversation involving Lehman representatives. Am. Countercl. ¶ 143(C).) JPMorgan alleges only that LBI employees failed to contradict statements by Barclays (*id.* ¶ 55), and JPMorgan cannot prove these individuals knew of Barclays' decision not to roll the repo, which was not made until the following day.

[71] Mot. to Dismiss Am. Countercl. at 62-65.

LBI, there is no reason to attribute their acts to LBHI as aider and abettor rather than to LBI as the primary tortfeasor. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 724 (S.D.N.Y. 2013) ("If, after discovery, it appears that the aiding and abetting claim is wholly duplicative of the primary claim, plaintiffs will not have the benefit of submitting both claims to the factfinder.").

## C.      JPMorgan's Counterclaims are Precluded by Waiver and Estoppel

As explained in Plaintiffs' motion to dismiss, JPMorgan's fraud and aiding and abetting counterclaims would—contrary to applicable law—require the Court to overrule a prior order by the Bankruptcy Court that there is "no support for the proposition that the resulting disclosure problems and disputes [associated with Barclays' purchase of LBI assets] were caused by willful misconduct, deliberate misrepresentations or the intentional withholding or concealment of relevant information during the Sale Hearing."[72] JPMorgan also waived those claims when it supported the Barclays transaction in the Bankruptcy Court *after learning* that Barclays would purchase fewer assets than allegedly represented. SUF ¶¶ 33-36. *See Kassover v. Prism Venture Partners, LLC*, 53 A.D.3d 444, 449 (2d Dep't 2008) (finding waiver when plaintiffs stated they would not object to merger at hearing but later attempted to raise related objections because they "should have raised this issue in the bankruptcy proceedings").

## D.      JPMorgan's Other Claims Fail as a Matter of Law

JPMorgan's other counterclaims also fail as a matter of law. JPMorgan has since acknowledged that, "[i]n light of the Court's ruling on the Rule 60(b) motion, JPMorgan agrees

---

[72]      Opinion on Motions Seeking Modification of the Sale Order Pursuant to Rule 60(b), the Trustee's Motion for Relief Under the SIPA Sale Order, Barclays' Cross-Motion to Enforce the Sale Orders and Adjudication of Related Adversary Proceedings, *In re Lehman Brothers Holdings, Inc., et al.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb 22, 2011) [Dkt. # 14612] at 18.

that the unjust enrichment claim [JPMorgan's Sixth Cause of Action] has been rendered moot 'to the extent the ruling in the Rule 60(b) proceeding stands.'"[73]  The Rule 60(b) order is final, and this counterclaim should therefore be dismissed.

JPMorgan's Seventh and Eighth Causes of Action rely on indemnity provisions that do not apply, because, *inter alia*, (i) any losses would be due to JPMorgan's negligence or willful misconduct—circumstances specifically carved out of the indemnity provisions[74]—and (ii) indemnification clauses cannot immunize JPMorgan against the return of fraudulently-conveyed value.  *See Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.)*, 45 B.R. 629, 639 (Bankr. N.D. Ga. 1985) (dismissing indemnification counterclaim because, *inter alia*, "the literal terms of the indemnity agreement do not purport to require indemnification arising from an action under the avoidance powers of the Bankruptcy Code"); *cf. Asher v. Film Ventures Int'l, Inc. (In re Film Ventures Int'l, Inc.)*, 89 B.R. 80, 83-84 (9th Cir. B.A.P. 1988) (explaining that a provision insulating a creditor from liability for a preferential transfer would be invalid because "[s]uch a result would clearly be at odds with the equality of distribution principles underlying 11 U.S.C. § 547").

---

[73]  JPMorgan's Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss the Amended Counterclaims, In *re Lehman Holdings, Inc., et al.*, Adv. Pro. No. 10-032666 (JMP) (Bankr S.D.N.Y. Jun 3, 2011) [Dkt. # 78] at 7 n.2.

[74]  Am. Countercl. ¶¶ 157, 167.

## CONCLUSION

For the reasons set forth above, this Court should issue the requested summary judgment.

Dated: September 15, 2014  
      New York, New York

**CURTIS, MALLET-PREVOST, COLT & MOSLE LLP**

By: _/s/ Joseph D. Pizzurro_
    Joseph D. Pizzurro  
    L. P. Harrison 3rd  
    Michael J. Moscato  
    Peter J. Behmke  
    101 Park Avenue  
    New York, New York 10178  
    Telephone:  (212) 696-6000

    jpizzurro@curtis.com  
    lharrison@curtis.com  
    mmoscato@curtis.com  
    pbehmke@curtis.com

    *Counsel for Plaintiff, Debtor Lehman Brothers Holdings Inc.*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

By: _/s/ Andrew J. Rossman_
    Andrew J. Rossman  
    James C. Tecce  
    Erica P. Taggart  
    Christopher D. Kercher  
    51 Madison Avenue, 22nd Floor  
    New York, New York 10010  
    Telephone:  (212) 849-7000

    andrewrossman@quinnemanuel.com  
    jamestecce@quinnemanuel.com  
    ericataggart@quinnemanuel.com  
    christopherkercher@quinnemanuel.com

    *Special Counsel for Plaintiff Intervenor, the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.*