**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors.<br><br>――――――――――――――――――<br><br>LEHMAN BROTHERS HOLDINGS INC. and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiff/Counterclaim-Defendant and Plaintiff Intervenor,<br><br>-against-<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>Defendant/Counterclaimant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 11 Civ. 6760 (RJS)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000

*Attorneys for Defendant/Counterclaimant*
*JPMorgan Chase Bank, N.A.*

Dated:  October 15, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................. 5

POINT I:      PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT
ON CLAIMS RELATING TO JPMORGAN'S TRANSFER OF
$6.9 BILLION ........................................................................................................ 6

      A.     Relevant factual background ...................................................................... 6

      B.     JPMorgan did not forfeit its lien on $6.9 billion in cash collateral ......................... 9

            1.     JPMorgan did not release its security interest by exercising its
contractual right to move cash collateral to a JPMorgan account. ............. 9

            2.     JPMorgan's security interest attached to the funds in the GL Cash
Collateral Account as "proceeds." ............................................................ 13

            3.     The extrinsic evidence on which plaintiffs rely is
inadmissible and irrelevant. ...................................................................... 19

            4.     The remedy for an allegedly unauthorized transfer is
not a loss of lien. ...................................................................................... 20

      C.     JPMorgan also retained a right of setoff. ................................................ 21

      D.     Plaintiffs' dependent claims fail. ............................................................ 22

      E.     Plaintiffs' request for statutory interest is at best premature. .............................. 23

POINT II:     PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT
DISMISSING THE AMENDED COUNTERCLAIMS. ...................................... 23

      A.     Relevant factual background .................................................................... 24

      B.     Material disputes of fact preclude summary judgment dismissing
JPMorgan's fraud claims (First, Second and Third Causes of Action). ............... 32

      C.     Material disputes of fact preclude summary judgment on JPMorgan's
aiding and abetting claims (Fourth and Fifth Causes of Action). ......................... 36

      D.     The defenses of estoppel and waiver do not bar JPMorgan's claims. .................. 38

      E.     Challenges to JPMorgan's claims of indemnification are at best premature
(Seventh and Eighth Causes of Action). ................................................ 40

CONCLUSION ........................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amarillo Nat'l Bank* v. *Komatsu Zenoah Am., Inc.*,
    991 F.2d 273 (5th Cir. 1993) ............................................................... 11

*Banco De La Provincia De Buenos Aires* v. *BayBank Boston, N.A.*,
    985 F. Supp. 364 (S.D.N.Y. 1997) ...................................................... 22

*Bank of Am., N.A.* v. *Lehman Bros. Holdings Inc.*,
    439 B.R. 811 (Bankr. S.D.N.Y. 2010) ........................................... 21 n.27

*Bank of N.Y.* v. *First Millennium, Inc.*,
    607 F.3d 905 (2d Cir. 2010) ......................................................... 38 n.40

*Bank of R.I.* v. *Mixitforme, Inc.*,
    2007 WL 299361 (R.I. Super. Ct. Jan. 11, 2007) ............................... 14

*Brady* v. *Chem. Constr. Corp.*,
    740 F.2d 195 (2d Cir. 1984) ................................................................. 6

*Citizens & S. Sec. Corp.* v. *Braten*,
    733 F. Supp. 655 (S.D.N.Y. 1990) ...................................................... 39

*Cofacredit, S.A.* v. *Windsor Plumbing Supply Co.*,
    187 F.3d 229 (2d Cir. 1999) .......................................................... 35 n.36

*Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*,
    68 N.Y.2d 954 (1986) ................................................................... 33 n.34

*Derisme* v. *Hunt Leibert Jacobson P.C.*,
    880 F. Supp. 2d 339 (D. Conn. 2012) ............................................ 24 n.31

*Gen. Motors Corp.* v. *Devex Corp.*,
    461 U.S. 648 (1983) ............................................................................ 23

*Gillman* v. *Chase Manhattan Bank, N.A.*,
    521 N.Y.S.2d 729 (2d Dep't 1987) ...................................................... 22

*Gillman* v. *Chase Manhattan Bank, N.A.*,
    73 N.Y.2d 1 (1988) ................................................ 11 & n.11, 12, 17 n.19, 22

*Grupo Sistemas Integrales de Telecomunicacion S.A.* v. *AT&T Commc'ns, Inc.*,
    1996 WL 312535 (S.D.N.Y. June 10, 1996) ............................... 34-35 n.35

*H & R Project Assocs., Inc.* v. *City of Syracuse*,
    737 N.Y.S.2d 712 (4th Dep't 2001) ................................................ 35 n.37

*Ill. State Bd. of Inv.* v. *Authentidate Holding Corp.*,
    369 F. App'x 260 (2d Cir. 2010) ................................................... 35 n.36

*In re CJL Co.*,
    71 B.R. 261 (Bankr. D. Or. 1987) ............................... 12, 13 n.12, 17 n.19

*In re CNB Int'l, Inc.*,
393 B.R. 306 (Bankr. W.D.N.Y. 2008) .................................................................. 23

*In re Corp. Jet Aviation, Inc.*,
45 B.R. 629 (Bankr. N.D. Ga. 1985) ............................................................. 40 n.42

*In re Film Ventures Int'l, Inc.*,
89 B.R. 80 (B.A.P. 9th Cir. 1988) ................................................................. 40 n.42

*In re First Cent. Fin. Corp.*,
377 F.3d 209 (2d Cir. 2004) ................................................................................ 22

*In re Herbst*,
469 B.R. 299 (Bankr. W.D. Wis. 2012) ........................................................ 17 n.20

*In re Kardos*,
27 F.2d 690 (2d Cir. 1928) ............................................................................ 20 n.25

*In re Lehman Bros. Holdings Inc.*,
404 B.R. 752 (Bankr. S.D.N.Y. 2009) ............................................................ 10 n.8

*In re Lehman Bros. Holdings Inc.*,
445 B.R. 143 (Bankr. S.D.N.Y. 2011) ................................................................ 38

*In re Lehman Bros. Holdings Inc.*,
469 B.R. 415 (Bankr. S.D.N.Y. 2012) ................................................... 15 n.16, 22

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
935 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................................... 37 n.38

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) .............................................................................. 39

*In re Verus Inv. Mgmt., LLC*,
344 B.R. 536 (Bankr. N.D. Ohio 2006) ........................................................ 17 n.19

*In re Vitamin C Antitrust Litig.*,
2013 WL 504257 (E.D.N.Y. Feb. 8, 2013) .................................................. 38 n.39

*Kassover* v. *Prism Venture Partners, LLC*,
862 N.Y.S.2d 493 (1st Dep't 2008) .............................................................. 39 n.41

*Kates* v. *Marine Midland Bank, N.A.*,
541 N.Y.S.2d 925 (N.Y. Sup. Ct. 1989) ....................................................... 21 n.27

*Lane* v. *McCallion*,
561 N.Y.S.2d 273 (2d Dep't 1990) ........................................................... 34-35 n.35

*Manley* v. *AmBase Corp.*,
337 F.3d 237 (2d Cir. 2003) .......................................................................... 11 n.11

*MBIA Ins. Corp.* v. *J.P.Morgan Sec. LLC*,
43 Misc. 3d 1221(A) (N.Y. Sup. Ct. 2014) ................................................... 32 n.33

*Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*,
765 N.Y.S.2d 575 (1st Dep't 2003) .............................................................. 35 n.37

*SEC* v. *Save The World Air, Inc.*,
2005 WL 3077514 (S.D.N.Y. Nov. 15, 2005) .............................................. 35 n.36

iv

*Segovia* v. *Equities First Holdings, LLC*,
  2008 WL 2251218 (Del. Super. Ct. May 30, 2008) ...................................... 21 n.26

*Sheehy* v. *New Century Mortg. Corp.*,
  690 F. Supp. 2d 51 (E.D.N.Y. 2010) ...................................................... 24 n.31

*Stewart* v. *Jackson & Nash*,
  976 F.2d 86 (2d Cir. 1992) ................................................................. 35

*W.W.W. Assocs., Inc.* v. *Giancontieri*,
  77 N.Y.2d 157 (1990) ........................................................................ 19

## Statutes and Rules

N.Y. C.P.L.R. § 5001 ........................................................................... 23

N.Y. U.C.C. § 9-102 ........................................................... 14, 18 & n.22

N.Y. U.C.C. § 9-104 ............................................................. 17 & n.19

N.Y. U.C.C. § 9-202 ........................................................................... 17

N.Y. U.C.C. § 9-203 ................................................................... 15 n.15

N.Y. U.C.C. § 9-207 ........................................................................... 11

N.Y. U.C.C. § 9-208 ................................................................... 17 n.20

N.Y. U.C.C. § 9-315 ...................................................... 9 & n.7, 13, 14

N.Y. U.C.C. § 9-322 ................................................................... 18 n.22

N.Y. U.C.C. § 9-327 ................................................................... 10 n.9

N.Y. U.C.C. § 9-332 ............................................................. 14 & n.14

N.Y. U.C.C. § 9-622 ................................................................... 17 n.20

N.Y. U.C.C. § 9-623 ................................................................... 17 n.20

N.Y. U.C.C. § 9-625 ................................................................... 20 n.25

11 U.S.C. § 101 ............................................................... 22-23 n.28

11 U.S.C. § 362 ................................................................... 23 n.29

11 U.S.C. § 542 ........................................................................... 22

11 U.S.C. § 553 ....................................................... 22, 23 n.29

Fed. R. Civ. P. 56 ............................................................................. 6

## Other Authorities

12A Fletcher Cyc. Corp. § 5679 (2014) ........................................... 20 n.25

60A N.Y. Jur. 2d Fraud and Deceit § 25 (2014) .............................. 33 n.34

Clark & Clark, *Law of Secured Transactions Under the UCC* ¶ 4.12[4] (2014) ............ 20-21 n.25

9A Hawkland, U.C.C. Series § 9-202:1 (2014) ...................................... 17

John F. Hilson et al., *Report of the Deposit Accounts Task Force to the Article 9 Drafting
  Committee*, 54 Consumer Fin. L.Q. Rep. 203 (2000) ........................... 14

## PRELIMINARY STATEMENT

Although styled as a brief in support of plaintiffs' motion for summary judgment, much of plaintiffs' September 15, 2014 memorandum has no bearing on that motion and is instead devoted to accusations that are as spurious as they are gratuitous. When plaintiffs finally turn to the relief they are seeking, their arguments are not remotely sufficient to support summary judgment in their favor. As explained below, JPMorgan—rather than plaintiffs—is entitled to summary judgment on plaintiffs' eight claims predicated on the theory that JPMorgan unintentionally lost its lien on $6.9 billion of cash collateral by moving the funds from one bank account at JPMorgan to another. Nor do plaintiffs have any basis for summary judgment on JPMorgan's counterclaims: Their motion addresses the counterclaims only in cursory fashion and ignores the factual record supporting JPMorgan's causes of action.

**Movement of cash collateral.** Plaintiffs' claims relating to the $6.9 billion "cash sweep" seek a windfall of extraordinary proportions. Plaintiffs' position is that JPMorgan unintentionally forfeited its rights to $6.9 billion in collateral when it moved those funds from an LBHI demand deposit account to a general ledger cash collateral account at the bank, even though: (1) it is undisputed that JPMorgan moved the funds to protect its lien; (2) in either account, the cash served as collateral for tens of billions of dollars of obligations owed by Lehman to JPMorgan; and (3) the collateral was ultimately both needed and used to satisfy those obligations.

The September Security Agreement, Article 9 of the New York Uniform Commercial Code and the undisputed facts each refute plaintiffs' position. Under Section 9-315 of the U.C.C., a security interest "continues" following the transfer of collateral unless the secured party "authorize[s]" the release of its security interest. In this case, far from agreeing to a release of JPMorgan's security interest, the parties made clear in their contract that JPMorgan could transfer the deposit from an LBHI account to a JPMorgan account *without* losing that security inter-

est:  Under the September Security Agreement, JPMorgan had the express contractual right to transfer collateral to the bank "to *preserve* the Security or its value."  By exercising that contractual right to preserve its security interest, JPMorgan indisputably did not intend to—and did not—authorize the *release* of the security interest.

In addition, both the U.C.C. and the September Security Agreement make clear that JPMorgan's security interest attached to the deposit in the GL Cash Collateral Account (defined below) as "proceeds" of the deposit in the LBHI account.  The September Security Agreement expressly defines the bank's security as including "all proceeds" of the LBHI account and the funds held therein.  And the U.C.C. expressly contemplates that a transfer from one bank account to another results in "proceeds" to which a lender's security interest remains attached.  Plaintiffs' only response is to argue that "LBHI did not receive rights to JPMorgan's general ledger account" (Pl. Br. 25).  Plaintiffs' argument fails for several reasons, including that LBHI *did* obtain rights in the GL Cash Collateral Account.  As demonstrated in JPMorgan's motion for summary judgment, the GL Cash Collateral Account was used to hold cash collateral of broker-dealers, subject to those dealers' right to return of the collateral after satisfaction of their secured obligations.  In this case, the $6.9 billion was specifically identified as *Lehman's* pledged collateral and, after Lehman's default, it was used to satisfy *Lehman's* outstanding obligations.

Finally, even if plaintiffs were right that the transfer to the GL Cash Collateral Account was not authorized, it is well settled that the remedy for a secured party's unauthorized transfer of collateral is *not* loss of its lien.

**JPMorgan's counterclaims.**  Summary judgment should be denied on JPMorgan's counterclaims.  The facts adduced in discovery show that LBHI, following its bankruptcy, induced JPMorgan to extend tens of billions of dollars of new credit to its U.S. broker-dealer sub-

sidiary Lehman Brothers Inc. ("LBI") without disclosing that it had agreed to sell LBI's business to Barclays on terms that made it *impossible* for LBI to repay that credit.

Among the many gratuitous accusations in plaintiffs' brief is that JPMorgan's collateral requests of LBHI in 2008 were unjustified "cash grabs" because JPMorgan's clearance advances were "already fully secured" by securities in LBI's portfolio.  The facts supporting the counterclaims give the lie to this fable.  At the heart of those facts is a security known as RACERS—an unsaleable, complex financial construct with a face value of $5 billion.  Lehman used RACERS to secure overnight financings, and also to secure JPMorgan's intraday clearing advances that enabled LBI to repay those financings each morning.  Unbeknownst to JPMorgan, Lehman employees regularly derided RACERS, calling it "toxic racer crap" and "goat poo-poo" to be scattered in someone else's "back yard," among other things.  R-SOF ¶¶ 35-38.[1]

When LBHI sought to sell LBI's business to Barclays right after its bankruptcy filing, Lehman executives knew that Barclays would never take such a "toxic" asset, and they purposely excluded RACERS and other illiquid securities from the deal.  As a result, they also knew that the Barclays sale would *not* generate sufficient funds for LBI to repay its intraday advances from JPMorgan and that, when LBI entered liquidation proceedings, JPMorgan would be left with billions of dollars of claims secured by RACERS and other illiquid securities.

But Lehman said nothing to JPMorgan about its plan and efforts to exclude LBI's "toxic" assets from the Barclays transaction.  To the contrary, in an effort to persuade JPMorgan to continue extending LBI tens of billions of dollars of credit each day and to facilitate the Barclays

---

[1] Citations to "R-SOF" refer to the numbered paragraphs of Part II of JPMorgan's response to plaintiffs' statement of undisputed facts, submitted contemporaneously with this memorandum of law.  Additional factual background is set forth in JPMorgan's memorandum of law in support of of its own motion for summary judgment ("JPM Br.") and its statement of undisputed facts submitted therewith ("SOF").  Unless otherwise noted, emphasis is added, internal quotation marks are omitted and capitalized terms have the same meanings as in the JPM Br.

transaction, senior LBHI executives represented to JPMorgan that its exposure would be fully eliminated as a result of the Barclays sale.

Lehman's scheme worked.  Believing that its advances would be repaid because Barclays had agreed to purchase the securities that JPMorgan was financing, JPMorgan continued extending intraday credit to LBI and acted to facilitate the transfer of LBI's securities portfolio to Barclays.  Meanwhile, Lehman employees—many of whom would end up employed at Barclays—worked feverishly behind JPMorgan's back to ensure that RACERS and other "toxic" assets were not transferred to Barclays.  As one Lehman employee wrote in an internal email:  "We need to be 1000000000000000000000000000000000000000000000% sure that the RACER does not make its way to [Barclays]."  R-SOF ¶ 85.  Lehman employees also informed Barclays that RACERS "was never meant to be traded," and Barclays concluded that it was not "a real security" and should be assigned a value of between 0 and 10 cents on the dollar.  R-SOF ¶¶ 76-77.

As result of LBHI's deceptive conduct, when LBI's liquidation proceeding commenced on September 19, 2008, JPMorgan was stuck with unpaid claims of over $25 billion for the credit it extended during the week following LBHI's bankruptcy, with Lehman's unwanted securities as collateral.  Moreover, consistent with Lehman's description of RACERS as "goat poo-poo," JPMorgan was unable to sell that security in the market, and had similar difficulty liquidating hundreds of other illiquid securities that had been left behind.  In order to satisfy its claims, JPMorgan ultimately had to look to the $8.6 billion of collateral that LBHI pledged the prior week—the very *same* collateral that plaintiffs proclaim in their brief was obtained through a "cash grab" by JPMorgan when it was supposedly "fully secured."

Plaintiffs fail to grapple with these critical facts that defeat their motion.  They instead build up and tear down a lineup of straw men.  They mischaracterize the counterclaims as seek-

ing to hold LBHI liable for failing to predict *Barclays'* future conduct, ignoring all of the evi-

dence showing that *Lehman* concealed and misstated *existing facts* regarding the Barclays trans-

action, including its own efforts to ensure that RACERS and other illiquid securities would be

left behind at LBI.  Plaintiffs also claim that JPMorgan did not rely on Lehman's deceptive con-

duct, despite the evidence showing that JPMorgan:  (1) knew nothing about Lehman's deliberate

efforts to stick JPMorgan with "toxic" securities; and (2) continued to support Lehman based on

the understanding that its exposure would be eliminated through the Barclays deal.  If any of the

claims in the complaint go to trial, so too should the counterclaims.[2]

## ARGUMENT

The first twelve pages of plaintiffs' brief present a spurious and skewed version of the

events surrounding JPMorgan's 2008 collateral requests.  This revisionist history is replete with

self-serving distortions of the factual record,[3] assertions lacking any record support,[4] and allega-

---

[2] JPMorgan's counterclaims for fraud and aiding and abetting will be ripe only if one or more of LBHI's claims against JPMorgan survive summary judgment.  If JPMorgan's summary judgment motion is granted, those counterclaims do not need to be addressed.

[3] For example, plaintiffs assert that "[d]uring the spring and summer of 2008, the [Fed] encouraged JPMorgan and BNY Mellon to increase their intraday margins to match the level of margin required by overnight investors, but [Fed] President Timothy Geithner urged the banks' CEOs to 'go slow' to avoid causing a liquidity crisis for the broker-dealers."  Pl. Br. 5 & n.10.  President Geithner never gave that directive and no Fed witness has given testimony to support plaintiffs' assertion.  Lees Decl. Ex. 1 (Baxter Tr. 10/3/11 at 162:20-163:25) (Rule 30(b)(6) witness for the Fed).

[4] For example, without a single citation, plaintiffs claim:  "In the last four business days before Lehman's chapter 11 filing in September 2008, JPMorgan [received] inside information regarding Lehman's operations, financing, liquidity and prospects for a bailout."  Pl. Br. 6.  But the assertion is unsupported by a single witness, and indeed is contradicted by Treasury Secretary Paulson and Fed representatives.  Lees Decl. Ex. 1 (Baxter Tr. 1/17/12 at 401:12-403:12); SOF ¶ 1(d) (Paulson Decl. at 11).  Similarly, plaintiffs have suggested that JPMorgan acted inappropriately by basing credit decisions on a preview Lehman gave of its third-quarter financial results.  But LBHI's CFO Ian Lowitt and its Global Treasurer Paolo Tonucci both admitted that they fully expected JPMorgan to do so and did not believe that JPMorgan acted inappropriately.  Lees Decl. Ex. 10 (Lowitt Tr. 12/5/11 at 85:17-88:22); Lees Decl. Ex. 14 (Tonucci Tr. 11/10/11 at 188:13-191:18).

tions that have no bearing on either party's motion for summary judgment.[5]  Plaintiffs' "factual

backdrop" (Pl. Br. 4 n.4)—which ignores the most critical point in the case, namely that

JPMorgan had *no duty to lend* to Lehman—is "a smokescreen of irrelevant facts and tangential

issues," and should be ignored.  *Brady* v. *Chem. Constr. Corp.*, 740 F.2d 195, 202 (2d Cir. 1984).

What matters for purposes of plaintiffs' summary judgment motion is whether plaintiffs

have shown that there is no dispute of material fact and that they are entitled to judgment as a

matter of law with respect to the claims they have moved on.  Fed. R. Civ. P. 56.  They have not.

**POINT I:      PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
CLAIMS RELATING TO JPMORGAN'S TRANSFER OF $6.9 BILLION.**

### A.      Relevant factual background

In September 2008, LBHI entered into agreements that (1) guaranteed the obligations of

LBHI's subsidiaries to JPMorgan (the "September Guaranty" or "SG"), and (2) granted JPMorgan

a lien on collateral pledged to secure those obligations (the "September Security Agreement" or

"SSA").  These agreements are governed by New York law.  SG at § 17; SSA at 6.

In the September Security Agreement, LBHI granted JPMorgan a "security interest in,

and a general lien upon and/or right of set-off of, the Security."  SSA at 2.  "Security" is defined

to include several components:  (i) "the Accounts" (*i.e.*, "all accounts" of LBHI at JPMorgan)[6]

together with "any and all . . . funds and/or other assets from time to time held in or credited to

the Accounts"; (ii) "any interest, dividends, cash, instruments and other property from time to

---

[5] For example, plaintiffs assert that JPMorgan obtained collateral from LBHI in order to apply it
against "inflated" claims to "profiteer from Lehman's demise."  Pl. Br. 12.  JPMorgan of course
can only apply its collateral to valid claims.  Separate proceedings to adjudicate the allowed
amounts of JPMorgan's claims are pending in the bankruptcy court.

[6] One LBHI account, the "Overnight Account," was excluded from the definition of "Accounts."
*See* SSA at 1; August Security Agreement ("ASA") at 3.

time received, receivable or otherwise distributed in respect of or exchange for any or all of the then existing Security"; and (iii) "all proceeds of any and all of the foregoing Security." SSA at 1.

In connection with these agreements, between September 9 and 12, 2008, LBHI pledged approximately $1.7 billion in money-market funds to JPMorgan, and deposited $6.9 billion in cash collateral into an LBHI demand deposit account maintained at JPMorgan, denominated as DDA 066-141-605 (the "Deposit Account"). R-SOF ¶ 1. LBHI had the operational ability to make withdrawals from the Deposit Account, but it had no right to transfer cash collateral except upon "three days written notice" to JPMorgan. SSA at 3; SG at § 1. By contrast, JPMorgan had the express contractual right to "transfer to . . . the Bank [JPMorgan] . . . any of the Security" to "preserve the Security or its value." SSA at 2; *see also id.* (granting JPMorgan the right, as the secured party, "to direct disposition of . . . the funds in the deposit accounts . . . without the consent of [LBHI]").

Consistent with its contractual rights, JPMorgan moved the $6.9 billion of cash collateral out of the Deposit Account and into a cash collateral account maintained by JPMorgan on its general ledger, denominated as G/L 2103940020 NIB TRIPARTY CASH COLLATERAL (the "GL Cash Collateral Account"). Unlike funds in the Deposit Account, funds in the GL Cash Collateral Account could only be transferred through an instruction initiated within JPMorgan. R-SOF ¶¶ 2, 4. JPMorgan moved the $6.9 billion to the GL Cash Collateral Account to ensure that LBHI would not be able to withdraw those funds on its own initiative and thereby deprive JPMorgan of the security that the deposit of those funds was intended to provide. R-SOF ¶ 10.

The GL Cash Collateral Account was not a proprietary account of JPMorgan. Rather, it was an account used to hold cash collateral pledged by broker-dealer clients, including Lehman, engaged in financing activities such as triparty repos. When the cash collateral was no longer needed to secure financing, it was available to be returned to the dealer. R-SOF ¶¶ 3-5.

7

In addition to authorizing JPMorgan to transfer collateral in order to preserve it, the September Security Agreement explicitly described the limited circumstances in which JPMorgan agreed to "release" its security interest.  The critical provision (nowhere mentioned in plaintiffs' brief) provides that:

> Notwithstanding anything provided for herein, the undersigned [LBHI] may upon three days written notice to the Bank [JPMorgan] transfer any Security, provided that the undersigned shall not transfer any such Security if the Bank has exercised . . . any of its rights under this Security Agreement or the Guaranty or in the event any DEFAULT has occurred . . . prior to the end of the three day notice period and upon any such transfer the security interest hereunder shall be released.

SSA at 3.  These circumstances indisputably did not occur.  LBHI never gave written notice to the bank of the transfer of any of the Security, and LBHI never transferred any of the Security.  R-SOF ¶ 9.  On Monday morning, September 15, 2008, LBHI filed for bankruptcy, a "Default" under the September Security Agreement.  SSA at 4-5.  Under that agreement, LBHI's Default eliminated any right to transfer the security (even upon three days' written notice) and triggered JPMorgan's right to apply the collateral in satisfaction of the secured obligations.  SSA at 3-4.

After the commencement of LBHI's chapter 11 case and LBI's liquidation proceeding, JPMorgan was left with almost $30 billion in unpaid claims against the Lehman estates, including more than $25 billion arising from its advances made after LBHI's bankruptcy.  Ultimately, JPMorgan's claims were satisfied in full only as a result of JPMorgan's application of the $6.9 billion of cash and other collateral that LBHI agreed to pledge as security, and on which JPMorgan relied in making those advances.  R-SOF ¶ 104.  Contrary to plaintiffs' accusations of a "cash grab," plaintiffs' claims seek to deprive JPMorgan of collateral that was necessary and actually used to satisfy Lehman's unpaid obligations to JPMorgan.

**B.      JPMorgan did not forfeit its lien on $6.9 billion in cash collateral.**

In Count 38 of the complaint, plaintiffs seek a declaration that JPMorgan forfeited its lien on the $6.9 billion of cash collateral by moving those funds to the GL Cash Collateral Account. Plaintiffs' claim is predicated on the notion that the lien granted by the September Security Agreement extends *only* to LBHI's accounts at JPMorgan, and the funds held "from time to time" in those accounts, with the consequence that JPMorgan's lien was purportedly "extinguish[ed]" when those funds were transferred to the GL Cash Collateral Account. Pl. Br. 18-21.

Plaintiffs' theory collides with the plain language of the September Security Agreement and fundamental principles governing secured transactions. As detailed below, the September Security Agreement:  (1) expressly permits JPMorgan to transfer pledged deposits out of an LBHI account and into a JPMorgan account; and (2) expressly provides that JPMorgan's lien extends *not only* to pledged deposit accounts and the funds held therein, *but also* to "all proceeds" of that collateral, which (under the U.C.C.) includes other bank accounts to which the collateral is transferred. Accordingly, in either case, under the express terms of the parties' governing contract, JPMorgan retained its lien on the cash collateral following its transfer.

**1.      JPMorgan did not release its security interest by exercising its contractual right to move cash collateral to a JPMorgan account.**

Article 9 of the U.C.C. deals directly with the question of how a secured party can lose its lien. Under Article 9, a security interest in collateral "continues" following an exchange or disposition of collateral, unless the secured party "authorize[s] the disposition free of the security interest."[7] U.C.C. § 9-315(a)(1); *see* JPM Br. 25-26. Thus, to establish that JPMorgan forfeited

---

[7] *See* U.C.C. § 9-315 & cmt. 2 ("[Section 9-315(a)(1)] contains the general rule that a security interest survives disposition of the collateral . . . [and] makes explicit that the authorized disposition [that would terminate the security interest] . . . is an authorized disposition '*free of* the security interest.").

its lien on the cash collateral deposited by LBHI, plaintiffs would have to establish that

JPMorgan "*authorized*" the release of its lien on that collateral.  The September Security Agree-

ment, however, makes clear that JPMorgan did not so authorize.  Indeed, it is undisputed that

JPMorgan did not intend to release its lien over the $6.9 billion deposit.

Under the September Security Agreement, "[t]he right is expressly granted" to JPMorgan

to "transfer to . . . the Bank . . . any of the Security" in order to "*preserve the Security or its*

*value*."  SSA at 2.  The transfer of funds into the GL Cash Collateral Account was exactly that: a

"transfer" to "the Bank" in order "to preserve the Security or its value."  *See* R-SOF ¶ 10.  As

explained in JPMorgan's moving brief, a deposit account is simply the right to payment from a

bank arising out of the deposit of funds.[8]  If LBHI had withdrawn any amount from the Deposit

Account, JPMorgan's "Security," *i.e.*, the right to payment associated with the account, would

have been diminished by the amount of the withdrawal.[9]  JPMorgan's purpose in moving the

$6.9 billion of cash collateral (a rationale nowhere disputed by plaintiffs) was to protect that col-

lateral from diminution, as permitted by contract.  *See* R-SOF ¶ 10; Pl. SUF ¶¶ 21-22.

In this situation, where the governing contract expressly provided JPMorgan with the

right to transfer cash collateral to itself in order to "preserve" that collateral, plaintiffs have no

viable claim that JPMorgan authorized the release of its security interest when it exercised that

---

[8] *See* JPM Br. 25; *In re Lehman Bros. Holdings Inc.*, 404 B.R. 752, 758 (Bankr. S.D.N.Y. 2009)
("The deposit of cash into a bank account creates a debtor-creditor relationship between the bank
(as debtor) and the depositor (as creditor), at which time the depositor parts with title to the funds
in exchange for a debt owed to him by the bank.").

[9] In addition, the U.C.C. requires "control" to perfect a security interest over a deposit account,
and JPMorgan had such control over the Deposit Account and the GL Cash Collateral Account
maintained at the bank.  JPM Br. 25-26.  If LBHI had transferred the funds outside the bank, un-
der Section 9-332 of the U.C.C., an innocent third-party transferee would take the funds "free" of
JPMorgan's security interest, and the bank with control over the funds would have priority over
any conflicting security interest in the account, including JPMorgan's.  *See infra* note 14; U.C.C.
§ 9-327 & cmt. 4.

right.  To interpret the contract otherwise, *i.e.*, as preventing JPMorgan's security interest from extending to anything besides the balances held in LBHI's accounts "from time to time,"[10] would *nullify* JPMorgan's express right to transfer funds to a safer account—a right that the New York Court of Appeals has found to be vital in the context of a security interest in a deposit account.[11]

Plaintiffs contend that the contractual provision authorizing JPMorgan to "preserve" its security does not apply to a "transfer [of] collateral for the purpose of preventing the pledgor from accessing it."  Pl. Br. 23.  But the contract contains no such limitation.  SSA at 2.  Plaintiffs also argue that U.C.C. § 9-207, which requires a secured party to use "reasonable care in the custody and preservation of collateral," limited JPMorgan's right to preserve the collateral to protection of the *pledgor's* interest.  But Section 9-207 likewise contains no such limitation.  Nor would such a limitation make any sense.  Restricting the bank's ability to restrain the pledgor from accessing its collateral would be inimical to the very purpose of securing the bank's claim.  *See Amarillo Nat'l Bank* v. *Komatsu Zenoah Am., Inc.*, 991 F.2d 273, 277 (5th Cir. 1993) ("It does not require an MBA to appreciate that collateral which can be disposed of at the will of the debtor provides no security to the lender.").

Courts confronted with remarkably similar facts have approved of similar transfers aimed at preventing a pledgor from withdrawing funds pledged as collateral.  Most notably, the New York Court of Appeals directly addressed a similar protective transfer in a case involving JPMorgan's predecessor.  In *Gillman* v. *Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (1988), the Court rejected a debtor's claim that Chase acted unlawfully in transferring, without notice, a cash

---

[10] *See, e.g.*, Pl. Br. 21 ("JPMorgan's lien attaches to the pledged accounts and the balance held in or credited to those accounts 'from time to time'. . . .  When JPMorgan removed the $6.9 billion . . . [it] left itself with only a security interest in the then empty [Deposit Account].").

[11] *E.g.*, *Manley* v. *AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) (instructing courts to avoid "interpretations that render contract provisions meaningless"); *see infra* discussion of *Gillman* v. *Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1 (1988).

deposit from the debtor's checking account into an omnibus account, which, like the GL Cash Collateral Account here, contained funds for several depositors and from which the debtor had no withdrawal rights.  The Court concluded that "Chase cannot be held to have acted in bad faith when it took steps to safeguard the fund in which it had an existing security interest and which would, in all likelihood, constitute the only available asset for its reimbursement."  *Id.* at 6-7, 15-16.  The Court noted that if Chase had *not* taken such steps, it "could well have resulted in the depletion of the account and the destruction of its security interest."  *Id.* at 15.

Likewise, in *In re CJL Co.*, 71 B.R. 261 (Bankr. D. Or. 1987), the debtor pledged a cash deposit as security for a letter of credit.  The deposit was placed in a "restricted account" and a "hold" was placed on the funds (to be released after expiration of the letter of credit).  As in this case, the bank "became worried that because of [the debtor's] worsening financial condition it might attempt to withdraw the funds," and that "a Bank employee might mistakenly allow such a withdrawal."  To "insure that this could not happen," the bank transferred the funds "from the restricted account to the *general ledger account of the Bank*," where "the [d]ebtor completely and totally lost whatever possible ability it had to access those funds."  On summary judgment, the court *upheld* the bank's security interest following the transfer.  *Id.* at 262-63, 266.

Plaintiffs suggest that JPMorgan's "transfer" of the security was unnecessary because the bank had the operational ability to place a "block" on funds in the Deposit Account.  Pl. Br. 16, 24.  This is a *non-sequitur*.  The September Security Agreement nowhere says that JPMorgan's right to transfer the security is contingent upon other operational means being unavailable.  In fact, "transfer[ring]" the "Security" to "the Bank" is the *contractually specified* means of pre-serving it.  SSA at 2.  Nor would it have made any difference from LBHI's perspective what method was used:  In either case, LBHI would not have been able to transfer funds out of the ac-

count, and would have had no right to do so absent three days' written notice.[12]

Plaintiffs thus have no answer to the provision of the September Security Agreement that expressly permitted JPMorgan to move the collateral to preserve its lien.  Moreover, in arguing that JPMorgan released its lien by moving the collateral, plaintiffs entirely ignore the sole contractual provision that addresses when the bank's security interest would be "released" upon a transfer.  It provides:  "Notwithstanding anything provided for herein, [LBHI] may upon three days written notice to the Bank [JPMorgan] transfer any Security . . . and upon any such transfer the security interest hereunder shall be released."  SSA at 3.  These circumstances indisputably did not occur.  LBHI never gave three days' written notice or transferred any of the Security, as would be required for JPMorgan's security interest to be released pursuant to the agreement.  R-SOF ¶ 9.  Accordingly, there is no basis to claim that JPMorgan "authorized the disposition" of its cash collateral "free of the security interest" that Lehman provided when it transferred the collateral to a cash collateral account to protect that interest.  U.C.C. § 9-315(a)(1).[13]

### 2. JPMorgan's security interest attached to the funds in the GL Cash Collateral Account as "proceeds."

Plaintiffs' argument also cannot be squared with the September Security Agreement's grant of a security interest to JPMorgan in all "proceeds" of its collateral.  *See* SSA at 1 (defining

---

[12] Although the relative benefits of an account "block" and a transfer to the GL Cash Collateral Account are not relevant under the contract, as a factual matter, transferring the funds to the GL Cash Collateral Account decreased the risk of operational error.  Funds were more secure in the GL Cash Collateral Account because they could only be transferred through an instruction initiated within JPMorgan.  R-SOF ¶¶ 4, 10; *see In re CJL Co.*, 71 B.R. at 263.

[13] Plaintiffs invoke language from the August Security Agreement, which preserved JPMorgan's lien if *LBHI* moved cash collateral from one account to another, to argue that JPMorgan's lien under the September Security Agreement does not extend to transfers by JPMorgan.  Pl. Br. 15, 21.  This argument fails.  The cited language is merely incorporated in the September Security Agreement's broader definition of "Accounts."  *See* SSA at 1 (defining "Accounts" as "all accounts of [LBHI] at the Bank (including but not limited to the accounts included [in the August Security Agreement]").  It in no way restricts JPMorgan's rights under that agreement to transfer the collateral to an account in its own name or its rights to "proceeds."

"Security" as including the Deposit Account, funds held "from time to time" in that account, and "*all proceeds of any and all of the foregoing Security*"); *see also* U.C.C. § 9-315(a)(2) (a security interest automatically attaches to all "identifiable proceeds of collateral").

The GL Cash Collateral Account, as the account to which JPMorgan's cash collateral was moved, falls squarely within the U.C.C's definition of "proceeds."  SSA at 2 (incorporating U.C.C.'s definitions).  The U.C.C. defines "[p]roceeds" broadly to include "whatever is acquired upon the sale . . . exchange, or other disposition of collateral" (§ 9-102(a)(64)(A)) and all "rights arising out of collateral" (§ 9-102(a)(64)(C)).  Consistent with this broad definition, the U.C.C. contemplates that, in the event of a transfer of funds from one deposit account to another, the second account—*i.e.*, the right to payment from the bank maintaining the second account—will constitute "proceeds" of the first account. *See* U.C.C. § 9-332, cmt. 2, ex. 2;[14] John F. Hilson et al., *Report of the Deposit Accounts Task Force to the Article 9 Drafting Committee*, 54 Consumer Fin. L.Q. Rep. 203, 205 (2000) ("[I]f the debtor transfers funds from a collateralized deposit account to a new deposit account, the security interest attaches to the new deposit account as proceeds of the old."); *Bank of R.I.* v. *Mixitforme, Inc.*, 2007 WL 299361 (R.I. Super. Ct. Jan. 11, 2007) (debtor's bank retained security interest in debtor's rights in escrow account maintained at third-party bank as "proceeds," where escrow account was funded by withdrawal from account at

---

[14] U.C.C. § 9-332(b) protects innocent transferees of funds from a pledged deposit account by allowing them to take the funds free of the secured party's security interest that would otherwise follow the funds.  The Official Comment to § 9-332 demonstrates that provision's correct application and confirms that the transfer from one deposit account to another results in "proceeds" to which a lender's security interest remains attached.  In the relevant example, the debtor transfers funds from a deposit account in which its secured lender bank has a security interest to an account with a third-party bank.  The U.C.C. protects the third-party bank by having it take the funds free of any interest of the secured lender bank (which would otherwise continue).  U.C.C. § 9-332, cmt. 2, ex. 2.; *see id.* cmt. 5, ex. 3.  At the same time, the U.C.C. protects the secured lender bank by affording it a security interest in the right to payment from the new deposit account "as proceeds" of the account from which the funds were transferred.  *Id.* cmt. 2, ex. 2.

debtor's bank).  In this case, the $6.9 billion deposit in the GL Cash Collateral Account was transferred from the Deposit Account.  JPMorgan's security interest, therefore, attached to LBHI's rights vis-à-vis the deposit in the GL Cash Collateral Account, as identifiable proceeds of the Deposit Account.[15]

Plaintiffs assert that the GL Cash Collateral Account does not constitute proceeds of collateral because LBHI had no rights in that account.  Pl. Br. 19, 25-26.  This argument falters on both the undisputed facts and the law.  *First*, the facts before this Court[16] establish that plaintiffs are wrong in claiming that LBHI had no rights vis-à-vis the GL Cash Collateral Account.  As demonstrated in JPMorgan's moving brief and statement of undisputed facts:

- The GL Cash Collateral Account was *not* a proprietary account of JPMorgan.  Rather, it was an account used to hold cash collateral deposited by JPMorgan's dealer clients, subject to the rights of those dealers for return of the collateral after the secured obligations are satisfied.  R-SOF ¶¶ 3-5.  The very name of the account—G/L 2103940020 NIB TRIPARTY CASH COLLATERAL—states its purpose as a cash collateral account.

---

[15] Plaintiffs also argue that a security interest cannot attach to property unless that property is described in the security agreement.  Pl. Br. 19.  This is not correct.  U.C.C. § 9-203(b)(3)(A)'s requirement that a security agreement include a "description of the collateral" applies to original collateral, not to proceeds (which are, in any event, clearly described in the September Security Agreement).  *Id.* § 9-203(f).  In addition, § 9-203(b)(3)(A) is not the only provision applicable to "deposit accounts."  Instead, as § 9-203(b)(3)(D) makes plain, a security interest attaches to deposit accounts as original collateral if the secured party has control of the account pursuant to the security agreement; no description of the account in the security agreement is required.

[16] In a table included in its decision on JPMorgan's motion to dismiss, the bankruptcy court, without analysis, denied the motion in part because it found certain arguments advanced at that stage "unpersuasive" and because of "factual issues" regarding "whether the collateral transferred to JPMC's general ledger account constitutes proceeds of the LBHI deposit account under the U.C.C."  *In re Lehman Bros. Holdings, Inc.*, 469 B.R. 415, 460-61 (Bankr. S.D.N.Y. 2012).  The relevant facts and more complete arguments are now before the Court.

- The GL Cash Collateral Account typically held funds pledged by several dealers (including Lehman), with each dealer's funds specifically identified as that dealer's pledged collateral.  R-SOF ¶ 13.

- As shown in a contemporaneous screenshot, this was exactly how LBHI's $6.9 billion deposit was held in the GL Cash Collateral Account—*i.e.*, specifically identified as LBHI's pledged collateral:[17]

| JPMorgan Chase Bank | | | | | | Bra |
|---|---|---|---|---|---|---|
| | | Open Items As Of  09/15/2008 | | | | Septemb |
| **Account :** | **21039-40020 / 1** | MMA NIB TRIPARTY / NIB TRIPARTY CASH COLLATERAL | | | | Cha |
| **Date** | **Source** | **Dealer Name** | **Description** | **Entry** | **Amount** | **CR/DR** |
| 09/10/08 | 25000 | LEHMAN GSI TRIP | rev only on ins | 2425401 | $ 300,000,000.00 | CR |
| 09/11/08 | 25000 | LEHMAN GSI TRIP | VAR ACCTS REV O | 2435948 | $ 600,000,000.00 | CR |
| 09/11/08 | 25000 | LEHMAN GSI TRIP | A/O 9.9/G8CASH | 2435955 | $ 1,000,000,000.00 | CR |
| 09/12/08 | 04300 | JPMSI GOVT CLEA | coll to secure | 2451549 | $ 894,335,000.00 | CR |
| 09/12/08 | 25000 | DRESDNER KLEINW | ZTT3 CASH TO SE | 2451496 | $ 17,700,000.07 | CR |
| 09/12/08 | 25000 | LEHMAN BROTHERS | z99z,zszu,zszt | 2451511 | $ 296,935,000.00 | CR |
| 09/12/08 | 25000 | LEHMAN GSI TRIP | VAR ACTS REV ON | 2451492 | $ 5,000,000,000.00 | CR |
| 09/12/08 | 25000 | LEHMAN GSI TRIP | ZNVR CASH TO SE | 2451546 | $ 1,692,000,000.00 | CR |
| 09/12/08 | 25000 | LEHMAN GSI TRIP | ZNVR CSH TO SEC | 2451572 | $ 1,421,890,000.00 | CR |
| 09/12/08 | 02100 | MERRILL LYNCH C | Z613 T/P CASH C | 2451473 | $ 172,700,000.00 | CR |
| **Item Count :** | **10** | **Debit Total :** | | $ 0.00 | **Credit Total :** | $ 11,395,560,000.07 |
| **Grand Total :** | **10** | **DR :** | | $ 0.00 | **CR:** | $ 11,395,560,000.07 |

- In addition, JPMorgan (1) paid FDIC deposit insurance premiums on the cash collateral, (2) credited LBHI with interest on the cash collateral, and (3) applied the cash collateral, after default, in payment of LBHI's obligations—all of which demonstrate that JPMorgan treated the deposit as collateral for LBHI's liabilities to JPMorgan.  R-SOF ¶¶ 6-7, 19-20.

Plaintiffs are also wrong in asserting that JPMorgan, as the supposed "sole owner" of the general ledger account, cannot have a lien on its "own" property.  Pl. Br. 25.  As a factual matter, the evidence summarized above shows that Lehman maintained rights vis-à-vis the GL Cash

---

[17] R-SOF ¶¶ 14-15, 18.  As reflected in the screenshot, the GL Cash Collateral Account also held—in addition to the $6.9 billion in deposits pledged to JPMorgan—approximately $3.4 billion pledged by Lehman to other investors to secure triparty repos, as well as cash collateral pledged by other dealers, including Dresdner Kleinwort and Merrill Lynch.  R-SOF ¶¶ 16-17.

Collateral Account.  Moreover, as a matter of law, nothing prevents a secured party from holding an ownership interest in pledged property.  Article 9 expressly addresses this issue, making clear that its provisions "apply whether title to [legal ownership of] collateral *is in the secured party* or the debtor."  U.C.C. § 9-202 & cmt. 2, 3; *see* 9A Hawkland, U.C.C. Series § 9-202:1 (Article 9 rights not "dependent upon esoteric concepts such as which party to [a] transaction [debtor or secured party] held the legal title").[18]  Article 9 also makes clear that there is no requirement that the debtor be an accountholder or have the right to withdraw funds from a pledged deposit account.  Indeed, for example, U.C.C. § 9-104(3) expressly permits a "*secured party* [to] become[] the bank's customer with respect to the deposit account," and states that such an arrangement may itself "prevent, or may enable the secured party at its discretion to *prevent, the debtor from reaching the funds on deposit*."[19]

*Second*, beyond the facts showing that LBHI retained rights in the transferred collateral because of the nature of the GL Cash Collateral Account, LBHI also retained rights in the transferred collateral as a matter of law.  Under the U.C.C., both before and after the transfer, LBHI had a right to payment unless and until the collateral was applied to satisfy LBHI's obligations.[20]

---

[18] Plaintiffs' authority on this point (Pl. Br. 25), which consists of nothing more than snippets of vague general language, does not suggest otherwise.

[19] U.C.C. § 9-104, cmt. 3.  *See also, e.g.*, *In re Verus Inv. Mgmt., LLC*, 344 B.R. 536, 539, 544-46 (Bankr. N.D. Ohio 2006) (secured lender had perfected security interest in deposit account it held in its own name "FBO" the debtor); *accord Gillman*, 73 N.Y.2d at 1, 6-7, 15-16 (bank retained security interest in debtor's collateral in omnibus account over which debtor had no withdrawal rights); *In re CJL*, 71 B.R. at 262-63, 266 (bank retained security interest in debtor's collateral in general ledger account of the bank over which debtor had no withdrawal rights).

[20] *See, e.g.*, U.C.C. § 9-208(a), (b) (obligating secured party with control of deposit account to return collateral within ten days of demand by debtor if there is no outstanding secured obligation and no future credit commitment); *id.* §§ 9-622(a), 9-623(c) (debtor's retained rights in collateral terminate when collateral is applied in payment of the debt); *In re Herbst*, 469 B.R. 299, 304-05 (Bankr. W.D. Wis. 2012) (even after repossession by a creditor, "the debtor's interest in the property remains until it is sold").  *See* SSA at 4 (providing that upon foreclosure by the bank, LBHI loses all rights to the collateral).

Here, JPMorgan did not apply any portion of the $6.9 billion deposit until October 2008, well after the transfer to the GL Cash Collateral Account and LBHI's default.  R-SOF ¶¶ 6-7; Pl. SUF ¶¶ 24-25.  Thus, LBHI retained a contingent right to return of the collateral, irrespective of the account in which the funds were held.[21]

*Third*, in any event, the U.C.C.'s definition of proceeds does not require that the debtor receive rights in the transferred property.  While the prior version of Article 9 required that the debtor "receive" property for it to qualify as proceeds, Revised Article 9 eliminated that requirement.[22]  *See* U.C.C. § 9-102, cmt. 13d.  Thus, plaintiffs' assertion that the $6.9 billion was transferred to "an account where nothing was 'acquired' by LBHI in exchange" (Pl. Br. 26) would be irrelevant even if it were correct (which it is not).

In sum, even if there were a requirement that the debtor retain an interest in proceeds, on this record, there can be no genuine dispute that LBHI retained rights in the $6.9 billion of pledged collateral following its transfer to the GL Cash Collateral Account.  By operation of Article 9 and the express terms of the September Security Agreement, JPMorgan's security interest attached to those rights as "proceeds," requiring summary judgment for JPMorgan.  If, however, the Court were to find that a genuine dispute exists as to whether LBHI retained rights in the collateral, the facts adduced by JPMorgan regarding the nature of the GL Cash Collateral

---

[21] In addition, LBHI also retained a common law right to payment vis-à-vis the deposit in the GL Cash Collateral Account.  As plaintiffs' own authority makes plain (Pl. Br. 29-30), the deposit of funds with a bank creates a debt owed by the bank to the depositor—a debt that persists unless the deposit has been applied in satisfaction of a depositor's other obligations to the bank.

[22] Plaintiffs cite Comment 6 to U.C.C. § 9-322, but that section deals with the entirely separate issue of priority of interests in collateral.  U.C.C. § 9-102, the definitional section, makes clear that "proceeds" requires only that the "property be traceable, directly or indirectly, to the original collateral."  U.C.C. § 9-102, cmt. 13d.

Account would plainly preclude summary judgment in plaintiffs' favor.[23]

### 3. The extrinsic evidence on which plaintiffs rely is inadmissible and irrelevant.

Seeking to avoid the plain language of the *September* Security Agreement, plaintiffs turn to extrinsic evidence, claiming that the negotiating history of the *August* Agreements shows that the parties intended, in the later September Agreements, to exclude the GL Cash Collateral Account from JPMorgan's lien. Pl. Br. 13-14, 20-21. This extrinsic evidence is inadmissible and irrelevant.

As set forth above and in JPMorgan's moving brief, the language of the September Security Agreement is unambiguous. Where contractual language is plain, there is no basis to consider parol evidence to search for what the parties "really intended." *W.W.W. Assocs., Inc.* v. *Giancontieri*, 77 N.Y.2d 157, 162 (1990). Plaintiffs cannot rely on extrinsic evidence "to create an ambiguity" that does not exist. *Id.* at 163.

Moreover, the extrinsic evidence on which plaintiffs rely has no bearing on the question before the Court. Plaintiffs assert that "[n]either [the August nor September] Security Agreement[] grants JPMorgan a security interest in all LBHI cash generally within the possession, custody or control of JPMorgan," and that "[t]hat type of lien was requested by JPMorgan, and rejected by LBHI" during negotiations in August 2008. Pl. Br. 20. But JPMorgan has never claimed that its lien under the September Security Agreement extends to "all LBHI cash generally" at the bank. And there is nothing about Lehman's purported rejection of this draft language to suggest that the GL Cash Collateral Account was *excluded* from the definition of "Security," given that JPMorgan had the express contractual right to transfer the Security to itself and a lien

---

[23] The result is the same if the August Agreements are found to govern. In the August Security Agreement, JPMorgan was also granted the right to transfer the security to the bank, and a security interest in the Deposit Account and all proceeds. ASA at 1-2.

over all "proceeds" of the pledged deposit.[24]  Indeed, these rights were included from the very

first draft of the August Agreements.  *See* Kercher Ex. S at LBHI00000378.

Plaintiffs also rely on the fact that the first draft of the August Security Agreement stated

that JPMorgan would have the right to transfer the Security to itself "at its discretion."  Pl. Br.

13-14, 22.  Again, this is evidence of nothing.  JPMorgan does not claim that it had the right to

transfer the security "at its discretion."  JPMorgan claims that it had the right to take such action,

not only upon "default," but also "to preserve the Security or its value"—a right JPMorgan exer-

cised.  R-SOF ¶¶ 10, 21.

### 4.   The remedy for an allegedly unauthorized transfer is not a loss of lien.

Beyond all this, there is simply no basis for plaintiffs' assertion that JPMorgan should be

stripped of its lien if the transfer of the collateral to the GL Cash Collateral Account was not au-

thorized by the September Security Agreement.  Nothing in the agreement provides for such a

drastic remedy.  Nor do plaintiffs cite any statutory or case law supporting this remedy.  To the

contrary, the law is clear that the remedy for an unauthorized transfer of collateral by a secured

party is damages resulting from the violation (if any), *not* loss of the lien.[25]

---

[24] In fact, the extrinsic evidence makes clear that the negotiation in August on this point had
nothing to do with the GL Cash Collateral Account.  The purpose of the August Security Agree-
ment was to grant JPMorgan a lien on approximately $5 billion (face value) of securities, and on
any further security pledged by LBHI pursuant to the August Guaranty.  R-SOF ¶ 22.  The
broad, "catch-all" language from the initial draft which plaintiffs cite—"*all* . . . rights and inter-
ests" which "*at any time* shall come into the possession or custody or under the control of the
Bank"—was inconsistent with that purpose.  As a result, the parties agreed to more specific lien
language, which extended the bank's lien to two specified LBHI accounts, financial assets held
"from time to time" in those accounts, and proceeds.  ASA at 1.

[25] *See, e.g.*, U.C.C. § 9-625(b) & cmt. 3 ("basic remedy" for a secured lender's failure to comply
with its obligations is "damages in the amount of any loss caused by [such] failure," *i.e.*, "those
reasonably calculated to put an eligible claimant in the position that it would have occupied had
no violation occurred"); *In re Kardos*, 27 F.2d 690, 692 (2d Cir. 1928) (Hand, A.) ("lien [is] pre-
served in spite of the conversion"); 12A Fletcher Cyc. Corp. § 5679 ("If the pledgee converts the
pledge, the debt is discharged to the extent of the pledge's value."); Clark & Clark, *Law of Se-*

Here, there could be no such damages.  As detailed above, LBHI's right to transfer the

Security was subject to a three-day written notice provision, which notice was never provided,

and LBHI never tried—and was never prevented from—transferring the collateral out of its ac-

count.  Once LBHI filed for bankruptcy on September 15, 2008 (a "Default" under the agree-

ment), JPMorgan indisputably had the right to prevent LBHI from transferring the collateral and

the right to use the collateral to satisfy LBHI's obligations.  SSA at 3-5.  LBHI, therefore, never

had a right to access its funds after deposit.  And since the funds were used to reduce LBHI's

indebtedness, LBHI suffered no conceivable damages.[26]

### C.      JPMorgan also retained a right of setoff.

As set forth in detail in JPMorgan's moving brief (JPM Br. 29-30), JPMorgan also re-

tained a right of setoff with respect to the cash collateral.[27]  As a result, JPMorgan was entitled to

apply the $6.9 billion deposit against LBHI's obligations pursuant to its setoff rights irrespective

---

*cured Transactions Under the UCC* ¶ 4.12[4] (even a gross violation "should not void the debt or discharge the security interest").

[26] Similarly, plaintiffs vastly overstate their entitlement to relief based on their assertion that JPMorgan's transfer of the $6.9 billion cut off all interest that LBHI had in those funds.  Were it true that LBHI no longer had rights in the deposit (which, as discussed previously, it is not), then the transfer of the funds was *payment* of Lehman's obligations owing to JPMorgan.  Thus, if plaintiffs' assertion were credited, then—at worst—JPMorgan engaged in an early foreclosure, and the law is clear that the secured lender does not forfeit its security interest in that circumstance, but remains entitled to apply the collateral against the debt.  *See supra* note 25; *Segovia* v. *Equities First Holdings, LLC*, 2008 WL 2251218, at *21-24 (Del. Super. Ct. May 30, 2008) ("When the property converted is subject to a security interest, the measure of damages is the [value of the collateral] . . . *minus* the amount of the loan.").

[27] Plaintiffs may seek to rely on *Bank of America, N.A.* v. *Lehman Brothers Holdings Inc.*, 439 B.R. 811 (Bankr. S.D.N.Y. 2010), but that decision has no application here.  In that case, the bankruptcy court rejected a bank's attempt to use cash collateral that had been pledged "solely in respect of overdrafts" to set off against "unrelated obligations owed by LBHI to BOA."  *Id.* at 816-17, 822.  Here, by contrast, JPMorgan would be setting off for the *same* purpose for which the funds were deposited:  "[a]s security for the payment" of "all obligations and liabilities" of LBHI and its subsidiaries to JPMorgan.  SSA at 1-2; SG at §§ 1, 11 ("Liabilities"; "Setoff"); *see Kates* v. *Marine Midland Bank, N.A.*, 541 N.Y.S.2d 925, 929 (N.Y. Sup. Ct. 1989).

of the extent of its security interest.  JPMorgan's setoff rights provide an alternative basis for dismissal of Count 38 and the claims that are dependent on it.

### D.    Plaintiffs' dependent claims fail.

The remaining claims related to the transfer of the $6.9 billion deposit are dependent on plaintiffs' success in voiding JPMorgan's lien and setoff rights, and therefore plaintiffs' motion for summary judgment as to those claims must be denied as well.

*Conversion* **(Count 40)***.*  Because JPMorgan retained a security interest and had the right of setoff, its "failure to relinquish possession" of the collateral was not "unauthorized" (Pl. Br. 28), and therefore did not constitute conversion.  *See Gillman* v. *Chase Manhattan Bank, N.A.*, 521 N.Y.S.2d 729, 732-33 (2d Dep't 1987); *aff'd*, 73 N.Y.2d 1 (1988); *Banco De La Provincia De Buenos Aires* v. *BayBank Boston N.A.*, 985 F. Supp. 364, 371 (S.D.N.Y. 1997); *see also* JPM Br. 32-33 (providing additional reasons why plaintiffs' conversion claims should be dismissed).

*Breach of implied covenant, unjust enrichment, and turnover* **(Counts 25, 39, 45, and 47)**. Plaintiffs' alternative grounds for seeking return of the deposit also fail because JPMorgan had the contractual and statutory right to apply the deposit in satisfaction of Lehman's obligations. *See, e.g.*, *In re First Cent. Fin. Corp.*, 377 F.3d 209 (2d Cir. 2004); *Gillman*, 521 N.Y.S.2d at 732-33.  Similarly, JPMorgan's lien and setoff rights preclude any claim for turnover under Section 542 of the Bankruptcy Code.  *See* 11 U.S.C. §§ 542(b); 553(a).

*Stay violation* **(Counts 33 and 34)**.  Because JPMorgan's lien and setoff rights arose out of contracts subject to the Bankruptcy Code safe harbors, *see In re Lehman Bros.*, 469 B.R. at 437-43 (Bankr. S.D.N.Y. 2012) (concluding that the September Guaranty and September Security Agreement were safe-harbored "securities contracts"),[28] JPMorgan's October 2008 exercise of

---

[28] JPMorgan is also entitled to protection under safe harbors relating to "repurchase agreements," "swap agreements," and "master netting agreements," because the September Agreements oper-

its rights by means of setoff and application of cash were not subject to the automatic stay and therefore did not require judicial approval.[29]

E.    **Plaintiffs' request for statutory interest is at best premature.**

Plaintiffs' claim that they are entitled to prejudgment interest fails at the threshold because plaintiffs are not entitled to judgment on their claims.  In any event, whether statutory prejudgment interest is available depends on which claims plaintiffs succeed on, if any.  *See* N.Y. C.P.L.R. § 5001(a) (equitable state law claims not subject to mandatory statutory interest award); *In re CNB Int'l, Inc.*, 393 B.R. 306, 335-36 (Bankr. W.D.N.Y. 2008) (prejudgment interest on federal bankruptcy claims subject to court's discretion).  Accordingly, the question whether prejudgment interest is warranted in this case (and if so, at what rate and over what period) is appropriately deferred until such time as plaintiffs actually succeed on a particular claim, if ever.  And to the extent the Court has discretion over such issues, any ruling must await consideration of all relevant facts, including whether plaintiffs have caused delay in this litigation.  *See Gen. Motors Corp.* v. *Devex Corp.*, 461 U.S. 648, 657 (1983) (where court has discretion, "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the [plaintiff] has been responsible for undue delay").

**POINT II:    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT DISMISSING THE AMENDED COUNTERCLAIMS.**

Plaintiffs moved to dismiss JPMorgan's counterclaims in January 2011, but never pressed for a ruling on that motion or sought a stay of discovery.[30]  Now, almost four years later, plain-

---

ate as credit enhancements relating to repos and swap transactions.  *See* 11 U.S.C. §§ 101(47)(A)(iv), (53B), (38A).

[29] 11 U.S.C. §§ 362(b)(6), (7), (17), (27); *id.* §§ 553(a)(3), (b)(1); *see* JPM Br. 31.

[30] JPMorgan brought seven counterclaims against LBHI.  The first five counterclaims sound in fraud or aiding and abetting:  (1) fraudulent misrepresentation; (2) fraudulent concealment; (3) fraudulent inducement to lend; (4) aiding and abetting LBI's fraud; and (5) aiding and abet-

tiffs invite this Court *either* to rule on the motion to dismiss *or* to consider their summary judgment motion.  Pl. Br. 33.  This is an easy choice:  At this stage of the case, there is no reason for the Court to ignore the factual record summarized below.[31]  That record shows that there are material issues of disputed fact and summary judgment in plaintiffs' favor would be inappropriate.[32]

### A.    Relevant factual background

**Sunday-Monday, September 14-15, 2008.**  The events most relevant to the counterclaims began on Sunday, September 14, 2008, when LBHI's Global Treasurer, Paolo Tonucci, called Jane Buyers-Russo, a senior corporate banker at JPMorgan with responsibility for the Lehman relationship, and explained that LBHI would file for bankruptcy.  R-SOF ¶ 23.  Tonucci also explained that LBI would conduct an orderly wind-down of its business, including by reducing LBI's triparty repo activity and thereby eliminating JPMorgan's intraday exposure.  R-SOF ¶ 24.  On Monday morning, September 15, after LBHI had filed for bankruptcy, and with the security provided by the $8.6 billion of collateral that LBHI provided the prior week, JPMorgan exercised its discretion to extend approximately $87 billion in credit to LBI to unwind its overnight financings, thus facilitating the expected wind-down.  R-SOF ¶¶ 27-28, 97.

Later that Monday, Barclays agreed to purchase some of LBI's assets.  Lehman offered to sell Barclays a "liquid securities book," and Barclays agreed to buy most of the securities it was

---

ting Barclays' fraud.  The sixth counterclaim was voluntarily dismissed.  The seventh and eighth counterclaims seek indemnification for fees and expenses relating to this proceeding.

[31] *See, e.g.*, *Derisme* v. *Hunt Leibert Jacobson P.C.*, 880 F. Supp. 2d 339, 353-54 (D. Conn. 2012) (declining to "entertain any arguments as to the sufficiency" of pleadings on summary judgment); *Sheehy* v. *New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 66-67 (E.D.N.Y. 2010) (declining to dismiss fraud claims on summary judgment based on alleged pleading deficiencies).

[32] Should the Court accept plaintiffs' invitation to rule based upon papers submitted at the motion to dismiss stage, JPMorgan respectfully refers the Court to its brief in opposition to plaintiffs' motion to dismiss.  SOF ¶ 1(ee).  In that scenario, JPMorgan would also respectfully request the opportunity to amend the counterclaims to conform the pleadings to the proof developed in discovery.

shown.  R-SOF ¶¶ 29-30.  But Lehman never presented for sale—and Barclays never agreed to buy—the totality of the book of securities that LBI had been financing nightly (including through triparty repos) and pledging to JPMorgan intraday as security for the advances needed to unwind the overnight financings.  R-SOF ¶¶ 31-32.  Among the assets excluded from the deal was RACERS, a structured security with a $5 billion face value that was backed by "participations" in many of Lehman's worst assets.  R-SOF ¶ 33-34.  Before LBHI's bankruptcy—at the time plaintiffs now claim that JPMorgan was "fully collateralized"—RACERS was widely derided within Lehman:  on various occasions, it was described by Lehman employees as "goat poo-poo," "toxic," "crap" and "shit."  R-SOF ¶¶ 35-38.

**Tuesday, September 16, 2008.**  As part of the run on the bank that led to Lehman's de-mise, LBI's typical providers of overnight financing had fled, including almost all triparty repo investors.  The Fed, however, had recently expanded its program for lending to broker-dealers, and was an available source of overnight funding to LBI.  R-SOF ¶ 26.  Barclays also agreed to provide overnight financing to Lehman until the asset sale closed.  R-SOF ¶ 25.  But Lehman and Barclays needed JPMorgan to continue providing *intraday* financing to LBI.

On Tuesday evening, September 16, with the goal of persuading JPMorgan to continue supporting LBI, Tonucci and LBHI's CFO Ian Lowitt called Buyers-Russo.  R-SOF ¶ 44.  They told her that LBHI had struck a deal to sell LBI's assets to Barclays, and that Barclays had com-mitted to "fully support" LBI in the interim, including by providing repo financing.  R-SOF ¶ 45. Lowitt and Tonucci also represented that JPMorgan would be "taken out" of its financing posi-tion (*i.e.*, its advances would be fully repaid) as soon as the transaction was completed.  R-SOF ¶ 46.  After the call, Buyers-Russo relayed to JPMorgan's senior management that Lehman had agreed to sell "the entire Lehman book" to Barclays.  R-SOF ¶ 47.

These representations were false and misleading.  Given the deal Lehman had struck with Barclays, Lowitt and Tonucci knew, as of the time of their call with Buyers-Russo, that RACERS and other illiquid securities would not be sold.  R-SOF ¶¶ 39-40.  They also knew that, in light of LBI's cash position and the illiquidity of the excluded assets, the sale would not enable LBI to generate the cash needed to pay off JPMorgan's advances, so that, when LBI commenced liquidation proceedings, JPMorgan would be left with outstanding claims secured by the illiquid assets.  R-SOF ¶¶ 41-43.  Yet they failed to disclose any of this.  R-SOF ¶¶ 49-50.

**Wednesday, September 17, 2008.**  On Wednesday morning, September 17, LBHI filed a motion with the bankruptcy court seeking approval of its asset sale to Barclays.  R-SOF ¶¶ 52-53.  The motion described the assets being sold to Barclays as "LBI's assets, as well as three real properties."  R-SOF ¶ 52.  The Asset Purchase Agreement ("APA") attached to the motion stated that Barclays had agreed to purchase an approximately $70 billion securities portfolio containing LBI's "government securities, commercial paper, corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements" —the types of securities that made up LBI's triparty repo book.  R-SOF ¶ 54.  These filings were consistent with the other statements by Lehman that JPMorgan's clearing advances would be fully repaid.  R-SOF ¶¶ 55-56.

Meanwhile, the Fed conveyed to Barclays that it did not want to provide overnight financing to LBI anymore.  R-SOF ¶ 57.  With Lowitt's involvement—but without JPMorgan's knowledge—Barclays and the Fed agreed on a new "Takeout Agreement" that required Barclays to purchase all of the securities financed overnight by the Fed, but no others.  R-SOF ¶ 58.  At the time, LBHI knew that RACERS and other illiquid securities were *not* among the securities the Fed was financing.  R-SOF ¶ 59.  Thus, neither the Takeout Agreement nor the agreement Barclays had

reached with Lehman earlier in the week obligated Barclays to buy RACERS and other undesira-

ble securities that had been part of overnight repos and that JPMorgan was financing intraday.

Lehman and Barclays decided that the transfer of the Fed-financed portfolio would take

place on Thursday, September 18.  R-SOF ¶ 60.  During a conference call on the evening of Sep-

tember 17 involving JPMorgan, Barclays, and LBHI, Barclays representatives told their JPMor-

gan counterparts that the following day, Barclays would transfer $45 billion in cash to JPMorgan

to purchase the Fed-financed securities.  But they also told JPMorgan that, consistent with prior

representations, any "residual" securities would be financed by Barclays, so that JPMorgan's ex-

posure would be eliminated.  No one from LBHI said anything to the contrary.  R-SOF ¶ 61.

In another call that evening, Barclays' Gerard LaRocca told JPMorgan's Buyers-Russo

that Barclays was going to wire cash to "pay off" JPMorgan's triparty obligations, and in return

JPMorgan would "move the collateral over to Barclays."  LaRocca stated further that, once the

transaction was effectuated, JPMorgan would hold *surplus* unencumbered securities.  R-SOF ¶ 62.

These representations were entirely consistent with the representations made by LBHI.

**Thursday, September 18, 2008.**  Based on all of the assurances it had received—and hav-

ing been kept in the dark about plans to leave behind RACERS and other securities—JPMorgan's

understanding was that the sale of assets to Barclays would leave JPMorgan with no outstanding

exposure to LBI.  R-SOF ¶ 48, 90-91.  As a result, on Thursday morning, September 18, JPMorgan

again advanced approximately $70 billion to LBI to unwind its overnight financings, including a

$15.8 billion repo with Barclays that had been secured by, among other things, RACERS.  R-SOF

¶¶ 73, 89, 97.  Had JPMorgan known that LBHI had plotted to stick JPMorgan with multibillion-

dollar unpaid claims, it never would have extended credit to take out the Barclays repo, which was

backed by RACERS and other securities that were slated to be left behind.

The same morning, Tonucci instructed Lehman personnel to ensure that RACERS would "not be funded by Barclays" that evening.  R-SOF ¶ 82.  The reason was simple:  LBI's liquidation proceeding was to start the next day, Friday (R-SOF ¶ 52), so there was no expectation that JPMorgan would unwind the Thursday night financing on Friday morning.  Thus, if Barclays financed RACERS again, Barclays would wind up owning the security when LBI defaulted.  R-SOF ¶ 78.  Moreover, since the Fed would cease financing LBI upon the implementation of the Takeout Agreement on Thursday, if *Barclays* did not finance RACERS that night, the inevitable result was that JPMorgan's Thursday morning intraday advances against the security would not be taken out, and *JPMorgan* would end up owning the security the next day when LBI would default.

The pressure to ensure that RACERS remained with JPMorgan became even more acute by Thursday afternoon when Barclays learned that Lehman did not actually possess many of the securities that it originally agreed to sell.  R-SOF ¶¶ 70-72.  When Barclays personnel started reviewing the collateral that LBI still held and saw the $5 billion RACERS note, Mike Keegan and John Mahon of Barclays reached out to Lehman employees.  R-SOF ¶ 73-74.  Based on the information provided, the Barclays team concluded that RACERS was "crap" and a "piece of shit" that Barclays "definitely can't take."  R-SOF ¶¶ 74-75.  Lehman's James Seery later told Keegan that RACERS was "never meant to be traded," and Keegan concluded that it was "not a real security" and should be assigned a value of between 0 and 10 cents on the dollar.  R-SOF ¶¶ 76-77.

Keegan confronted the Lehman finance team about the fact that LBI did not hold the securities that Lehman previously had agreed to sell.  Keegan testified that he "got in their faces and w[as] screaming at them that, you know, the deal was off.  They weren't going to have jobs in the morning."  R-SOF ¶ 79.  As Tonucci has testified, "it was definitely made clear by Barclays that they did not want RACERS" or any other securities Barclays called "toxic waste."

R-SOF ¶ 80.  Lowitt, however, reassured Keegan that Lehman "never had any intention of giving

[RACERS] to you . . . .  It was always going to stay behind in the bankrupt entity."  R-SOF ¶ 81.

So RACERS remained out of the deal, as Lehman had intended from the beginning.

Lowitt and Tonucci again instructed Lehman personnel not to include RACERS.  R-SOF

¶¶ 82-83.  The head of operations at Lehman wrote to his team that Lehman "CANNOT

PLEDGE the RACER's" to Barclays.  R-SOF ¶ 84.  Another team member followed up with an

email stating:  "We need to be 100000000000000000000000000000000000000000000000%

sure that the RACER does not make its way to BONY/Barcap."  R-SOF ¶ 85.  To ensure that

RACERS would remain behind, Lehman personnel put the security in a segregated "shell" on the

trading platform, rendering it unavailable for use in a triparty repo that night.  R-SOF ¶ 86.

Barclays, meanwhile, understood that LBI would be entering liquidation the next day and

that extending repo financing to LBI on Thursday night "would effectively be buying the inven-

tory backing that repo."  R-SOF ¶ 78.  Keegan was asked by senior management whether

Barclays should provide financing to LBI that evening.  R-SOF ¶ 87.  Based on his review of the

collateral that had backed Barclays' repo financing of the night before (including RACERS),

Keegan advised that Barclays should *not* provide any more financing.  R-SOF ¶ 88.

No one at Lehman or Barclays told JPMorgan any of this, and so JPMorgan began to

facilitate the transfer of LBI's triparty book.  But after Barclays delivered the first $5 billion in

cash, the transaction was delayed as a result of operational problems and a disagreement about

whether JPMorgan would release $5 billion in securities that represented the margin in the

$50 billion portfolio that Barclays was buying for $45 billion.  R-SOF ¶¶ 63-65.  To resolve the

open issues, Barclays CEO Bob Diamond held a call with senior JPMorgan executives and in-

sisted that JPMorgan release the $5 billion of margin, reassuring JPMorgan that its triparty expo-

sure would be eliminated.  R-SOF ¶¶ 66-67.  Based on the representations that both Barclays and LBHI had made, and without knowing of their plan to leave RACERS and other illiquid securities behind, JPMorgan agreed to release the margin.  R-SOF ¶ 68.

Barclays then transferred another $40 billion, the remainder of the purchase price for the Fed-financed assets.  In the midst of the transfer of LBI's securities, Barclays' Keegan spoke with another Barclays trader, Marty Malloy, and asked during a recorded phone conversation in which Keegan audibly snickers:  "*So we know we're going to get our [securities] back before they [JPMorgan] realize they haven't got the tri-party roll?*"—*i.e.*, before JPMorgan realized that Barclays would not continue to finance RACERS or other illiquid securities.  Malloy said: "That's what we're going through right now, Mike."  R-SOF ¶ 69.  As the night progressed, LBI's securities continued to be transferred to Barclays—but not RACERS and other illiquid securities that Lehman personnel had earmarked to remain at JPMorgan.

**Friday, September 19, 2008.**  By Thursday evening, September 18, nearly all of Lehman's triparty repo counterparties had departed.  With the Fed no longer willing to act as a backstop, there was no one left to provide overnight financing and relieve JPMorgan of its intra-day advances.  As a result, although the $45 billion transferred by Barclays to Lehman eliminat-ed some of JPMorgan's advance on Thursday morning, a large portion of that advance—including amounts secured by RACERS and other illiquid securities—remained outstanding through the night and the following day.  After LBI entered liquidation proceedings on Friday, September 19, JPMorgan was stuck with more than $25 billion in unpaid claims from the advance it had made on Thursday morning.  R-SOF ¶¶ 100, 104.

On Friday evening, the bankruptcy court overseeing LBHI's bankruptcy proceedings held a hearing to approve the sale of LBI's assets to Barclays.  By this time, Lehman and Barclays

had already effectuated the asset transfer, with JPMorgan's help, ensuring that the bank could not discover the truth until it was too late. But even at the hearing, the truth continued to be obscured. Counsel to LBHI told the bankruptcy court that Barclays was buying only $47.4 billion in securities, rather than the approximately $70 billion stated in the APA that had been filed two days before. The explanation given for the $23 billion difference was that "the markets dropped and the value of the securities dropped as well." R-SOF ¶¶ 101-02. That explanation was not true. For all the reasons explained above, the primary cause of the decline was that Barclays had not purchased—indeed, had never agreed to purchase—the totality of the securities in LBI's overnight financing book.

Although Lehman never disclosed the truth about the deal, senior executives at JPMorgan soon realized they had been duped: On September 20, JPMorgan's Chief Risk Officer Barry Zubrow wrote to other senior executives: "I'm stating the obvious, but basically Barclay's / Lehman tricked us into holding the assets they didn't want." R-SOF ¶ 103.

**The aftermath.** Following LBI's default, JPMorgan began liquidating the securities that had been left behind to secure its unpaid clearing advances. True to its reputation within Lehman as "goat poo-poo" and "toxic crap," the $5 billion RACERS note was not saleable in the market, nor were hundreds of other securities that had been excluded from the deal and left behind at JPMorgan. JPMorgan thus faced a deficit of billions of dollars. The only way it was able to satisfy its claims was to look to the cash and cash-equivalent collateral that LBHI had provided in the week leading up to its bankruptcy to secure Lehman's obligations to JPMorgan (R-SOF ¶ 104)—the same collateral that plaintiffs seek to recover in this proceeding, including on the basis that JPMorgan was already "fully secured."

JPMorgan's counterclaims thus seek recompense for the damages JPMorgan will suffer in the event it is required to make payments on any of plaintiffs' claims in this lawsuit.  The counterclaims allege, among other things, that JPMorgan was deceived into extending credit and facilitating the Barclays deal based on misrepresentations by LBHI that its advances would be repaid in full, and by LBHI's deliberate failure to disclose the true terms of the transaction to JPMorgan—including that RACERS and other illiquid securities were excluded from the start, thus guaranteeing that JPMorgan would be left with unpaid claims secured by many of Lehman's worst securities.

### B.    Material disputes of fact preclude summary judgment dismissing JPMorgan's fraud claims (First, Second and Third Causes of Action).

Plaintiffs have *not* sought summary judgment on most of the elements of JPMorgan's counterclaims of fraudulent misrepresentation, fraudulent concealment and fraudulent inducement to lend.  They do not dispute in their motion that LBHI made misleading misstatements and omissions with intent to deceive, or that JPMorgan was damaged.  Rather, plaintiffs' argument is that the issue of reasonable reliance can be decided in their favor as a matter of law.  Pl. Br. 33-36.

In presenting this reliance argument, however, plaintiffs do not even address two out of JPMorgan's three fraud claims.  Although they argue that JPMorgan did not reasonably rely on "two alleged misrepresentations" by LBHI (Pl. Br. 33), they say nothing about JPMorgan's claim of fraudulent concealment, which requires a showing of reliance on an omission, not a misrepresentation.[33]  Nor do they address JPMorgan's claim of fraudulent inducement to lend, which is premised not on a misrepresentation about the Barclays transaction, but on the fact that LBHI, when it caused LBI to incur billions of dollars of debt to JPMorgan via intraday financing, knew

---

[33] *E.g.*, *MBIA Ins. Corp.* v. *J.P.Morgan Sec. LLC*, 43 Misc. 3d 1221(A), at *35 (N.Y. Sup. Ct. 2014) (elements of fraudulent concealment claim include "reasonable reliance on the omission").

and intended that the advances would not be repaid.[34]  Since plaintiffs have not even tried to ad-

dress those two claims, their motion for summary judgment as to those claims must be denied.

Regardless, plaintiffs have offered no basis to avoid a trial on the issue of reliance with

respect to *any* of the fraud claims, including the misrepresentation claim.  As demonstrated

above, both Lowitt and Tonucci were aware by September 16 that Barclays had not agreed to

purchase RACERS and various other securities held at LBI, and that LBI would default and

leave JPMorgan with unsatisfied claims secured by RACERS and the other unwanted securities.

Yet neither Lowitt nor Tonucci, nor anyone else at Lehman, ever disclosed these critical facts to

JPMorgan.  Instead, on a September 16 call to Buyers-Russo, Lowitt and Tonucci represented

that JPMorgan would be taken out in full via the Barclays sale.  JPMorgan, meanwhile, contin-

ued to extend tens of billions of dollars in credit to LBI throughout the week, actively facilitated

the securities transfer to Barclays, and voluntarily relinquished its lien on $5 billion of margin.

In claiming that JPMorgan, as a matter of law, did not rely to its detriment on LBHI's de-

ceptive conduct, plaintiffs cannot contend with the simple logic that banks do not extend credit to

borrowers that *plan* to default.  Moreover, they simply ignore the testimony of senior JPMorgan

executives confirming that the acts and omissions of LBHI in fact had the effect of misleading

JPMorgan.  For example, Heidi Miller, the head of the business unit at JPMorgan that provided

clearance services to LBI, and one of the people responsible for deciding whether to extend in-

traday credit to Lehman, testified that JPMorgan helped "facilitate" the Barclays transaction be-

cause "multiple parties had explained on the triparty side"—including to Jane Buyers-Russo—

---

[34] *See, e.g.*, 60A N.Y. Jur. 2d Fraud and Deceit § 25 (2014) ("[I]t is an act of fraud to purchase or secure goods or services with a preconceived intention not to pay for them.  It is likewise an act of fraud to procure money as a loan through a fraudulent scheme with the preconceived intention not to repay the loan."  (citing cases)); *see also Deerfield Commc'ns Corp.* v. *Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) ("a promise . . . made with a preconceived and undis-closed intention of not performing it . . . constitutes a misrepresentation").

that the deal "was going to entail movement of the entire triparty book."  R-SOF ¶ 98.  Miller further testified that JPMorgan released its lien on $5 billion in margin based on, among other things, the communications between Buyers-Russo and Lehman executives confirming that Barclays would "assume the intraday funding" of LBI.  R-SOF ¶ 68.

JPMorgan's Chief Risk Officer Barry Zubrow similarly testified that JPMorgan continued to extend credit to LBI throughout the week while understanding—including in reliance on "conversations that the Lehman people were having with . . . Jane Buyers-Russo and others at JPMorgan"—that "all of [JPMorgan's] clearance and settlement exposures would be fully paid and liquidated."  R-SOF ¶¶ 48, 90.  JPMorgan's General Counsel Stephen Cutler likewise testified that, based on communications with "Lehman and Barclays," JPMorgan believed that "at some point during that week we were going to be replaced by Barclays, and that they were going to take us out of our lending position."  R-SOF ¶ 91.

Plaintiffs nonetheless assert that LBHI's representations to JPMorgan about the Barclays transaction—including the representation made to Buyers-Russo that JPMorgan would be taken out of its financing position in connection with the Barclays transaction (R-SOF ¶ 46)—were merely "predictions" about what Barclays would do in the future, and thus cannot form the basis of a fraudulent misrepresentation claim.  Pl. Br. 34.  Those representations, however, were not mere "predictions."  Tonucci and Lowitt already knew that the agreement between LBHI and Barclays excluded RACERS and other securities financed by JPMorgan, and that those securities would remain behind at LBI.  As a result, they also knew that JPMorgan necessarily would *not* be taken out of its financing position, as Tonucci admitted in deposition.  R-SOF ¶ 43.[35]  Numer-

---

[35] The cases plaintiffs cite in their brief on this subject are therefore inapposite, as they involved representations about future intentions, not representations about a current agreement.  *See Grupo Sistemas Integrales de Telecomunicacion S.A.* v. *AT&T Commc'ns, Inc.*, 1996 WL

ous cases, including from the Second Circuit, have held that misrepresentations about the existence and terms of an agreement are actionable in fraud.  *See, e.g.*, *Stewart* v. *Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (law firm's representation that it had been retained by major client "were not future promises but representations of present fact").[36]

Plaintiffs next contend that JPMorgan could not reasonably rely "on a draft agreement subject to court approval . . . because its effectiveness depend[ed] on unfulfilled contingencies." Pl. Br. 34.  Again, this mischaracterizes JPMorgan's claim.  JPMorgan relied on the filed APA, in conjunction with other information, not because the APA was certain to become effective but because it purported to represent the existing *agreed* terms of the deal between LBHI and Barclays.[37]  Unbeknownst to JPMorgan, however, Lehman had excluded from the transaction illiquid securities that had been assigned face values of billions of dollars, including RACERS, and had planned from the start to leave those securities behind at LBI, financed by JPMorgan. Moreover, the same day the APA was filed, Barclays and Lehman quickly reached a separate

---

312535, at *14-15 (S.D.N.Y. June 10, 1996) (misrepresentation concerning service provider's future intention to support technology purchased by plaintiff); *Lane* v. *McCallion*, 561 N.Y.S.2d 273, 275 (2d Dep't 1990) (misrepresentation concerning the "outcome of a future zoning application").

[36] *See also Cofacredit, S.A.* v. *Windsor Plumbing Supply Co.*, 187 F.3d 229, 239-41 (2d Cir. 1999) (representation by seller of receivables that "invoices evidenced firm sales" and thus the right to receive payment was a "misrepresentation"); *Ill. State Bd. of Inv.* v. *Authentidate Holding Corp.*, 369 F. App'x 260, 263-64 (2d Cir. 2010) (upholding fraud claim based on company's representation that an amendment to a critical contract was forthcoming and its failure to correct that representation when negotiations over the amendment fell through); *SEC* v. *Save The World Air, Inc.*, 2005 WL 3077514, at *5, 10, 16 (S.D.N.Y. Nov. 15, 2005) (company misrepresented present facts when it announced agreement was "signed sealed and delivered," when in reality the deal "had yet to be finalized").

[37] Plaintiffs' cited cases, again, are inapposite, as they do not involve misrepresentations concerning the existing terms of an agreement.  *Richbell Info. Servs., Inc.* v. *Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 589 (1st Dep't 2003) (misrepresentation claim based on company's failure to complete IPO transaction as expected); *H & R Project Assocs., Inc.* v. *City of Syracuse*, 737 N.Y.S.2d 712, 713 (4th Dep't 2001) (negligent misrepresentation claim based on assurances that state funding for construction project would be obtained).

understanding that a much narrower set of securities would be transferred (*i.e.*, only the portfolio the Fed was financing on Wednesday night), but did not inform JPMorgan of this critical change.

Ignoring all the evidence that JPMorgan was deceived and that its senior executives were led to believe that the bank's intraday financings would be fully taken out, plaintiffs argue that JPMorgan did not actually rely on LBHI's misrepresentations because its outside counsel posed questions in a September 17 email to Barclays' and LBHI's outside counsel. But in testimony that plaintiffs ignore, JPMorgan's same counsel stated that "the combination of the asset purchase agreement and conversations and e-mails from Jane [Buyers-Russo] and others . . . got me to the point where I understood that the full amount of the debt was to be paid off." R-SOF ¶ 92. More-over, in the very email that plaintiffs quote, JPMorgan's counsel characterized as "obvious" the "requirement" that JPMorgan's advances be repaid as part of the Barclays transaction. R-SOF ¶ 93. JPMorgan's counsel further testified that, when he wrote the September 17 email, he knew nothing about LBHI's plan to leave RACERS behind. R-SOF ¶ 94; *see* R-SOF ¶ 99. Accordingly, plaintiffs' selective presentation of a single email does not sustain their burden on summary judg-ment; in these circumstances, the issue of reliance clearly presents disputed issues of fact.

C.    **Material disputes of fact preclude summary judgment on JPMorgan's aiding and abetting claims (Fourth and Fifth Causes of Action).**

Plaintiffs' challenges to JPMorgan's aiding and abetting claims fail as well. With respect to the claim for aiding and abetting Barclays' fraud—which included Barclays' conscious con-cealment of its decision not to continue financing RACERS until JPMorgan facilitated the trans-fer of other securities—plaintiffs argue that JPMorgan has not developed evidence that LBHI: (1) "caused JPMorgan to unwind the repo on the morning of September 18"; or (2) "influenced Barclays' decisions not to roll the trade that night or purchase the securities left with JPMorgan." Pl. Br. 36.

Plaintiffs are wrong on both counts.  As explained in JPMorgan's own summary judgment motion, one of LBHI's first acts after entering bankruptcy was to seek a "Comfort Order" precisely for the purpose of inducing JPMorgan to continue making discretionary advances to LBI—an order the bankruptcy court entered based on the "need to provide market liquidity for the debtor and its affiliates during the early stages of this bankruptcy case and beyond." SOF ¶¶ 124-30.  Moreover, as explained above, LBHI further induced JPMorgan to continue extending credit, and to facilitate the Barclays transaction, by assuring JPMorgan that its clearance advances would be repaid in full, and by concealing the fact that, in reality, LBI would default on those advances and leave JPMorgan with a multibillion-dollar claim secured by "toxic" assets. Lehman also influenced Barclays to stop providing financing to LBI:  Lehman representatives warned Barclays about RACERS, which led Barclays to conclude that RACERS was worth a fraction of face value and should be left at LBI.  R-SOF ¶¶ 73-75.  And after Barclays made clear to Lehman that it would not take RACERS, Lehman personnel took great pains to ensure that RACERS was left behind.  R-SOF ¶¶ 82-86.

With respect to the claim for aiding and abetting *LBI's* fraud—which consisted of procuring credit from JPMorgan with the present intention not to repay—plaintiffs' only argument is that Lowitt and Tonucci worked for *both* LBI and LBHI.  Pl. Br. 36-37.  But plaintiffs cite no authority holding that just because an officer works for both a parent company and its subsidiary, aider and abettor liability for the parent is precluded as a matter of law.[38]  There is ample basis to conclude that when Lowitt and Tonucci caused LBI to incur obligations to JPMorgan that LBI

---

[38] The sole case plaintiffs cite—which *upheld* a claim of aiding and abetting market manipulation—merely stated that incremental damages for an aiding and abetting claim would not be available where, by the very nature of the alleged scheme, any act of substantial assistance by a defendant was itself actionable as a *primary* wrongdoing.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 723-24 (S.D.N.Y. 2013).

could not satisfy, they were acting on behalf of the bankrupt LBHI, which was desperately seek-

ing to sell and preserve LBI's business, and that *LBHI* can therefore be held liable for aiding and

abetting LBI's fraudulent conduct.[39]

### D.     The defenses of estoppel and waiver do not bar JPMorgan's claims.

Plaintiffs also argue, in conclusory fashion, that they are entitled to summary judgment

based on affirmative defenses of estoppel and waiver.  Invoking estoppel, they argue that

JPMorgan's fraud claims are precluded by a bankruptcy court ruling in a separate litigation be-

tween Lehman and Barclays—to which JPMorgan was not a party—concerning whether Lehman

was entitled under Rule 60(b) to relief from the order approving the Barclays transaction on the

ground that the bankruptcy court "knew nothing about the existence of a multibillion-dollar dis-

count in the value of acquired financial assets" (*i.e.*, that Barclays was acquiring a $50 billion

securities portfolio for $45 billion in cash).  *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 157

(Bankr. S.D.N.Y.  2011).  But none of the elements of collateral estoppel is met.[40]  The claims

asserted by JPMorgan are not predicated on "the multibillion-dollar discount" of the securities

sold to Barclays at issue in the Rule 60(b) proceeding; they are based on different factual allega-

tions that were not presented, let alone adjudicated, in that proceeding—allegations relating prin-

cipally to the securities that were *not* sold to Barclays.  And of course, as a non-party to the Rule

60(b) proceeding, JPMorgan had no opportunity to litigate its grievances in that setting.

---

[39] *See In re Vitamin C Antitrust Litig.*, 2013 WL 504257, at *4 (E.D.N.Y. Feb. 8, 2013) (recognizing the "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership").

[40] The doctrine of collateral estoppel, or issue preclusion, applies only when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010).

Plaintiffs' waiver defense is equally meritless. Plaintiffs assert that JPMorgan somehow failed to preserve its fraud claims because it did not object to the Barclays transaction at the sale hearing on September 19. But at the time of that hearing, JPMorgan did not know the critical facts that support its fraud claims including, among other things, (1) that LBHI made the conscious decision at the outset of the transaction to exclude RACERS and other illiquid securities, thus ensuring that JPMorgan would be left with a claim secured by "toxic" assets, (2) that Tonucci and other Lehman personnel (many of whom were hired by Barclays) actively manipulated the securities transfer to Barclays to ensure that RACERS and other illiquid assets would be left behind, and (3) that LBHI took additional steps to make absolutely sure that Barclays would not finance RACERS and other illiquid securities on Thursday night, September 18. JPMorgan cannot be charged with having waived its fraud claims at the sale hearing when it did not "have full knowledge of . . . the material facts constituting the fraud." *Citizens & S. Sec. Corp.* v. *Braten*, 733 F. Supp. 655, 668 (S.D.N.Y. 1990).

In any event, the only issue relevant to the sale hearing was whether LBHI had met the requirements of section 363(b) of the Bankruptcy Code for selling assets outside the ordinary course of business—*i.e.*, whether there was a "good business reason" for the transaction. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Whether JPMorgan had a separate fraud claim was not before the court and, at the time, not yet known to JPMorgan. *See* R-SOF ¶¶ 94-96.[41]

---

[41] For this reason, plaintiff's sole authority cited in support of the waiver defense—which involved a claim that directly attacked a court-approved transaction—is inapposite. *Kassover* v. *Prism Venture Partners, LLC*, 862 N.Y.S.2d 493, 498 (1st Dep't 2008) (breach of contract claim that was "tantamount to challenging [a bankruptcy court-approved merger] through the backdoor" was waived because it was not raised in the bankruptcy proceedings).

### E.   Challenges to JPMorgan's claims of indemnification are at best premature (Seventh and Eighth Causes of Action).

Plaintiffs are not entitled to summary judgment on JPMorgan's indemnification claims. JPMorgan is seeking indemnification for the fees and expenses incurred in this lawsuit. While the relevant contractual indemnity provisions contain a carve-out for losses resulting from JPMorgan's "willful misconduct," that exception will not apply, and JPMorgan will be entitled to attorneys' fees, if judgment is entered in its favor on all of plaintiffs' claims. It is also possible for plaintiffs to succeed on some of their claims and for the indemnity provisions still to apply, as some claims require no showing of willfulness (*e.g.*, Count 25, seeking turnover of property). Accordingly, there is no basis for summary judgment on the indemnity issue.[42]

### CONCLUSION

For the foregoing reasons, and for the reasons stated in JPMorgan's own motion, plaintiffs' motion for partial summary judgment on Counts 25, 33-34, 38-40, 45, and 47 of the complaint should be denied; instead, summary judgment should be entered in favor of JPMorgan. In addition, in the event that any of plaintiffs' affirmative claims survive summary judgment, plaintiffs' motion for summary judgment on JPMorgan's counterclaims should likewise be denied.

---

[42] Plaintiffs' authorities do not compel a different result. Unlike in *In re Corp. Jet Aviation, Inc.*, 45 B.R. 629, 639 (Bankr. N.D. Ga. 1985), here the "literal terms" of the relevant indemnity provisions provide for the relief sought, and JPMorgan is not using them to offset any exposure it might have under the avoidance provisions of the Bankruptcy Code. And unlike the agreements envisioned by the court in dictum in *In re Film Ventures International, Inc.*, 89 B.R. 80, 83 (B.A.P. 9th Cir. 1988), nothing in the indemnity provisions here "prohibits the filing of an adversary proceeding to avoid any security interests," nor has JPMorgan ever alleged that this is the case.

Dated:    October 15, 2014
          New York, New York


                                      Respectfully submitted,

*Of Counsel*:                         WACHTELL, LIPTON, ROSEN & KATZ

Harold S. Novikoff
Marc Wolinsky                         By:   */s/ Paul Vizcarrondo, Jr.*
Amy R. Wolf                                 Paul Vizcarrondo, Jr.
Douglas K. Mayer
Ian Boczko                            51 West 52nd Street
Emil A. Kleinhaus                     New York, New York  10019
                                      Telephone:  (212) 403-1000
                                      Facsimile:  (212) 403-2000

                                      *Attorneys for Defendant/Counterclaimant*
                                      *JPMorgan Chase Bank, N.A.*