# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

————————————

Chapter 11 Case No. 08-13555 (JMP)
Adversary Proceeding No. 10-3266 (JMP)
No. 11-cv-6760 (RJS)

————————————

IN RE LEHMAN BROTHERS HOLDINGS INC., *ET AL.*,

Debtors.

————————————

LEHMAN BROTHERS HOLDINGS INC. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC.,

Plaintiff and Plaintiff Intervenor,

VERSUS

JPMORGAN CHASE BANK, N.A.,

Defendant.

————————————

MEMORANDUM AND ORDER
September 30, 2015

————————————

RICHARD J. SULLIVAN, District Judge:

Plaintiff Lehman Brothers Holdings Inc. ("LBHI," collectively with all of LBHI's subsidiaries, "Lehman") and Plaintiff Intervenor Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. (the "Committee," collectively with LBHI, "Plaintiffs") bring this adversary proceeding, under Rule 7001 of the Federal Rules of Bankruptcy Procedure, seeking, *inter alia*, damages and the recovery of $8.6 billion from Defendant JPMorgan Chase Bank, N.A. ("JPMC") for the benefit of Lehman's creditors.

Now before the Court is Plaintiffs' motion for partial summary judgment (Doc. No. 55), and Defendant's motion for summary judgment as to all Plaintiffs' claims (Doc. No. 49). For the reasons set forth below, Plaintiffs' motion is denied, and Defendant's motion is granted in part and denied in part.

## I. BACKGROUND

### A. Facts[1]

Plaintiffs allege that JPMC took unfair advantage of Lehman at a time when Lehman relied upon JPMC as its main source of credit to sustain critical trading operations. They claim that actions taken by JPMC to mitigate its risk exposure to Lehman during the early days of the financial crisis included "take it or leave it" demands and a coordinated "cash grab" designed to ensure that JPMC would be repaid ahead of other creditors in the event of Lehman's insolvency. As it turned out, JPMC's concerns regarding Lehman's financial stability came to fruition, and the Court must now decide, long after the fact,

whether JPMC's actions were authorized by the parties' agreements and governing law.

A summary of the facts alleged in Plaintiffs' First Amended Complaint appears in the Court's prior opinion and order denying Defendant's motion to withdraw the reference to the bankruptcy court in this matter. (Doc. No. 40.) Accordingly, the Court sets forth below only those undisputed facts pertinent to the instant motion.

### 1. The Clearance Agreement

Prior to its bankruptcy, "Lehman was the fourth largest investment bank in the United States," offering "an array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management, and private equity." (Doc. No. 3, Ex. A ("First Amended Complaint") ¶ 15.) As is most relevant here, Lehman "provided prime broker services to professional investors and hedge funds, allowing them to borrow securities and cash [in order] to be able to invest on a leveraged basis using borrowed funds, or debt, to increase the returns on equity." (*Id.*) These service offerings required Lehman to buy and sell billions of dollars in securities each day on behalf of itself and its clients.

At all times relevant to this action, JPMC served as the primary bank and credit provider for broker/dealer Lehman Brothers Inc. ("LBI"), a wholly-owned subsidiary of LBHI. (Def. MSJ 56.1 Stmt. ¶ 2.) Among its roles, JPMC functioned as the agent for LBI's "triparty repurchase agreements," also known as "triparty repos." (Def. MSJ 56.1 Stmt. ¶ 6; Pl. PSMJ 56.1 Stmt. ¶ 1.) In a repurchasing agreement, one party sells an asset to another party with a promise to repurchase that asset at a pre-specified future date. In the triparty repo market, a third party known as a clearing bank acts as

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements submitted in connection with Defendant's motion for summary judgment ("MSJ") and Plaintiffs' motion for partial summary judgment ("PMSJ"). (Doc. No. 67 ("Def. MSJ 56.1 Stmt."); Doc. No. 78 ("Pl. MSJ 56.1 Stmt."); Doc. No. 58 ("Pl. PMSJ 56.1 Stmt."); Doc. No. 74 ("Def. PMSJ 56.1 Stmt."); Doc. No. 90 ("Pl. Reply PMSJ 56.1 Stmt.").) Unless otherwise noted, where only one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding these cross-motions, the Court also considered Defendant's revised memorandum of law in support of its motion for summary judgment (Doc. No. 66 ("Def. MSJ Mem.")), Plaintiffs' memorandum of law in support of their motion for partial summary judgment (Doc. No. 59 ("Pl. PMSJ Mem.")), Defendant's memorandum of law in opposition to Plaintiffs' motion (Doc. No. 73 ("Def. PMSJ Opp'n")), Plaintiffs' memorandum of law in opposition to Defendant's motion (Doc. No. 77 (Pl. MSJ Opp'n")), Defendant's reply (Doc. No. 87 ("Def. MSJ Reply")), and Plaintiffs' reply (Doc. No. 89 ("Pl. PMSJ Reply")), along with the affidavits, declarations, exhibits, and citations to supplemental authority attached thereto (Doc. Nos. 51–52, 56–57, 68, 74–75, 79–83, 91, 94, 96).

an intermediary between two groups of parties engaging in a repurchase transaction – broker/dealers like LBI on the one hand, and outside investors on the other.  In a tri-party repo transaction, at the end of the day, the clearing bank settles the repos, which involves simultaneously transferring securities from the broker/dealer's account to the outside investors' accounts and the cash from the outside investors' accounts to the broker/dealer's accounts.  (Def. MSJ 56.1 Stmt. ¶ 4.)  The outside investors hold the securities overnight and, in the morning of the next trading day, the clearing bank "unwinds" the repo, returning the securities to the broker/dealer and transferring cash (at the repurchase price plus interest) to the outside investors.  (*Id.* ¶ 5.)

During the relevant period, only two clearing banks – JPMC and Bank of New York Mellon – provided triparty repo clearing services to broker/dealers like LBI.  (Pl. MSJ 56.1 Stmt. ¶ 6; *id.* Cntrstmt. ¶¶ 2, 28.)  These clearing banks provided the nearly $2.5 trillion of daily intraday credit and liquidity that broker/dealer banks like LBI required to "maintain their inventory of securities, to support their trading activity, and to settle new issues of securities."  (Pl. MSJ 56.1 Cntrstmt.  ¶ 3 (internal quotation marks omitted).)  At its peak in March of 2008, LBI alone borrowed as much as $242 billion of intraday credit from JPMC to unwind its triparty repo transactions.  (Def. MSJ 56.1 Stmt. ¶ 76.)

JPMC's triparty repo obligations were defined in a Clearance Agreement executed on June 15, 2000 between LBI and JPMC's predecessor-in-interest, the Chase Manhattan Bank ("Chase").  (*Id.* ¶¶ 3, 14.)  Under the terms of the Clearance Agreement, JPMC agreed to "act as [LBI's] non-exclusive clearance agent for securities transactions" and as the "custodian with respect to [LBI's] tri-party custody transactions."  (*Id.* ¶ 6.)  Specifically, Section 3 provided that JPMC may "permit transfer from the Clearing Account [to other JPMC accounts] to the extent that after such transfer [JPMorgan] remain[s] fully collateralized."  (*Id.* ¶ 71 (quoting Doc. No. 3, Ex. C ("Clearance Agreement")).)  The lending provision appearing in Section 5 of the agreement also preserved JPMC's right, via Chase, to decline a request by LBI for an extension of credit and provided that "[a]ll loans, whether of money or securities, shall be payable on demand."  (*Id.* ¶ 58.)  The provision further provided that Chase, and thereby JPMC, "may, solely at [its] discretion, permit [LBI] to use funds credited to the Account prior to final payment" and "may at any time decline to extend . . . credit at [JPMC's] discretion, with notice . . . ."  (*Id.*)  The contract's countervailing lien provisions in Section 11 granted JPMC, via Chase, a lien over certain assets held in LBI's accounts at JPMC as security for its exposure on advances made by JPMC to LBI.  (*Id.* ¶ 59.)  The lien provisions further provided that LBI "may upon three days['] written notice to [JPMC] transfer any security."  (*Id.* ¶ 88.)

Although the "initial term" of the Clearance Agreement commenced on June 15, 2000 and ended on October 7, 2002, the parties continued to engage in transactions under the terms of the agreement from June 2000 until they executed a formal amendment continuing their agreement in May 2008.  (*See* Def. MSJ 56.1 Stmt. ¶ 3; Clearance Agreement.)

## 2.  The August Agreements

In early 2008, the Federal Reserve urged JPMC to review its exposure in the clearance market and increase the margins it required from broker/dealers like LBI to

cover clearing-related functions. (Def. MSJ 56.1 Stmt. ¶ 8; Pl. MSJ 56.1 Stmt. ¶ 8.) JPMC began that process and, in June, following negotiations, LBHI pledged collateral in the form of securities priced at approximately $5 billion to secure JPMC's advances of intraday credit (the "June Collateral"). (Def. MSJ 56.1 Stmt. ¶ 9; Pl. MSJ 56.1 Stmt. ¶ 9.)

A few months later, in August 2008, JPMC raised concerns to Lehman regarding (1) the valuation of the June Collateral, and (2) the enforceability of its lien on those funds. (Def. MSJ 56.1 Stmt. ¶¶ 10–11; Pl. MSJ 56.1 Stmt. ¶ 10.) In response to these concerns, LBHI agreed to transfer the June Collateral to a securities account maintained at JPMC, and the parties entered into a series of new agreements further defining their triparty repo and security obligations (collectively the "August Agreements"). (Def. MSJ 56.1 Stmt. ¶ 12.) The August Agreements, executed on or about August 29, 2008, included an amendment to the Clearance Agreement (the "August Amendment"), a guaranty of LBHI's obligations (the "August Guaranty"), and a security agreement which provided JPMC with a lien over LBHI accounts (the "August Security Agreement"). (Id. ¶¶ 12–15; Pl. PMSJ 56.1. Stmt. ¶¶ 8, 11.) In the August Agreements, LBHI agreed to post collateral to guarantee the intraday trading obligations of LBHI and Lehman subsidiaries, as defined in the amended Clearance Agreement. (Pl. MSJ 56.1 Cntrstmt. ¶ 21; Doc. No. 56, Ex. R at 1.)

### 3. The September Agreements

On September 9, 2008, Lehman's stock dropped to $7.79, a 45% decline from the prior day's value. (Def. MSJ 56.1 Stmt. ¶ 19.) That same day, JPMC approached Lehman to obtain a "broad-based collateral agreement to secure all the risk that JPMorgan had to Lehman Brothers" and request additional collateral from Lehman. (Id. ¶¶ 20–21; see also Pl. MSJ 56.1 Stmt. ¶¶ 20–21.) In the discussion, JPMC allegedly told LBHI executives that, if they did not execute the proposed agreements before LBHI's earnings call the next day, "it would be difficult for JPMorgan to continue to be supportive of Lehman." (Pl. MSJ 56.1 Stmt. ¶ 78.)

The following morning, Lehman's Global Treasurer Paolo Tonucci, working directly below Lehman's Chief Financial Officer ("CFO"), executed a number of contracts with JPMC (the "September Agreements"). (Def. MSJ 56.1 Stmt. ¶¶ 22, 105–06.) The September Agreements included an amendment to the Clearance Agreement (the "September Amendment"), a guaranty (the "September Guaranty"), and a security agreement (the "September Security Agreement"). (Id. ¶¶ 22–24.) The September Amendment stated that LBHI's obligations to JPMC would include "all of [LBI's] existing or future indebtedness, obligations and liabilities of any kind to [JPMC] including, without limitation, derivative transactions, settlement of securities hereunder or any other business." (S.D.N.Y. Bankr. 10-ap-03266 (JMP), Doc. No. 14-6 at 1.)

### 4. JPMC's Demands for Collateral Under the September Agreements

The following day, on September 10, 2008, LBHI pre-announced its third-quarter 2008 earnings, revealing a $3.9 billion loss and its plans to spin off real estate assets. (Def. MSJ 56.1 Stmt. ¶ 27.) The next day, LBHI's stock price closed at $4.22, 42% lower than its closing price on the prior day. (Id. ¶ 28.)

By September 11, 2008, LBHI provided JPMC with additional collateral, totaling $3.6 billion in cash and money market funds. (Def. MSJ 56.1 Stmt. ¶ 26; *see also* Pl. MSJ 56.1 Stmt. ¶ 21.) Nevertheless, that evening top executives from LBHI and JPMC convened for a conference call, during which JPMC demanded an additional $5 billion in cash collateral to secure its clearance activities pursuant to the September Agreements. (Def. MSJ 56.1 Stmt. ¶ 29.) Lehman Chief Executive Officer ("CEO") Richard Fuld agreed to the request only after confirming with Lehman CFO Ian Lowitt that Lehman had sufficient financial resources to post the collateral. (*Id*. ¶¶ 29–30; *see also* Pl. MSJ 56.1 Stmt. ¶ 33 (noting that LBHI "scrambled to pull together virtually all unencumbered cash" in order to comply).) The following morning, JPMC settled Lehman's triparty repo book, advancing approximately $120 billion (Def. MSJ 56.1 Stmt. ¶¶ 32, 92); later that same day, LBHI posted the $5 billion in cash it had agreed to provide JPMC (*id*. ¶ 33).

In total, between September 9 and 12, 2008, LBHI pledged a security interest in approximately $1.7 billion in money-market funds to JPMC; LBHI had also deposited a total of $6.9 billion of cash collateral into a LBHI demand deposit account denominated DDA# 066-141-605 (the "Cash Account"). (Def. MSJ 56.1 Stmt. ¶ 162; *see also* First Amended Complaint ¶ 66.) After the funds were deposited, JPMC moved the $6.9 billion out of the Cash Account and into an account maintained on JPMC's general ledger, G/L 2103940020 MMA NIB TRIPARTY CASH COLLATERAL (the "GL Cash Collateral Account"). (Def. MSJ 56.1 Stmt. ¶ 163; Pl. PMSJ 56.1 Stmt. ¶ 20.) The GL Cash Collateral Account held cash pledged to JPMC by various broker/dealer clients engaged in financial activities, including triparty repos, and only JPMC

could transfer funds from the account. (Def. MSJ 56.1 Stmt. ¶¶ 164–65; Pl. PMSJ 56.1 Stmt. ¶ 22.)

### 5. Lehman's Bankruptcy Filing

Beginning on the evening of Friday, September 12, 2008 and continuing over the weekend, the CEOs of major Wall Street banks met at the Federal Reserve to address Lehman's precarious financial situation. (Def. MSJ 56.1 Stmt. ¶ 34.) During those meetings, then-Treasury Secretary Henry Paulson informed the CEOs that, without help, Lehman would not open for business the next week. (*Id*.)

Before the U.S. markets opened on Monday, September 15, 2008, LBHI filed a Chapter 11 petition with the U.S. Bankruptcy Court for the Southern District of New York. (*Id*. ¶ 44.) Timothy Geithner, then-President of the Federal Reserve Bank of New York, later testified – with the obvious benefit of hindsight – that by September 14 Lehman's bankruptcy had become "truly inevitable," and a senior Federal Reserve official later commented that "the entire Street [had been] running away from Lehman." (*Id*. ¶¶ 35, 37.)

### 6. LBHI's Comfort Order Motion and Proceedings in the Bankruptcy Court

The morning of Lehman's bankruptcy, JPMC provided approximately $87 billion of credit to LBI to unwind the previous Friday's triparty repo agreements and other financing. (Def. MSJ 56.1 Stmt. ¶¶ 45, 100.) The following day, on September 16, 2008, LBHI filed a motion in the bankruptcy court seeking a so-called "comfort" order – designed to lift the automatic stay imposed upon Lehman's bankruptcy filing that otherwise prevented Lehman from incurring additional debt – to induce JPMC to continue making intraday clearance

advances to LBI during the pendency of the bankruptcy (the "Comfort Order Motion"). (*Id*. ¶ 46.) Specifically, the motion asked the bankruptcy court to clarify that JPMC was authorized to continue incurring debt from Lehman under the August and September Agreements and that LBHI was authorized to guaranty and provide collateral for post-bankruptcy JPMC advances. (*Id*. ¶ 46.) LHBI's Comfort Order Motion stated that JPMC made clearance advances at "its sole discretion" and that obligations arising from clearance advances were "payable . . . upon demand by [JPMC]." (*Id*. ¶ 47; *see also id.* ¶ 125.) The Court granted the motion at a hearing that day. (Def. MSJ 56.1 Stmt. ¶ 130.) Also on September 16, 2008, Tonucci allegedly told Jane Buyers-Russo, a senior corporate banker at JPMC responsible for the Lehman relationship, that LBHI was awaiting approval from the United Kingdom's Financial Services Authority of a proposed sale to Barclays Capital Inc. ("Barclays"), and that JPMC would be "taken out of its [lending] position" once the transaction closed. (Def. PMSJ 56.1 Stmt. ¶ 27; Def. PMSJ 56.1 Cntrstmt. ¶ 23.)

On September 17, 2008, LBHI filed a motion with the bankruptcy court seeking approval of its asset sale to Barclays; the motion noted that the sale included "LBI's assets as well as three real properties" and attached a proposed asset purchase agreement that excluded from the sale "[c]ommercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets.)" (Def. PMSJ 56.1 Cntrstmt. ¶¶ 52–53; Pl. PMSJ 56.1 Cntrstmt. Response ¶ 52.)

On the evening of September 18, 2008, Barclays observed that, because LBI would enter liquidation the following day, any

party extending financing to LBI that evening "would effectively be buying the inventory backing that repo" post-liquidation. (Def. PMSJ 56.1. Cntrstmt. ¶ 78.) According to Lehman representatives, Barclays was particularly insistent that its overnight financing not include "RACERS" – structured securities with a face value of $5 billion but backed by questionable Lehman assets including commercial real estate loans – among its collateral at the time of Lehman's liquidation. (Def. PMSJ 56.1 Cntrstmt. ¶¶ 33–34, 79–80.) Lehman personnel, thus, ensured that RACERS would "not be funded by Barclays that evening." (Def. PMSJ 56.1 Cntrstmt. ¶¶ 82–86.)

On September 19, 2008, the bankruptcy court entered an order commencing liquidation proceedings of Lehman. (Def. MSJ 56.1 Stmt. ¶ 51.) It engaged Lehman and its creditors in a sale hearing over the evening of September 19 and morning of September 20, 2008, during which counsel for JPMC and Lehman were present. (Pl. PMSJ 56.1 Stmt. ¶ 33.) During the hearing, the parties learned that Barclays would purchase only a portion of LBI's assets and would do so at a lower price than previously believed. (Pl. PMSJ 56.1 Stmt. ¶¶ 34–35; Def. PMSJ 56.1. Cntrstmt. ¶¶ 101–102.) The bankruptcy court presiding over the subsequent Chapter 11 proceedings ultimately authorized the sale of LBI assets to Barclays, and the transaction closed on September 22, 2015. (Def. PMSJ 56.1. Cntrstmt. ¶ 52; Pl. PMSJ 56.1 Stmt. ¶ 26.) Following the sale, JPMC representatives expressed their belief that JPMC, along with other Lehman creditors, had been cheated, stating that "basically Barclay[s] / Lehman tricked us into holding the assets they didn't want." (Def. PMSJ 56.1 Cntrstmt. ¶ 103.)

The following month, in October 2008, JPMC applied approximately $1.9 billion from the $6.9 billion GL Cash Collateral Account to claims related to Lehman derivatives contracts, securities lending agreements, and repurchase agreements. (Pl. PMSJ 56.1 Stmt. ¶ 24 (naming only derivatives contracts); Def. MSJ 56.1 Stmt. ¶ 167.)  It then applied the remaining funds in partial satisfaction of other Lehman obligations to JPMC. (Def. MSJ 56.1 Stmt. ¶ 168.)

Ultimately, JPMC filed claims against the LBHI estate in the amount of approximately $30 billion, including secured claims under the August and September Guaranties for approximately $25 billion resulting from extensions of triparty repo credit under the Clearance Agreement. (*See id.* ¶ 48.)

## B.  Procedural History

The Lehman bankruptcy is the largest and, arguably, most complex in U.S. history. Since Lehman filed its petition for bankruptcy in September 2008, Judge James M. Peck has overseen the administration process for tens of thousands of claims against the LBHI estate and presided over numerous adversary proceedings stemming from the bankruptcy.

On September 15, 2010, Plaintiffs filed their First Amended Complaint in this adversarial proceeding, which sets forth 49 independent claims for relief and seeks damages as well as the return of $8.6 billion in collateral that JPMC received from Lehman. On October 19, 2010, JPMC filed its motion to dismiss Plaintiffs' First Amended Complaint in the bankruptcy court. On December 1, 2010, while briefing was pending, JPMC filed counterclaims alleging that LBHI fraudulently induced JPMC to continue extending credit to LBI

after LBHI's bankruptcy filing.  (*See* Doc. No. 3, Ex. B ("Amended Counterclaims").)

On April 19, 2012, the bankruptcy court granted JPMC's motion to dismiss 20 of Plaintiffs' 49 claims at issue in this matter. Specifically, the bankruptcy court found that claims based on preference liability or constructively fraudulent transfers – under Sections 544, 547, and 548 of the Bankruptcy Code – were foreclosed by the Bankruptcy Code's safe harbors.  The court otherwise denied the motion.  *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415, 420 (Bankr. S.D.N.Y. 2012).[2] Thereafter, Plaintiffs filed a motion to dismiss Defendant's amended counterclaims.  The bankruptcy court did not rule on that motion.

Following notice that JPMC intended to move for summary judgment, the Court withdrew its prior reference of this matter to the bankruptcy court on August 4, 2014. (*See* Doc. Nos. 43–45.)  Defendant filed its motion for summary judgment on September 15, 2014 (Doc. No. 49), and Plaintiffs filed their motion for partial summary judgment on the same day (Doc.

---

[2] While the motion was pending, Defendant moved this Court to withdraw the bankruptcy court's reference in this matter.  The Court ruled on the motion on September 28, 2012, concluding that the bankruptcy court lacked the *constitutional* authority to finally adjudicate the majority of Plaintiffs' claims but, nonetheless, declined to withdraw the reference finding that the bankruptcy court had the *statutory* authority to issue proposed findings of fact and conclusions of law which might prove valuable in light of the bankruptcy court's extensive knowledge and experience in this matter.  (Doc. No. 40.)

No. 55).  The motions were fully briefed on October 31, 2014.[3]

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita*

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).  "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact.  A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]," *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

---

[3] On August 11, 2014, the Court issued an order observing that the parties had "propose[d] a staggering motion schedule that call[ed] for more than 600 pages of legal briefs spread over seven months, along with an unlimited quantity of exhibits, affidavits, and deposition designations."  (Doc. No. 47 at 1.)  Since this type of "trial on written submissions" is inconsistent with the purpose of Rule 56, the Court imposed strict page limits and ordered that "the parties shall be limited to a total of twenty-five exhibits" but that "documents that have already been docketed, such as the Complaint, need not be re-submitted as exhibits."  (*Id.* at 1–2.)  In apparent disregard of the Court's clear ruling, Plaintiffs now urge that "[i]n the event that the Court finds the cited evidence insufficient to create a triable question of fact on any particular issue, Plaintiffs respectfully request relief from the order and permission to supply additional evidence."  (Pl. MSJ Opp'n at 3 n.3; *see also* Pl. MSJ 56.1 Stmt. (offering similar statements 37 different times).)  The request is denied.  In light of the Court's inherent authority to "manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), the Court is confident that the page limits and exhibit caps imposed for this motion were appropriate, applied equally to both parties, and sufficient to enable the parties to demonstrate to the Court "whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II. DISCUSSION

Plaintiffs claim that JPMC used its "life or death" leverage as Lehman's primary clearing bank to extract virtually all of Lehman's remaining liquidity and establish a $8.6 billion "slush fund" for its own use. The allegations, however, rest on the fundamental premise that JPMC was obligated to extend credit to Lehman under its credit agreement and that, therefore, JPMC's demands, conditioning extensions of credit on obtaining additional collateral, were wrongful. As set forth below, an analysis of the parties' contracts contradicts that premise; rather, the contracts negotiated between the parties unambiguously permitted JPMC to cease extending credit to LBI even without an extended notice period. Plaintiffs alternatively argue that JPMC's efforts to secure its collateral and ensure that Lehman's debt would be paid in full through operation of its lien were unlawful and improper. Again, the Court disagrees. The parties' agreements do not limit JPMC's ability to request the collateral necessary to secure LBHI's obligations. Moreover, the Court finds that JPMC retained its lien over the collateral originally deposited in the Cash Account even after transferring it to JPMC's GL Cash Collateral Account.

### A. The Parties' Contractual Agreements Did Not Impose on JPMC an Obligation to Lend or Otherwise Restrict JPMC's Right to Request Collateral

In order to understand the triparty repo financing relationship between JPMC and Lehman and the obligations the parties owed to one another, the Court begins with the language of the parties' governing contracts, assessing both their express and implied terms.

### 1. The Clearance Agreement Did Not Require JPMC to Indefinitely Extend Credit to Lehman

The Clearance Agreement is the foundational document defining the relationship between the parties. Its credit-related provisions, appearing in Section 5, are central to this dispute, and provide as follows:

> [JPMC] may, solely at [its] discretion, permit [LBI] to use funds credited to the Account prior to final payment . . . . All loans, whether of money or securities, shall be payable on demand and shall bear interest at such reasonable rates as shall be determined by [JPMC]. Notwithstanding the fact that [JPMC] may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to [LBI], whether or not as a regular pattern, [JPMC] may *at any time* decline to extend such credit at [its] discretion, *with notice* . . . .

(Clearance Agreement § 5 (emphasis added).)

The text of Section 5 clearly contemplates JPMC's ability to extend credit at its discretion, and the right to decline, with notice, further extensions of credit regardless of any prior course of conduct. Plaintiffs nonetheless argue that the phrase "with notice" obligated JPMC to provide "commercially reasonable notice" before denying credit to LBI. (Pl. MSJ Opp'n at 9.) Plaintiffs estimate that this notice would require "months and perhaps even a year." (Pl. MSJ Opp'n at 12 n.15.) They further claim that any interpretation that would permit Defendant to threaten on September 11, 2015 to cease extending credit on the morning of September 12, 2015

9

– which Plaintiffs allege Defendant did and which Defendant denies – would render the "with notice" clause either meaningless or superfluous. (*Id*.)

Under New York law, which governs the agreements between the parties (Clearance Agreement § 24), contractual interpretation at summary judgment takes place in two stages. First, a court must determine, as a matter of law, whether the disputed contractual terms are ambiguous. *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "No ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Id*. at 467 (alternation in original, citations and internal quotation marks omitted). Second, if a court concludes that the contractual terms are "complete, clear and unambiguous," it must proceed to interpret those terms according to their "plain meaning." *Id*. (citations and internal quotation marks omitted). However, if a court finds that the contractual language is ambiguous, then it should typically deny summary judgment. Nevertheless, a court may "resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary," or if the nonmoving party "fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (alteration in original, citations and internal quotation marks omitted).

The plain meaning of Section 5 is difficult to square with Plaintiffs' strained and extra-textual interpretation of the phrase "with notice." As set forth below, the Court finds that the phrase "with notice" in the quoted clause of Section 5, where a notice period is not defined, unambiguously means "accompanied by notice *at any time before* the noticed event occurs."

In order to discern the "plain and ordinary" meaning of the parties' contractual text, the Court consults dictionary sources. *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). To begin, the word "with," as used here, is defined as "accompanying." *American Heritage Dictionary of the English Language* 1988 (5th ed. 2011); *see also Webster's Third New International Dictionary, Unabridged* 2626 (2002) ("accompanied by"). "Notice," the operative term in the contractual phrase, means "a formal announcement, notification, or warning, especially an announcement of one's intention to withdraw from an agreement." *American Heritage Dictionary of the English Language* 1206. Further, "notice" is often used in combination with a temporal word and defined as "warning, announcement, or intimation given a specified time before the event to take place," as in "evacuating a school building . . . in a minute's notice," "ready to leave at short notice," or "allow me ten minutes' notice." *Webster's Third New International Dictionary, Unabridged* 1544; *see also* 10 *Oxford English Dictionary* 551 (2d ed. 1989) (defining "notice" as "an intimation by one of the parties to an agreement that it is to terminate at a specified time"). Indeed, Plaintiffs' own proposed definition, "a notification or warning of something, especially to allow preparations to be made" (Pl. MSJ Opp'n at 9 (quoting *Oxford English Dictionary* (2014)), supports this reading. The same

result obtains where "notice" is used in a legal context. *Black's Law Dictionary*, for example, defines notice as "legal notification required by law or agreement, or imparted by operation of law as a result of some fact." *Black's Law Dictionary* 1227–28 (10th ed. 2014). It then separately defines a handful of additional phrases involving the word "notice," including "advance notice," which it defines as "notice given beforehand, usu[ally] by a specified amount of time." *Id.* None of these definitions suggest that "notice," standing alone, takes on a particular temporal dimension. To the contrary, additional words are required to define a notice period where one is intended.

A holistic reading of the contract further supports this interpretation. *See Eighth Ave. Coach Corp. v. City of N.Y.*, 286 N.Y. 84, 85 (1941) (noting that a "contract must be read as a whole in order to determine its purpose and intent"). The very clause containing the "with notice" phrase also states that JPMC has the right "at any time [to] decline to extend . . . credit at [its] discretion." (Clearance Agreement § 5.) Additionally, Section 5 provides that intraday credit from JPMC shall be "payable on demand," emphasizing that JPMC may exercise its right to cease providing intraday credit. (*Id.*) These contractual provisions further clarify the parties' intent to ensure that any extension of credit would occur at JPMC's discretion. To require commercially reasonable notice – which Plaintiffs quantify at "months and perhaps even a year" (Pl. MSJ Opp'n at 12 n.15) – would be inconsistent with the neighboring provisions of Section 5 and impermissibly "giv[e] them an interpretation apart from the contract of which they are a part." *Eighth Ave. Coach Corp.*, 286 N.Y. at 88.

Moreover, the Court's reading of "with notice" does not, as Plaintiffs claim, render the contract's termination provision a nullity. The termination provision at issue appears in Section 17 of the Clearance Agreement and provides:

> [T]his Agreement may be terminated by either party by written notice to the other if such other party has failed to comply with any material provision of this Agreement which failure shall continue for (30) days after notice of such failure . . . .

(Clearance Agreement § 17.) In the absence of a breach, the contract states that the non-breaching party may "terminate this Agreement provided that [it] ha[s] given [the other party] written notice of such termination at least 12 months prior to the effective date of termination." (*Id.*) Indeed, the Clearance Agreement, a 43-page document, reflects the parties' decisions regarding the structure of their clearance relationship and included terms beyond those discussing the extension of credit that appear in Section 5. Accordingly, the fact that the agreement, as a whole, could not be terminated without 12 months' (or 30 days') notice does not mean that the credit-related provisions specifically addressed in Section 5 were subject to the same requirements. The broad language used in Section 5, coupled with the apparent decision not to include the timing provisions of Section 17, leads to the inescapable conclusion that JPMC bargained for, and received, the right to stop extending credit to LBI at any time in its discretion, with the simple requirement that Lehman receive notice of that fact.

Plaintiffs make much of the fact that, given Lehman's highly-leveraged business structure, a failure of JPMC to extend triparty repo credit would have put Lehman

out of business, effectively terminating the clearance relationship between JPMC and Lehman. (Pl. MSJ 56.1 Cntrstmt. ¶ 7.) But this fact does not render the Court's reading of "with notice" in Section 5 a nullity. (*See* Pl. MSJ Opp'n at 12.) The practical effect of a refusal by JPMC to extend credit to Lehman is an artifact of Lehman's business model – *i.e.*, its independent choices regarding how to structure its business that were neither within JPMC's control nor provided for in the text of the parties' agreement – and should not require Defendant to extend credit despite the contractual terms discussed above. Accordingly, the Court finds that because the termination provision operates independently from the "with notice" provision in the prior section, it cannot compel a reading of the "with notice" text that is different from the term's ordinary meaning discussed above.

Finally, the Court's interpretation of the "with notice" phrase is not superfluous, as Plaintiffs suggest. (Pl. MSJ Opp'n at 9.) The financial industry, perhaps more so than any other, understands the value of even the smallest increments of time. *See* Charles Duhigg, *Stock Traders Find Speed Pays, In Milliseconds*, N.Y. Times (July 23, 2009), *available at* http://www.nytimes.com/2009/07/24/business/24trading.html. Warning of JPMC's intention to cease extending credit, even of unspecified duration, provided Lehman with precious time to respond to the upcoming change in its triparty repo business. Although one could argue in hindsight that notice of several months or a year would have been preferable for an entity with Lehman's exposure, it is not the notice that Lehman bargained for, and the Court is not in a position to enhance Lehman's contractual rights after the fact.

## 2. The Parties' Agreements Do Not Restrict JPMC's Right to Request Additional Collateral

Next, the Court examines whether JPMC was contractually prohibited from requiring collateral under the Clearance Agreement beyond the level required to secure its intraday credit advances, as Plaintiffs contend. (Pl. MSJ Opp'n at 13.) The sole Clearance Agreement term relevant to this inquiry appears in Section 3, entitled "Authority." It provides, in pertinent part:

> [JPMC is] hereby authorized, as your agent, and agree[s] pursuant to your instructions, . . . [*inter alia*] to permit [LBI] to make transfers between the Clearing Account(s), Custody Account(s) and the Segregated Account(s) or other accounts, it being understood that [JPMC] shall only permit transfers from the Clearing Account(s) to the Custody Account(s) or Segregated Account(s) to the extent that after such transfer [JPMC] remain[s] *fully collateralized*; ha[s] been fully paid with respect to any securities being transferred into the Segregated Account(s) or other accounts.

(Clearance Agreement § 3 (emphasis added).) Plaintiffs argue that this provision, properly interpreted, offers JPMC "the right only to be fully collateralized – not *over*collateralized" with respect to its clearance activities. (Pl. MSJ Opp'n at 13.) Plaintiffs further allege that Defendant's imprecise calculations regarding their $5 billion collateral demand overestimated the funds needed to secure JPMC's advances and thus, resulted in an impermissible overcollateralization. (*See id.* at 17–18.)

While Plaintiffs' protests are understandable, they find no support in the

text of Section 3 where Plaintiffs ground their legal claim. This contract section was designed to set forth the conditions under which LBI might permissibly transfer the securities that comprise JPMC's collateral. The function of the provision was to protect JPMC's interest in ensuring that its advances were *fully* secured, in the event that LBI sought to transfer securities that had previously been posted as collateral. In keeping with that function, Section 3 permitted Lehman to transfer securities only when JPMC was otherwise "fully collateralized" and the securities were unnecessary to secure JPMC's credit advances. The "fully collateralized" language operates as a shield to protect JPMC in the event of a default, and there is nothing in the language of Section 3 that creates a right for Lehman to impose a cap on its collateral obligations or otherwise ensure that Lehman was not "overcollateralized." Accordingly, the Court finds that Defendant's contractual right to request "further security or payment on account of any of [its] Liabilities" left the determination as to what constituted sufficient collateral to JPMC and was not an invitation for courts to intervene and scrutinize the value of collateral already received or the amount of Lehman's outstanding debt. (Doc. No. 3, Ex. E ("August Security Agreement") at 5; Doc. No. 3, Ex. G ("September Security Agreement") at 5.)

### 3. An Obligation to Extend Credit or Restrict Collateral Does Not Arise from Implied Contractual Terms

Notwithstanding the *express* terms of the Clearance Agreement interpreted above, Plaintiffs claim that an obligation to provide commercially reasonable notice and refrain from overcollateralization arises independently from the *implied* covenant of good faith and fair dealing. (Pl. MSJ Opp'n at 10–11.) The Court disagrees.

New York law "recognize[s] an implied covenant of good faith and fair dealing in every contract." *Alter v. Bogoricin*, No. 97-cv-662 (MBM), 1997 WL 691332, at *7 (S.D.N.Y. Nov. 16, 1997); *accord Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) ("Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." (citation omitted)). In general, the implied covenant prohibits parties to a contract from acting in a manner that "will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 305 (S.D.N.Y. 1998) (internal quotation marks omitted). Thus, "[w]here [a] contract contemplates the exercise of discretion," the implied covenant imposes a duty "not to act arbitrarily or irrationally in exercising that discretion." *Dalton*, 87 N.Y.2d at 389. The implied covenant, however, "is not without limits, and *no obligation can be implied that would be inconsistent with other terms of the contractual relationship*." *Id.* (emphasis added, internal quotation marks omitted).

Here, Plaintiffs rely on *Components Direct, Inc. v. European American Bank & Trust Co.* to argue that, even under loan agreements where banks lend money at their "sole discretion," the implied covenant of good faith and fair dealing requires them to exercise their discretion in a commercially reasonable manner. 175 A.D.2d 227 (N.Y. 2d Dep't 1991); (Pl. MSJ Opp'n at 10–11, 14–21.) Plaintiffs, therefore, ask the Court to ignore Section 5's assurances – that JPMC extends credit "solely at [its] discretion," that it "may at any time decline to extend such credit at [its] discretion with notice," and that all loans are "payable on

demand" – to impose instead an undefined "reasonableness" requirement condemning JPMC's actions.

Plaintiffs' claim, however, invokes the doctrine of "lender liability" law, often associated with *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752 (6th Cir. 1985), which has been largely discredited. *K.M.C.* involved a revolving credit agreement similar to the Clearance Agreement at issue here. Although in that matter, creditor Irving argued that it had a contractual right to refuse to extend credit and to demand payment from borrower K.M.C. at its own discretion, the Sixth Circuit, applying New York law, found that these rights did not relieve Irving of an obligation to provide K.M.C. prior notice of its intent to cut off credit. Since *K.M.C.* was decided in 1985, its holding has been widely criticized – most notably in *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351 (7th Cir. 1986). Specifically, *Kham & Nate's Shoes* noted that the *K.M.C.* holding effectively overrode the express terms of the contractual agreement between the parties before the court: "Although courts often refer to the obligation of good faith that exists in every contractual relation, this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." 908 F.2d at 1357. After all, "if creditors are not permitted to bargain for the added protection of being able to act without notice, then creditors will demand higher interest rates and faster repayment, or may decline to extend credit altogether." *Travel Services Network, Inc. v. Presidential Financial Corp. of Mass.*, 959 F. Supp. 135, 142 (D. Conn. 1997) (discussing judicial and academic criticism of *K.M.C.*).

Given the weight of criticism aimed at the lender liability case law in the past two decades, the Court concludes that New York courts would now either interpret *K.M.C.* and *Components Direct* narrowly or reject their reasoning entirely. *See generally*, *Travel Services Network*, 959 F. Supp. at 142 (reaching the same conclusion regarding *K.M.C.* under Massachusetts law); *Nat'l Westminster Bank v. Ross*, 130 B.R. 656, 680 (S.D.N.Y.1991) (concluding that *K.M.C.* is inconsistent with precedent of the New York Court of Appeals finding, in the context of an employment contract, that absent an "express limitation in the individual contract" the right to act "at will" must "remain[] unimpaired" (quoting *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)). In fact, the Second Circuit, in *Manufacturers Hanover Trust Co. v. Yanakas* found that where a bank had "never represented that credit of a certain amount would be provided, and the borrower had no reasonable expectation of continued . . . credit," imposing an obligation under the implied covenant was inappropriate. 7 F.3d 310, 318 (2d Cir. 1993) (internal quotation marks and alteration omitted)). Accordingly, the Court finds that, regardless of whether JPMC's refusal to extend credit "propelled [Lehman] downhill," JPMC merely exercised the rights enumerated in the contract between the parties. *Kham & Nate's Shoes*, 908 F.2d at 1358.

Plaintiffs further argue that Defendant's request for additional collateral violated the implied covenant of good faith and fair dealing, pointing to U.C.C. § 1-208. (Pl. MSJ Opp'n at 15.) There, the U.C.C. provides that contractual terms requiring "collateral or additional collateral 'at will' . . . shall be construed to mean that [the party requesting collateral] shall have power to do so only if [it] in good faith believes that the prospect of payment or performance is impaired." However, the comment to

U.C.C. § 1-208 clarifies that the implied covenant of good faith and fair dealing "has no application to demand instruments or obligations whose very nature permit call at any time with or without reason." Indeed, it is well settled that "New York law does not impose an obligation of good faith on a lender calling in a demand note." *Bankers Trust Co. v. F.D. Rich Co.*, No. 90-cv-4827 (KMW), 1991 WL 221091, at \*4 (Oct. 11, 1991). Nonetheless, Plaintiffs argue that the funds JPMC advanced to unwind Lehman's triparty repos were "overdrafts" and not "loans" payable on demand under the terms of the Clearance Agreement. (Pl. MSJ Opp'n at 15 n.22.) This is a distinction without a difference, however, since under New York law an overdraft is akin to a loan and is payable on demand. *See Ctr. Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 859 F. Supp. 97, 105 (S.D.N.Y. 1994) ("Without question, as between a banking firm and a depositor . . . an overdraft is a loan." (internal quotation marks omitted)). Accordingly, Defendant's actions in obtaining collateral do not run afoul of U.C.C. § 1-208 or its associated case law.

That Plaintiffs are now dissatisfied with the bargain they struck and believe that JPMC behaved badly in enforcing its terms is of no moment. The parties were sophisticated players, represented by counsel, and practiced in executing and administering contracts of this type. The Court will not now rewrite the parties' contractual text – with express or implied terms – to provide Lehman with language more beneficial than what it negotiated.

Moreover, in light of the Court's holding that JPMC was not obligated to extend credit to Lehman, the Court finds for Defendants with respect to Counts 46 and 48, alleging coercion and duress based on JPMC's extraction of collateral under

wrongful threat to cease extending credit the following day. (*See* Pl. MSJ Opp'n at 3 (conceding that claims for coercion and duress must fail if the Court concludes that JPMC was under no obligation to continue extending credit to Lehman).) Consistent with the Court's conclusion that the parties' agreements did not cap the collateral JPMC may permissibly request or prohibit JPMC from becoming "overcollateralized" in the eyes of Lehman, the Court further finds for Defendant on Count 41, which claims that JPMC committed a breach of the Clearance Agreement by requesting collateral beyond that needed to secure its obligations arising under that agreement. Put simply, a party does not breach an agreement by behaving as the instrument permitted.

## B. The August and September Agreements Are Valid and Enforceable

Having failed to establish that JPMC was obligated to extend credit or restricted in its ability to demand collateral under the parties' governing contracts, the viability of Plaintiffs' claims rests on the enforceability of those agreements. Since Plaintiffs do not argue on summary judgment that the August Agreements are invalid or that JPMC's actions constituted a clear breach of their terms, the Court grants judgment for Defendant on Count 43, which asserts that JPMC breached the August Agreements by requesting collateral in excess of that permitted by those contracts; Count 44, which alleges that JPMC breached the August Agreements by not returning the $5 billion in collateral on the evening of September 12, 2008; and Count 45, which alleges that JPMC breached the covenant of good faith and fair dealing with respect to the August Agreements.

Plaintiffs do, however, challenge the validity of the September Agreements. Specifically, Plaintiffs allege in Count 35

that Defendant did not offer sufficient consideration to support the September Agreements and that the September Agreements were signed by an individual without authority to bind Lehman. They further allege in Count 47 that Defendant's actions in demanding billions of dollars in collateral violated the implied covenant of good faith and fair dealing with respect to the September Agreements. The Court will address each of these arguments in turn.

### 1. Plaintiffs' Attempts to Invalidate or Rescind the September Agreements Are Foreclosed by the Waiver of Defenses Clause

The September Guaranty, one of the September Agreements, contains a waiver clause – also known under New York law as a "hell or high water clause" – that, for the reasons discussed below, bars Lehman from presenting the defenses of lack of consideration and lack of authority. The waiver clause states:

> The liability of [LBHI] under this Guaranty is absolute and unconditional irrespective of . . . *any lack of validity or enforceability of any . . . Facility Document* or . . . any other setoff, defense, or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) or circumstance whatsoever with respect to . . . the Facility Documents . . . which might constitute a legal or equitable defense available to . . . a guarantor; and [LBHI] *irrevocably waives the right to assert such defenses, setoffs or counterclaims in any litigation* or other proceeding relating to . . . the Facility Documents.

(Doc. No. 3, Ex. F ("September Guaranty") at § 2 (emphasis added)). "Facility

Documents" are defined by the September Guaranty to include, "any agreement between [LBHI] and [JPMC]," including the September Guaranty itself and the September Security Agreement. (*Id.* at 1.)

A recent Second Circuit opinion "confirm[ed] that, under New York Law, 'hell or high water' clauses are enforceable" against "sophisticated parties." *Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107, 110 (2d Cir. 2005). Moreover, New York courts have generally enforced these clauses, provided that their terms clearly waive the challenged defense. *See, e.g.*, *Citibank, N.A., et al. v. Plapinger, et al.*, 66 N.Y.2d 90, 92 (1985). In fact, New York courts have specifically found that a "hell or high water" clause may bar claims of lack of consideration and authority. *See Liberty Mut. Fire Ins. Co. v. Mystic Transp., Inc.*, No. 04-cv-1150 (GEL), 2004 WL 2071703, at *3 (S.D.N.Y. Sept. 16, 2004) (finding that "an individual who executes an absolute and unconditional guaranty is precluded from raising . . . lack of consideration" as a basis for invaliding the agreement (citing *Plapinger*, 66 N.Y.2d at 93)); *Gen. Trading Co. v. A&D Food Corp.*, 738 N.Y.S.2d 845, 845 (1st Dep't 2002) (noting that a "guarantee, which states that it is absolute and unconditional and that the guarantors waive the right to interpose any defenses, effectively waived the defense[] of . . . failure of consideration"); *Keeseville Nat'l Bank v. Gulati*, 599 N.Y.S.2d 175, 176 (3d Dep't 1993) (holding that a waiver of all defenses precluded a claim for lack of authority).

Plaintiffs nonetheless claim that "in order to bar a specific defense, a waiver must specifically disclaim that defense, *unless* the contract was the product of 'extended negotiation.'" (Pl. MSJ Opp'n at 35 & n.81.) Here, since the September

Guaranty was quickly signed and does not specifically mention consideration and authority, Plaintiffs argue that its waiver cannot be enforced. (*Id.* at 34–36.) While "extended negotiation" may be *acknowledged* by courts discussing "hell or high water" clauses, it is by no means a *requirement* for enforceability. *See Ursa Minor Ltd. v. Aon Fin. Prods.*, No. 00-cv-2474 (AGS), 2000 WL 1010278, at *6 (S.D.N.Y. July 21, 2000) (addressing a hell or high water clause while omitting any mention of the duration of negotiations). Rather, the enforceability of a waiver turns on whether (1) the parties are "sophisticated," and (2) the contractual terms are clear and "unambiguous." *Wells Fargo*, 419 F.3d at 110 (noting several times the sophistication of the parties while omitting discussion of the period of negotiation entirely). The circumstances present here easily meet this standard. LBHI was a sophisticated party represented by counsel at the time of the parties' admittedly fast-paced discussions regarding the September Agreements. Moreover, a waiver of "all defenses," like that in the September Guaranty, is considered clear and unambiguous under New York law. *See Plapinger*, 66 N.Y.2d at 92 (enforcing a guarantee that "recites that it is absolute and unconditional irrespective of any lack of validity or enforceability of the guarantee, or any other circumstance which might otherwise constitute a defense available to a guarantor in respect of the guarantee").[4]

---

[4] That the clause contains boilerplate provisions does not alter the Court's analysis. (Pl. MSJ Opp'n at 35–36.) Particularly where parties are sophisticated, the Court will not second guess their election of stock language. *See, e.g., In re Victory Mkts., Inc.*, 221 B.R. 298, 304 (2d Cir. 1998) ("[E]ven if the operative provisions [in the contract] were to be considered boilerplate, we cannot accept the contention that language of that character is to be disregarded . . . . At no time should the source of language affect its efficacy.").

Accordingly, Plaintiffs' claims for lack of consideration and authority are waived under the terms of their agreement.

### 2. Plaintiffs Ratified the September Agreements and September Collateral Transfer

In addition to waiving their challenges to the validity of the September Agreements on the grounds of lack of consideration and authority, Plaintiffs also forfeited them, along with the claims they now advance based on the implied covenant of good faith and fair dealing, by ratifying the documents and waiving any related claims for breach in their statements to and conduct before the bankruptcy court.

Where a party "does not promptly repudiate [a] contract or release, he will be deemed to have ratified it." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122 (2d Cir. 2001) (internal quotation marks omitted). And a party may ratify a contract "by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *Id.* at 122–23 (internal quotation marks omitted). Similarly, "where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accept the benefits of the contract, such continuing performance constitutes a waiver of the breach." *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 342 (S.D.N.Y. 2008).

Here, the Court finds that once Lehman filed for bankruptcy – availing itself of the protection of the Bankruptcy Code and proceeding under the guidance of a bankruptcy court judge – it was put to a choice: either receive the benefits of its

prior agreement with JPMC, most notably the extension of intraday credit, or argue that these agreements were invalid or had been breached for the reasons Plaintiffs later articulated in Count 35 and 47 of their first amended complaint. *See In re Century/ML Cable Venture*, 294 B.R. 9, 32 (Bankr. S.D.N.Y. 2003) (noting that the Bankruptcy Code's purpose is to protect the right of debtors via bankruptcy court proceedings). Indeed, Plaintiffs here had every opportunity to explain to the bankruptcy court that JPMC was *obligated* to extend credit to LBI and had *wrongfully* extracted $8.6 billion in collateral from Lehman under the allegedly invalid September Agreements. They did not do so. Instead, Lehman argued in its motion for a Comfort Order that JPMC extended credit "in its *sole discretion*" and that the collateral JPMC requested was "*completely understandable*." (Def. MSJ 56.1 Stmt. ¶ 45.) At no time did LBHI suggest that Lehman was operating under the thumb of a coercive business arrangement, argue that the September Agreements were legally infirm – for lack of consideration, authority, or any other reason – or request that the court claw back funds transferred pursuant to JPMC's prior collateral demands. Moreover, Lehman continued to accept intraday credit from JPMC during the period leading up to Lehman's bankruptcy and through the bankruptcy proceedings.

Faced with this reality, Plaintiffs now argue that their Comfort Order motion "expressly *reserved* LBHI's right to challenge the September Agreements" at a later date. (Pl. MSJ Opp'n at 37.) In fact, it did nothing of the kind. To the contrary, the motion made no mention whatsoever of a contemplated claim to invalidate the September Agreements or September collateral transfers or to assert a breach of contract; instead, Lehman stated that it

"[did] not seek an order of [the bankruptcy c]ourt validating Chase's guarantees of Lehman or the liens securing such guarantees." (Pl. MSJ 56.1 Stmt. ¶ 18.) The actions of Lehman before the bankruptcy court, therefore, are not consistent with the behavior required of a party seeking to promptly repudiate an invalid agreement and transaction. *VKK Corp.*, 244 F.3d at 122–23.

Since the Court finds no infirmity with the September Agreements, and since – in any event – Plaintiffs have waived their right to challenge their enforceability or assert a belated claim for breach, the Court grants judgment as a matter of law in favor of Defendant on Count 35, which seeks a declaratory judgment invalidating the September Agreements, and Count 47, which alleges a breach of the implied covenant of good faith and fair dealing under the September Agreements.

## C. LBHI's Collateral Pledge Was Not the Product of Fraud and Does Not Merit Equitable Relief

Plaintiffs further argue that, regardless of whether JPMC was permitted to cease extending credit and request additional collateral, JPMC fraudulently induced LBHI to extend collateral and LBHI engaged in an fraudulent conveyance of LBHI's assets aimed to ensure that JPMC's loans would be repaid.

### 1. JPMC Did Not Fraudulently Induce LBHI to Extend Collateral

Plaintiffs allege in Count 49 that JPMC fraudulently induced LBHI to extend an additional $5 billion of capital to secure its intraday credit advances on September 12, 2008 by promising to return those funds at the end of the trading day. Plaintiffs note that JPMC did not, in fact, return the $5

billion and further claim that JPMC had no intention of returning the cash to LBHI at the time of its fraudulent promise.

To prove fraudulent inducement under New York law, a plaintiff must establish "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." *Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir. 1986) (quoting *Brown v. Lockwood*, 432 N.Y.S.2d 186, 193 (N.Y. 2d Dep't 1980)). There is unquestionably a dispute between the parties regarding whether JPMC misstated a material fact: several Lehman witnesses claim that JPMC induced Lehman to extend $5 billion in collateral to JPMC based on a promise that those funds would be returned to Lehman by the close of business on September 12, 2008, whereas JPMC's witnesses deny ever making such a promise. (*See, e.g.*, Pl. MSJ 56.1 Stmt. ¶¶ 30, 87, 90, 142, 146, 152–55.) A dispute of this nature could not ordinarily be resolved on summary judgment. But here the contractual agreements between the parties clearly establish that Plaintiffs could not have reasonably relied on JPMC's alleged promise.

The September Security Agreement states that LBHI "may upon three days written notice to [JPMC] transfer any security" and further provides that "[n]o provision hereof shall be modified or limited except by written instrument expressly referred hereto and to the provision so modified or limited." (September Security Agreement at 3.) Under the plain terms of the September Security Agreement, any funds held as collateral by JPMC could be returned to LBHI *only* upon three days' *written* notice, and oral statements allegedly made by JPMC on the September 12, 2008 phone call could not alter the parties' written agreement. *See John St. Leasehold LLC v. Fed. Deposit Ins. Corp.*, No. 95-cv-10174 (JGK), 1996 WL 737196, at *7 (S.D.N.Y. Dec. 24, 1996) ("Where a written agreement expressly bars oral modification of the agreement, a party cannot argue that it reasonably relied on an oral modification for purposes of establishing a fraud . . . claim."). Accordingly, JPMC's oral promise to return funds, assuming it occurred, could not raise a genuine issue of material fact with respect to Plaintiffs' claim for fraudulent inducement, since Plaintiffs' reliance is an essential element of that claim and foreclosed as a matter of law. Accordingly, the Court finds for Defendant on Count 49. The Court also grants summary judgment for Defendant on Count 42, which alleges that JPMC breached the Clearance Agreement in refusing to return the $5 billion of collateral to LBHI at the end of the trading day on September 12. Once again, the Clearance Agreement fully contemplated JPMC's power to hold collateral against its triparty repo advances, and an oral promise could not alter its terms. (Clearance Agreement at 19–20 (permitting modification only by signed writing).)

2. There Is Insufficient Evidence of LBHI's Actual Intent to Defraud Creditors

Plaintiffs further argue that the September Agreements and all collateral transfers should be avoided as actual fraudulent conveyances. (Pl. MSJ Opp'n at

21–25.)[5] Specifically, they allege that the agreements were executed by LBHI for the benefit of JPMC, in haste, during a turbulent financial time, and that the collateral transfers occurred on a rushed basis, during a financial meltdown, when Lehman entities were insolvent or undercapitalized, for no consideration. (First Amended Complaint ¶¶ 87–108.)

Under 11 U.S.C. § 548, a transfer made or obligation incurred within two years of the petition date may be avoided as intentionally or "actually" fraudulent if it was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." 11 U.S.C. § 548(a)(1)(A). To show an actual fraudulent conveyance, Plaintiffs must demonstrate that the *debtor* – here, LBHI – had an affirmative intent to hinder delay or defraud – *i.e.*, "something more than just an intent to prefer one creditor over another;" rather, the debtor must have "had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends." 5 Collier on Bankruptcy ¶ 548.04[1][a] (16th ed. 2013) [hereinafter Collier].[6]

Since "[f]raudulent intent is rarely susceptible to direct proof," courts have recognized the existence of certain "badges of fraud" that may be used to circumstantially establish the requisite actual intent to defraud. *In re Kaiser*, 722 F.2d at 1582; *see also In re Nazzaro*, No. 810-ap-8500, 2013 WL 145627, at *10 (Bankr. E.D.N.Y. Jan. 14, 2013) ("Proving actual intent to defraud is difficult because a debtor is unlikely to admit to fraudulent intent."). In fact, in his prior order on Defendant's motion to dismiss, Judge Peck identified a number of alleged badges of fraud that, if supported by evidence unearthed in later discovery, might "create a strong inference of fraudulent intent." *In re Lehman Bros. Holdings, Inc.*, 469 B.R. 415, 447 (Bankr. S.D.N.Y. 2012).

Plaintiffs allege in Counts 1 and 3 that various "badges of fraud" support the inference that LBHI intended to defraud its creditors when it provided JPMC with additional collateral under the September Agreements. They further argue that JPMC's intent to interfere with other creditors' rights to serve its own ends should be imputed to LBHI. (Pl. MSJ Opp'n at 24.) The Court will address Plaintiffs' imputation arguments first, and then consider whether the badges of fraud articulated by Plaintiffs support an inference of actual intent to defraud creditors.

"Some courts . . . recognize that when a transferee is in a position to dominate or control the debtor's disposition of the

---

[5] Plaintiffs no longer contend that LBHI "intend[ed] to hinder, delay, or defraud [its] creditors" when it "entered into the *August Agreements*" as alleged in Count 2 of their complaint (Pl. MSJ 56.1 Stmt. ¶ 140 (emphasis added)). Accordingly, the Court finds for Defendant on Count 2.

[6] Plaintiffs claim to have demonstrated that "LBHI knew or should have known that the natural and obvious consequences" of signing the September Agreements and transferring the September Collateral "would be to hinder or delay Lehman's other creditors." (Pl. MSJ Opp'n at 22.) However, Plaintiffs misunderstand the legal standard applicable to their conveyance claim, which requires an actual intent to hinder, delay, or defraud. *MFS/Sun Life*

*Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 936 (S.D.N.Y. 1995) ("There is no indication that the courts of New York or the other relevant jurisdictions have imported the concept of foreseeability into an analysis of actual intent to defraud. Such a standard, though appropriate where culpability is based on negligent conduct, is incompatible with the concept of actual fraud.").

property, the transferee's intent to hinder, delay or defraud will be imputed to the debtor/transferor." Collier ¶ 548.11[2]. However, "in the typical case [under New York law] the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of *ownership, executive office or other insider role*." *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 447 (Bankr. S.D.N.Y. 2001) (emphasis added) (citing *Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats)*, 144 B.R. 451, 459 (Bankr. D.N.D. 1992) ("This situation normally arises . . . where the transferee is the Debtor's sole or dominant shareholder. . . . The cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee." (citations omitted)). *In re Adler* clarifies that JPMC's strong financial leverage over Lehman, as alleged by Plaintiffs, is insufficient to establish that JPMC dominated or controlled LBHI for purposes of imputing JPMC's intent to LBHI. Rather, the Court's analysis regarding imputation must turn on *actual control* of Lehman, which Plaintiffs do not even allege. Specifically, Plaintiffs do not contend that Defendant exercised formal control over Lehman or became an insider so embedded within Lehman that it functioned as an *alter ego* of the company. Plaintiffs merely argue that JPMC's insistence on additional collateral to support substantial lending activity presented the company with a difficult decision, *not that JPMC served as Lehman's decision-maker*. Accordingly, the Court declines to impute JPMC's intent, whatever it may have been, to Lehman for purposes of analyzing the actual intent of the debtor under Section 548. *See id.* (refusing to impute intent between companies bound to each other by critical financing contracts without further indicia suggesting legal

control). Instead, the Court will examine the badges of fraud alleged by Plaintiffs with respect to *LBHI's*, and not *JPMC's*, intent.

Plaintiffs specifically point to four badges of fraud that they believe generate a genuine dispute of material fact as to LBHI's actual intent to defraud its creditors. First, Plaintiffs allege that JPMC "gave LBHI inadequate consideration, if any, in return for the September Agreements or $8.6 billion" transfers. (Pl. MSJ Opp'n at 23.) This assertion, of course, turns on the already refuted assumption that Defendant had an obligation to extend credit to LBI pursuant to the existing Clearance Agreement. In light of the Court's prior finding that JPMC had no such obligation, it becomes clear that the consideration for the $8.6 billion in collateral was the extension of credit in the tens of billions of dollars to LBI at a time when its very survival required such infusions of credit. As such, Plaintiffs have failed to establish that JPMC provided "inadequate consideration" for the collateral, much less present a "badge of fraud" supporting an inference of fraudulent intent.

Second, Plaintiffs point to the "lack of arms-length" relationship between JPMC and LBHI and assert that JPMC's "unequaled leverage as [LBHI's] primary clearing bank" enabled it to "dictate terms to Lehman regarding cash transfers and collateral agreements." (*Id.*) This fact, however, is evidence of sharp elbows, not inter-relatedness. "The relationships here were significantly different from the family relationships – a husband conveying property to his wife, for example, or a mother conveying property to her son – one typically sees in fraudulent conveyance cases," and the transactions did not "involve sham or dummy corporations or fictitious parties." *Lippe v. Biarnco, Corp.*, 249 F. Supp. 2d 357, 382 (S.D.N.Y. 2003). Rather,

the evidence reflects that JPMC drove a hard bargain, consistent with an arms-length relationship, not that LBHI engineered a sweetheart deal designed to interfere with creditors. *See In re Abramov*, 329 B.R. 125, 131–32 (Bankr. E.D.N.Y. 2005) (determining whether a transaction was at "arms-length" by assessing whether adequate consideration was given). Therefore, no reasonable juror could conclude that LBHI engaged in fraud solely due to the relationship that existed between LBHI and JPMC.

Third, Plaintiffs argue that the "secrecy, haste, and unusual nature" of the parties' September Agreements and transfers support an inference of LBHI's fraudulent intent at the time it transferred additional collateral to JPMC. They urge that "the new agreements, and the $8.6 billion in transfers [were] concealed from the public" at a time immediately prior to a critical earnings call, and that Lehman "was including the $8.6 billion in transfers in its available liquidity pool, which Lehman published to provide comfort to creditors about its ability to fund itself." (Pl. MSJ Opp'n at 23.) Significantly, Plaintiffs do not argue that LBHI acted to hide information from its investors or published a disclosure that otherwise misstated then-current facts. Without these allegations or facts supporting them, there is a no clear indication that LBHI conducted its deal in "secrecy." Nonetheless, Plaintiffs argue that "haste" in LBHI's execution of the September Agreements and posting of the September Collateral suggests LBHI's intent to defraud. Plaintiffs' own allegations, however, confirm that JPMC insisted on haste as a condition for extending funding the next morning and that LBHI objected to the fast-turnaround. Accordingly, LBHI's "haste" also cannot support an inference that *LBHI* behaved with actual intent to defraud.

Fourth, and finally, Plaintiffs allege that "LBHI was in financial distress at the time of the challenged transfers." (*Id.*) This contention, though certainly borne out by the record, is insufficient to suggest fraud. While these transactions did not occur in the ordinary course of business, they were supported by legitimate and pressing business reasons. Indeed, there is nothing unlawful about a company transacting business during unusually difficult financial times in an attempt to prevent its own collapse. To find otherwise would place in question any contract executed during a financial downturn and invite upheaval in the financial markets.

Determining the existence of actual fraudulent intent is typically a question of fact that precludes summary judgment, *see Trustees of Hamilton College v. Cunningham*, 418 N.Y.S.2d 251, 254 (4th Dep't 1979), but it is clear on the basis of the record before the Court that the extensive discovery conducted in this matter has not uncovered facts sufficient to raise an inference of intent to defraud, and no reasonable juror could find that LBHI acted with such an intent as alleged in Counts 1 and 3. *See Lippe*, 249 F. Supp. 2d at 384. Accordingly, the Court grants summary judgment in favor of Defendant with respect to those Counts.

### D.  JPMC Had a Continuing Lien Over Lehman's $6.9 Billion

In Count 38, Plaintiffs request a declaratory judgment that JPMC has no lien over LBHI's $6.9 billion collateral pursuant to the August and September Agreements. Specifically, they allege that JPMC released any lien over the funds when it transferred the funds to its general ledger account. (Pl. MSJ Opp'n at 28.)

The lien provisions of the Clearance Agreement granted JPMC a security interest in assets held in certain Lehman accounts to secure JPMC's exposure on advances made to LBI. Accordingly, JPMC held a security interest over those funds that LBHI posted as collateral subject to JPMC's lien. Between September 9 and 12, 2008, LBHI deposited $6.9 billion into the Cash Account. (Def. MSJ 56.1 Stmt. ¶ 162; *see also* First Amended Complaint ¶ 66.) The parties agree that the collateral originally deposited by LBHI in the Cash Account was subject to JPMC's lien under the Clearance Agreement as later modified by the August and September Agreements. Plaintiffs argue, however, that JPMC forfeited its lien when it unilaterally transferred those funds from the Cash Account to the GL Cash Collateral Account. (Pl. PMSJ Mem. at 18–27; Def. MSJ 56.1 Stmt. ¶ 163; Pl. PMSJ 56.1 Stmt. ¶ 20.)

The September Security Agreement granted JPMC a "security interest in, and general lien upon and/or right to set-off of, the [LBHI] Security." (September Security Agreement at 2.) The "Security," in turn, is defined as: (i) "the Accounts, together with any security entitlements relating thereto and any and all . . . funds and/or other assets from time to time held in or credited to the Accounts or otherwise carried in the Accounts"; (ii) "any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or exchange for any or all of the then existing Security"; and (iii) "all proceeds of any and all of the foregoing Security." (*Id.* at 1.) The "Accounts" constituting JPMC's "Security" further included "all accounts of [LBHI] at [JPMC]" except for an "Overnight Account" not relevant to this claim. (September Security Agreement at 1–2; August Security Agreement at 3.)

The contract, however, provided an express mechanism for "release" of JPMC's security interest over funds in the Cash Account:

> Notwithstanding anything provided for herein, [LBHI] may upon three days['] written notice to [JPMC] transfer any Security, provided that the undersigned shall not transfer any such Security if [JPMC] has exercised . . . any of its rights under this Security Agreement or the Guaranty or in the event any DEFAULT has occurred . . . prior to the end of the three day notice period and upon any such transfer the security interest hereunder shall be released.

(September Security Agreement at 3.) The parties agree that LBHI never provided written notice to JPMC of its intention to transfer any of the Security prior to its default on September 15, 2008. (Pl. PMSJ 56.1 Cntrstmt. ¶ 9.) Accordingly, Defendant never "released" its lien over the $6.9 billion at issue. Indeed, Article 9 of the U.C.C., as adopted in New York, makes clear that a security interest in collateral "*continues*" following disposition unless the secured party "authorize[s] the disposition free of the security interest" or a particular provision of Article 9 terminates that interest. N.Y. U.C.C. § 9-315(a)(1) (emphasis added). Here, JPMC indisputably did not "authorize" the release of its lien on the collateral. Moreover, the official comment to U.C.C. § 9-332(b) notes that in the "case in which a bank debits an encumbered account and credits another account it maintains for the debtor," the transfer does not release a security interest. Accordingly, the lien did not release by operation of law.

Nonetheless, Plaintiffs argue that JPMC forfeited its lien over the funds by executing a unilateral *transfer* of funds not specifically authorized by the parties' agreements. Specifically, they argue that the September Security Agreement grants a lien over only LBHI's accounts at JPMC and the funds "from time to time" contained in those accounts, and thus JPMC's lien was "extinguish[ed]" when it transferred those funds from an account where LBHI had the practical, if not legal, right to withdraw funds to the GL Cash Collateral Account where only JPMC could make a withdrawal. (Pl. PMSJ Mem. at 18–21.)

Under New York law, when an agreement containing a security interest is "clear and complete, the writing should be enforced according to its terms." *In re Adirondack Timber Enter., Inc.*, 2010 WL 1741378, at *3 (Bankr. N.D.N.Y. Apr. 28, 2010). Accordingly, "in the absence of any ambiguity, the court looks solely to the language used by the parties to discern the contract's meaning" as a matter of law. *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004). Here, the September Security Agreement specifically defines "Security" to include "all *proceeds* of any and all of the foregoing Security." (September Security Agreement at 1 (emphasis added).) Although the agreement does not specifically define the term "proceeds," it refers the Court to the U.C.C. for guidance. (September Security Agreement at 2.) The U.C.C. interprets "proceeds" broadly to include "whatever is acquired upon the sale . . . exchange, or other disposition of collateral" and "rights arising out of collateral." N.Y. U.C.C. § 9-102(a)(64)(A) & (C). Moreover, the U.C.C.'s official comment clarifies that a transfer of *all* funds maintained in an account subject to a security interest – and not just the interests or dividends accrued on

those funds – is a cognizable transfer of "proceeds." U.C.C. § 9-332, cmt. 2, ex. 2. The U.C.C. explains via example that, "inasmuch as [a] deposit account maintained with [a third-party bank] constitutes the proceeds of the deposit account at [the secured lender bank], [the secured lender]'s security interest would attach to that account as proceeds." *Id.* Indeed, the example does not limit its terms to a debtor's transfer, as opposed to a secured lender's transfer, or require that funds move to a third-party bank. Accordingly, when JPMC transferred collateral from the Cash Account to the GL Cash Collateral Account, JPMC's right of payment attached to the collateral in the later account as proceeds of the former.

Plaintiffs respond that, under New York U.C.C. § 9-203, an interest in security funds is "enforceable against the debtor and third parties with respect to the collateral *only if . . . the debtor has rights in the collateral or the power to transfer rights in the collateral to [a] secured party*." (Pl. PMSJ Mem. at 25 (quoting N.Y. U.C.C. § 9-203(b)(2) (emphasis added)).).[7] But, as evidence uncovered in discovery clearly demonstrates, LBHI *did have rights*, albeit limited rights, in the collateral held in the GL Cash Collateral Account. The affidavit of Michael Mego, the individual at JPMC with principal responsibility for managing the GL Cash Collateral Account, clearly states that the account held "cash collateral pledged by broker-dealers engaged in financing activities such as triparty repos" and was "not considered a proprietary account at JPMorgan." (Declaration of

---

[7] Plaintiffs also argue that a security interest cannot attach to property unless that property is described in the security agreement itself. (Pl. PMSJ Mem. at 19.) But the GL Cash Collateral Account, for the reasons discussed above, was an "account of [LBHI] at [JPMC]."

Michael Mego, dated Sept. 11, 2014, Doc. No. 52 ("Mego Decl.") ¶ 2.) Moreover, the funds in that account "would be debited from the GL Cash Collateral Account and credited back" to a dealer's demand deposit account "once [they were] no longer required to secure financing." (*Id.* ¶¶ 6–7.) Moreover, beyond JPMC's actual practice, the contractual agreements between the parties clearly provided LBHI with the legal right to return of the collateral upon three days' written notice once its financial obligations had been fulfilled. (September Security Agreement at 2.) Accordingly, Defendant's transfer of the $6.9 billion was accomplished in a manner consistent with the parties' agreements, as the GL Cash Collateral Account constitutes "proceeds" of the Cash Account that are subject to Defendant's security interest.

Because Defendant did not affirmatively release its lien and because Defendant maintained a secured interest, in any event, over the $6.9 billion as proceeds of the Cash Account, Defendant is entitled to judgment as a matter of law with respect to Count 38.

### E.  JPMC Is Not Liable for Conversion, Unjust Enrichment, or Constructive Trust

Several of Plaintiffs' remaining causes of action cannot continue in light of the Court's holding that the parties' agreements were valid, contemplated collateral transfers of the type provided, and permitted JPMC to move LBHI's collateral to the GL Cash Collateral Account.

For example, Plaintiffs allege in Counts 37 and 40 that JPMC wrongfully converted the $6.9 billion from the Cash Account and an additional $1.7 billion in money market fund collateral – along with additional collateral of an unspecified amount provided on prior occasions – to its own use. Under New York law, "[t]o establish a cause of action to recover damages for conversion, a plaintiff must show legal ownership or an immediate superior right of possession to a specific identifiable thing and must show that the defendant exercised an unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights." *Nat'l Ctr. for Crisis Mgmt., Inc. v. Lerner*, 938 N.Y.S.2d 138, 138–39 (2012) (citation omitted).  Since the Court finds that the parties' contract permitted Defendant to request the $6.9 billion in collateral and later transfer that collateral to the GL Cash Collateral Account without forfeiting its lien, the Court finds that JPMC held those funds pursuant to a valid lien and did not exercise "unauthorized dominion" over the $6.9 billion.  Accordingly, Defendant must prevail as a matter of law on Plaintiffs' conversion claims.

Plaintiffs further allege in Counts 36 and 39 that funds posted to JPMC from LBHI as collateral securing the parties' triparty repo agreements, including the $8.6 billion in funds discussed above, were wrongfully obtained and transferred and should not unjustly enrich JPMC.  In order to assert a claim for unjust enrichment, however, a litigant must put forth "proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  In this instance, Plaintiffs would have to demonstrate that JPMC was enriched at the expense of the *debtor*, LBHI.  Since JPMC merely maintained its lien over LBHI's collateral pursuant to the agreement between the parties, the Court has concluded that it was not.

Whether JPMC was preferred relative to other creditors, as Plaintiffs seek to show

(Pl. MSJ Opp'n at 32), is a separate issue irrelevant to its unjust enrichment claim. *See Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 599 N.Y.S.2d 816, 819 (1st Dep't 1993). Indeed, *Lines v. Bank of America National Trust & Savings Ass'n*, cited by Plaintiffs, is not to the contrary. 743 F. Supp. 176, 182 (S.D.N.Y. 1990). In that case, Judge John E. Sprizzo applied the doctrine of unjust enrichment to prevent a *double* recovery manufactured by a litigant's decision to draw down letters of credit that it knew "were intended as *replacement* collateral, not additional collateral" to secure the debt. *Id.* at 180 (emphasis in original). Here, the Court has already found that the funds obtained by JPMC are clearly additional collateral that did not unjustly enrich JPMC. Accordingly, the Court grants judgment as a matter of law for Defendant on Counts 36 and 39.

Finally, summary judgment is granted for Defendant on Count 32, in which Plaintiffs seek a constructive trust over the $5 billion obtained by JPMC with its alleged assurance that the funds would be returned. Specifically, a claim of constructive trust under New York law requires Plaintiffs to show unjust enrichment. *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d. Cir. 2004); *David v. Rabuffetti*, No. 08-cv-5647 (RJS), 2011 WL 1346997, at *6 (S.D.N.Y. Mar. 30, 2011). Since Plaintiffs have failed to do so here, this claim must also be dismissed.

### F. Plaintiffs' Remaining Remedial Claims Cannot Continue Without Their Corresponding Substantive Counts

Since Plaintiffs' remaining claims – including those for turnover, transfer recovery, and claim disallowance – are remedial and require the Court to find at least a dispute of material fact with regard to JPMC's collateral transfers and the validity of the lien, the Court grants summary judgment for Defendant with respect to counts 4, 25, 27, and 31. *See, e.g., In re Colonial Realty Co.*, 980 F.2d 125, 131 (2d Cir. 1992) (turnover); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 33 (S.D.N.Y. 2013) (transfer recovery); *In re Metiom, Inc.*, 301 B.R. 634, 641–42 (Bankr. S.D.N.Y. 2003) (§ 502(d) claim disallowance).

### G. Genuine Issues of Fact Remain Regarding Plaintiffs' Claims of Voidable Setoff and Violation of the Automatic Stay

Plaintiffs claim that, because Lehman was insolvent in the days leading up to its bankruptcy, the September Transfers should be avoided as wrongful transfers made for the purposes of obtaining a right to set off in violation of Section 553(a)(3) of the Bankruptcy Code or as transfers designed to otherwise improve JPMC's credit position with respect to LBHI in violation of Section 553(b) of the Bankruptcy Code. (First Amended Complaint ¶¶ 232–37, 243–49.) Additionally, in Count 33, Plaintiffs allege that JPMC violated the Bankruptcy Code's automatic stay provision when it applied funds comprising the collateral under the September Agreements to set off its own claims against the LBHI estate arising from *other* agreements between the parties including derivative contracts, securities lending agreements, and repurchase agreements with LBHI affiliates. (Pl. MSJ Opp'n at 29; Pl. MSJ 56.1 Stmt. ¶ 167; Pl. PMSJ 56.1 Stmt. ¶ 24 (naming only derivative contracts); First Amended Complaint ¶¶ 266–69.)

As a general matter, a creditor is precluded by the automatic stay from exercising its setoff rights without first obtaining bankruptcy-court approval. *See In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 834 (Bankr. S.D.N.Y. 2010). A

creditor is also generally precluded from incurring a debt that has the effect of engineering a right to setoff and preferring their claims over others. *See, e.g.*, 11 U.S.C. § 553; *In re Bennett Funding Grp., Inc.*, 146 F.3d 136, 140 (2d Cir. 1998).

Defendant argues for summary judgment on Counts 26, 28, and 33, however, on the sole grounds that its actions are protected by safe harbor provisions. To be sure, Section 362 of the Bankruptcy Code, upon which Plaintiffs' claim relies, contains safe harbors insulating transactions from later judicial scrutiny for financial institutions exercising their "contractual rights" under "any security agreement or arrangement or other credit enhancement forming a part of or related to" a protected contract, 11 U.S.C. §§ 362(b)(6) (securities contract), 362(b)(7) (repurchase agreement), 362(b)(27) (master netting agreement). However, the parties' briefs and Local Rule 56.1 Statements do not provide sufficient detail regarding the circumstances surrounding the alleged setoffs to permit the Court to determine whether those transactions – if they are in fact setoffs – were subject to the safe harbor. Accordingly, the Court denies summary judgment on Counts 26, 28, and 33 as well as Counts 29 and 34, the associated remedial counts. *See Lehman*, 469 B.R. 415, 454 (Bankr. S.D.N.Y. 2012) ("Whether the safe harbors apply to protect [the] particular setoff[s presented in this matter] is a highly fact specific inquiry.")

## H. Judgment Regarding Plaintiffs' Claims of Equitable Subordination Is Premature

Plaintiffs allege in Count 30 that JPMC's claims should be subordinated because of its outrageous and inequitable conduct in seizing Lehman's remaining liquidity for its own use rather than waiting for Lehman to declare bankruptcy and proceeding through the bankruptcy court.

The doctrine of equitable subordination is codified in Section 510(c) of the Bankruptcy Code. 11 U.S.C. § 510(c). It authorizes a bankruptcy court to subordinate a claim where: (1) "[t]he claimant engaged in some type of inequitable conduct"; (2) "[t]he misconduct caused injury to the creditors or conferred an unfair advantage on the claimant"; and (3) "[e]quitable subordination of the claim is consistent with bankruptcy law." *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994) (quoting *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)). "Inequitable conduct is generally defined as either (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; or (3) the claimant's use of the debtor as a mere instrumentality or *alter ego*." *N.J. Steel Corp. v. Bank of N.Y.*, No. 95-cv-3071(KMW), 1997 WL 716911, at *4 (S.D.N.Y. Nov. 17, 1997) (citation omitted). The Court's analysis of these factors, however, differs "depending on the status of the creditor, specifically, whether the creditor acted as a[n] insider or an ordinary creditor." *Id.* at *15 (emphasis in original).

Courts have uniformly held that the Bankruptcy Code's definition of "insider" must be flexibly applied on a case-by-case basis. *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994). However, an "insider" must, in every case, exercise dominion and control sufficient to create a "merger of identity" to the point where the "creditor has become, in effect, the *alter ego* of the debtor." *Id.* at 500.

As stated above, Plaintiffs have not produced evidence to suggest that JPMC exercised control over Lehman sufficient to become, in effect, its *alter ego*. Indeed, Lehman's briefing does not even argue that JPMC functioned as an insider during the

relevant period, only that it was privy to various pieces of inside information. (*See* Pl. MSJ Opp'n at 32–33.) Accordingly, the Court finds that no reasonable juror could conclude that JPMC acted as an insider at Lehman. Consequently, JPMC must be considered as an "ordinary creditor" for purposes of Plaintiffs' equitable subordination claim.

Because an ordinary creditor does not owe a fiduciary duty to the debtor, it is unusual for a court to subordinate claims arising out of such arms-length dealings. *See 80 Nassau Assocs.*, 169 B.R. at 838. In the case of non-insider creditors, "the proponent of equitable subordination must show wrongful conduct involving fraud, illegality or some other breach of a legally recognized duty." *Id.* at 839. The law is clear, however, that "[t]he permissible parameters of a creditor's efforts to seek collection from a debtor are generally those with respect to voidable preferences and fraudulent conveyances proscribed by the Bankruptcy Act;" where these are not present, "there is generally no objection to a creditor's using his bargaining position, including his ability to refuse to make further loans needed by the debtor, to improve the status of his existing claims." *In re W.T. Grant Co.*, 699 F.2d 599, 610 (2d Cir. 1983). Here, as discussed above, the Court denied summary judgment to Defendant with respect to Plaintiffs' claims alleging voidable preferences under the bankruptcy code. Accordingly, Defendant's request for summary judgment on Count 30 requesting equitable subordination is also denied.

## I. There Are Genuine Issues of Fact Regarding Defendant's Counterclaims

Defendant also asserts counterclaims against Plaintiffs, alleging that Lehman encouraged JPMC to extend additional credit during Lehman's bankruptcy with false misrepresentations and omissions designed to assure JPMC that its advances would be repaid. Accordingly, Defendant asserts counterclaims against Lehman for fraud, aiding and abetting the fraud of LBI and Barclays, and indemnification for fees and expenses related to this matter.[8] Although the Bankruptcy Court did not decide Plaintiffs' motion to dismiss Defendant's counterclaims, the parties now request that the Court consider those counterclaims on summary judgment. (Pl. PMSJ Mem. at 33; Def. PMSJ Opp'n at 24.)

### 1. The Parties Dispute Whether LBHI Fraudulently Obtained Credit from JPMC

Defendant's Counterclaims 1 through 3 allege that Plaintiffs wrongfully misstated, or wrongfully omitted, key terms of LBHI's deal with Barclays in an effort to encourage JPMC to continue to extend capital during Lehman's final days. Among other misrepresentations, Defendant alleges that Lehman executives told Jane Buyers-Russo of JPMC on September 15, 2008 that "Barclays had committed to support LBI fully until the deal closed, including by providing overnight financing that would reduce or eliminate LBI's dependence on the Fed[eral Reserve] . . . at which point [JPMC] would be taken out of its position in full." (Amended Counterclaims ¶ 33.) JPMC alleges that Lehman knew at the time, in light of LBI's cash position and the illiquidity of the assets Barclays excluded from its transaction, that LBI's sale would not generate the cash necessary to pay off JPMC's advances and that JPMC would be left with outstanding claims secured by illiquid assets once LBI commenced

---

[8] Defendant's sixth counterclaim for unjust enrichment was voluntarily dismissed. (Def. PMSJ Opp'n at 23 n.30.)

liquidation proceedings. (Def. PMSJ Opp'n at 26.)

To prevail on a common law fraud claim in New York, Defendant must prove that (1) Plaintiffs made a material false representation; (2) Plaintiffs intended to defraud Defendant thereby; (3) Defendant reasonably relied upon the representation; and (4) Defendant suffered damage as a result of such reliance. *Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *see also Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 247 F. Supp. 2d 352, 364 (S.D.N.Y. 2002) ("New York law requires [the] same elements for fraudulent misrepresentation and fraudulent inducement."). "Alternatively, instead of an affirmative misrepresentation, [Defendant's] fraud cause of action may be predicated on acts of concealment where [Plaintiffs] had a duty to disclose material information." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (2003); *see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 123 (2d Cir. 1984).

As an initial matter, Plaintiffs briefly argue that Defendant is estopped from litigating its fraud claims based on proceedings in litigation between Lehman and Barclays in *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 157 (Bankr. S.D.N.Y. 2011). (Pl. PMSJ Mem. at 37 & n.72.) Since Defendant was not a party to that prior suit and had no opportunity to litigate there, collateral estoppel does not attach. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010) (listing the elements of collateral estoppel, including that "the party had a full and fair opportunity to litigate the issue"). Alternatively, Plaintiffs assert that JPMC waived its fraud claims by not raising them at the bankruptcy court's sale hearing

discussing the then-proposed Barclays transaction. (Pl. PMSJ Mem. at 37.) However, the only question before the bankruptcy court at the sale hearing was whether there was a "good business reason" for the Barclays-Lehman transaction. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (stating the legal standard for the bankruptcy court's review). Accordingly, JPMC's complaints of fraud were entirely irrelevant to the proceeding and JPMC can hardly be said to have waived them with its silence.

Plaintiffs argue on the merits that these counterclaims should be denied since "reliance on predictive statements of what a third party will do in the future is unreasonable as a matter of law." (Pl. PMSJ Mem. at 34.) Clearly, "[a] speaker's representations about another party's future intentions or plans are generally construed as opinion, not fact, and hence cannot give rise to a claim of fraud or fraudulent inducement." *Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Commc'ns Inc.*, No. 92 Civ. 7862 (KMW), 1996 WL 312535, at *15 (S.D.N.Y. June 10, 1996). But JPMC does not allege mere predictive statements; instead, it alleges that Lehman representatives misrepresented the terms of the proposed deal with Barclays and concealed the information that securities financed by JPMC were excluded from the Barclays deal and would remain behind in LBI after the sale from JPMC. Such statements of a present fact are actionable misrepresentations upon which a party may have reasonably relied. *See Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 263–64 (2d Cir. 2010) (summary order); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992). Here, there is substantial evidence in the record indicating a genuine dispute of material fact regarding whether Lehman

actually made misstatements regarding the then-existing terms of the LBHI-Barclays deal and whether those statements induced reliance on the part of JPMC. (Def. PMSJ 56.1 Stmt. ¶¶ 43, 46, 68; Def. PMSJ 56.1 Cntrstmt. ¶¶ 92, 94, 99.) The Court, therefore, denies Plaintiffs' summary judgment with respect to Counterclaims 1 through 3.

Having failed to demonstrate that they merit summary judgment on Defendant's primary fraud claims, Plaintiffs argue that Defendant has put forth no evidence to suggest that LBHI aided and abetted the fraud of others. (Pl. PMSJ Mem. at 36–37.) Their contention is incorrect. Indeed, Defendant argues that Barclays consciously concealed its decision not to continue financing low-value securities – like RACERS – until JPMC facilitated the transfer of other replacement securities, and that LBHI facilitated that fraud by assuring JPMC that it would be repaid for its post-bankruptcy advances in full to induce further extensions of JPMC credit. (Def. PMSJ 56.1 Cntrstmt. ¶¶ 32–39.) Moreover, there is ample evidence suggesting that LBHI took great pains to ensure that undesirable assets were excluded from the Barclays sale, leaving them behind to cover the debts owed to creditors like JPMC. (*Id.* ¶¶ 73–75.) In light of the dispute, the Court also denies summary judgment on Counterclaim 5, which alleges that LBHI aided and abetted Barclays's fraud.

Finally, the Court denies summary judgment with respect to Counterclaim 4, which alleges that LBHI aided and abetted LBI's fraud in procuring credit from JPMC with the present intention not to repay JPMC's advances. On their motion, Plaintiffs argue for dismissal on the sole ground that, since the representatives of LBHI and LBI are one and the same, the

aiding and abetting count is duplicative and should be dismissed. (Pl. PMSJ Mem. at 36–37.) A factual question remains, however, regarding whether the corporate officers were acting in their capacity as LBI or LBHI employees when they perpetrated the alleged fraud. Accordingly, the Court must postpone any determination of duplication of substantive claims, or their resulting damages, and deny summary judgment.

## 2. Judgment as a Matter of Law on Defendant's Claim for Indemnification Is Premature

Defendant's Counterclaims 7 and 8 argue that JPMC should be indemnified by Lehman for its fees and expenses incurred in this action based on the contractual provisions in the Clearance Agreement and the Custodial Undertaking, which provided that Lehman would "indemnify [JPMC] and hold [it] harmless against any and all losses, claims, damages, liabilities or actions to which [it] may become subject," including provision for reimbursement of attorneys' fees. (Amended Counterclaims ¶ 157 (quoting the Clearance Agreement); *see also id.* ¶ 167 (quoting the Custodial Undertaking).)

Because the Court cannot determine at this time whether Plaintiffs will carry their burden with respect to claims of "willful misconduct" carved out of the parties' indemnification agreements (Pl. PMSJ Mem. at 38 (noting the carve outs in the relevant contracts); Def. PMSJ Opp'n at 40 (same)), summary judgment on this claim is premature and denied.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is denied with respect to Counts 26, 28, 29,

30, 33, and 34; in all other respects, Defendant's motion is granted. Plaintiffs' motion for partial summary judgment is denied. The Clerk of the Court is respectfully directed to terminate the motions located at docket numbers 49 and 55.

It is further ordered that the parties shall submit a joint letter to the Court by October 16, 2015 setting forth proposed next steps in this action, including counsels' availability for trial and the prospects for settlement.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2015
       New York, New York

        *       *       *

Plaintiff Lehman Brothers Holdings Inc. is represented by Joseph D. Pizzurro, L. P. Harrison III, Michael J. Moscato, and Peter J. Behmke of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178.

Plaintiff Intervenor, the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. is represented by Andrew J. Rossman, James C. Tecce, Erica P. Taggart, and Christopher D. Kercher of Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010.

Defendant is represented by Paul Vizcarrondo, Jr., Harold S. Novikoff, Marc Wolinsky, Amy R. Wolf, Douglas K. Mayer, Ian Boczko, and Emil A. Kleinhaus

of Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/2015